# Exhibit A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| In re CASSAVA SCIENCES, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) | Originating No. 1:21-cv-00751-DAE (W.D. Tex.) |
| This Document Relates To: | | CLASS ACTION |
| ALL ACTIONS. | | DECLARATION OF KEVIN A. LAVELLE IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS FROM NON-PARTY DR. HOAU-YAN WANG |

- 1 -

I, Kevin A. Lavelle, declare, under penalty of perjury:

1.     I am a member of the law firm of Robbins Geller Rudman & Dowd LLP, the State Bar of California, and am lead counsel for lead plaintiff Mohammad Bozorgi.  I submit this declaration in support of Plaintiffs' Motion to Compel the Production of Documents from Non-Party Dr. Hoau-Yan Wang.

2.     Attached is a true and correct copy of the following exhibits:

Exhibit 1:   *U.S. v. Hoau-Yan Wang*, Criminal No. TDC24CR211, Indictment (D. Md. June 27, 2024);

Exhibit 2:   Cassava Sciences Inc., Current Report (Form 8-K) (July 1, 2024);

Exhibit 3:   *SEC v. Cassava Scis., Inc.; Remi Barbier; Lindsay Burns*, Case No. 24-cv-1150, ECF 1 (W.D. Tex. Sept. 26, 2024) (SEC complaint);

Exhibit 4:   Hou-Yan Wang, Administrative Proceeding File No. 3-22210, U.S. Securities and Exchange Commission;

Exhibit 5:   Press Release; U.S. Securities and Exchange Commission, *SEC Charges Cassava Sciences, Two Former Executives for Misleading Claims about Alzheimer's Clinical Trial* (Sept. 26, 2024);

Exhibit 6:   Email Chain of Conversations between Kevin Lavelle and Counsel for Dr. Wang ranging from September 6, 2023 to October 15, 2024;

Exhibit 7:   *In re Cassava Scis., Sec. Litig.*, 1:21-cv-00751, ECF 104 (W.D. Tex. May 11, 2023) (motion to dismiss order);

Exhibit 8:   June 13, 2023 Subpoena to Produce Documents Addressed to Dr. Wang and Request Nos. 1-57;

Exhibit 9:    Non-Party Hoau-Yan Wang's Objections and Responses to Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action;

Exhibit 10:   August 13, 2021 Grand Jury Subpoena for Records Addressed to Dr. Wang from the U.S. Department of Justice.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 15, 2024.

_s/ Kevin A. Lavelle_
KEVIN A. LAVELLE

4873-8724-2234.v1

# EXHIBIT 1



USDC- GREENBELT
'24 JUN 27 PM 5:51

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA    *

         *

   v.        *    CRIMINAL NO. TDC24CR211

         *

HOAU-YAN WANG,    *    **(Major Fraud Against the United**

         *    **States, 18 U.S.C. § 1031;**

   **Defendant.**    *    **Wire Fraud, 18 U.S.C. § 1343;**

         *    **False Statements, 18 U.S.C. § 1001;**

         *    **Principals, 18 U.S.C. § 2;**

         *    **Forfeiture, 18 U.S.C. § 981(a)(1)(C))**

         *

         *

       *******

## INDICTMENT

The Grand Jury for the District of Maryland charges:

## I.    GENERAL ALLEGATIONS

At all times relevant to this Indictment:

### A. The Defendant

1.    Defendant HOAU-YAN WANG resided in Philadelphia, Pennsylvania, and worked as a tenured professor in the School of Medicine at University 1. University 1 was a New York State public university that received state and federal funds. In addition to his teaching duties, WANG ran a laboratory at University 1 that conducted scientific research, including in the area of neuroscience. WANG obtained significant grant funding to pay for certain expenses in his laboratory at University 1, including salaries and laboratory supplies.

### B. Company 1

2.    Company 1 was a publicly traded biopharmaceutical company based in Austin, Texas. Company 1 focused on the development of Drug A as a potential treatment for Alzheimer's

disease. Company 1 also worked on the development of Test A, a potential diagnostic test used to detect Alzheimer's disease in a biological sample, including blood.

3.      Beginning in at least 2005, WANG was a paid advisor and consultant to Company 1. In his role as an advisor and consultant, WANG served as a scientific investigator on various projects and helped Company 1 secure federal grant funding for scientific research. WANG worked on the development of both Drug A and Test A with Company 1.

### C. The National Institutes of Health

4.      The U.S. National Institutes of Health ("NIH"), part of the U.S. Department of Health and Human Services, was the nation's medical-research agency and the largest public funder of biomedical research in the world. Through the annual appropriations process, Congress provided taxpayer funding to NIH to enable, among other things, grant programs designed to support biomedical research for a variety of projects in order to enhance life and reduce illness and disability. NIH was comprised of different components that each had a specific research agenda, often focused on particular diseases or body systems. One such component, the National Institute on Aging, was established to improve the health and well-being of older adults, including through funding for Alzheimer's disease and related dementias research. NIH was headquartered in Bethesda, Maryland, within the District of Maryland.

5.      NIH published grant policies, guidelines, and notices of funding opportunities. Each year, NIH set aside funding specifically to support small-business research and development, including for businesses like Company 1. Each funding-opportunity announcement typically cited to policy which advised applicants that anyone who knowingly made or presented any false, fictitious, or fraudulent statements, representations, or claims in seeking NIH funding could be criminally prosecuted. That policy also required that all records pertinent to the grant be retained

for a period of three years from the date the annual financial report was submitted to NIH following the disbursement of funds.

6.      In order to seek NIH funding in response to a specific funding opportunity, an eligible applicant was required to submit a proposal that contained, among other things, a research plan, a description of the site locations, profiles of key personnel, and a detailed budget. As part of the research plan and/or personnel profiles, an applicant could include the results of any relevant laboratory, animal, or human testing of a drug and any relevant publications in scientific journals authored by the grant applicant. Grant applications were submitted to NIH electronically and retrieved through computer servers located within the District of Maryland up until in and around April 2020.

7.      NIH's grant-approval process involved multiple steps and rounds of review within NIH, in consultation with an external peer-review panel, and included evaluations of the applications across a number of metrics. Once awarded, each project was funded in different phases that were established under NIH policies, along with funding caps for purposes of any single grant award. However, those caps could be exceeded through separate applications for grants for administrative supplements or grant renewals, which were separately evaluated and approved by NIH.

8.      NIH relied upon truthful representations from an applicant in proposals and related documents in making its funding decisions.

**D. Western Blot Technique**

9.      Western blotting was a laboratory technique that was used to detect a specific protein or the charge of a protein in a biological sample, often reflected in visible "bands" that appeared in the experiment. Results for this technique were captured either by developing an

image similar to an x-ray on physical film or an electronic scan. In each image, the thickness and/or darkness of a band corresponded to the relative amount of protein present in a particular sample, which could be quantified using a process called densitometry. The presence or absence of a band, the measurement of how dark or light a band appeared, and the location the band were the primary scientific results of a Western blot experiment and were typically used as points of comparison between tested samples.

## II.    THE SCHEME TO DEFRAUD

### A.  Overview of the Scheme

10.    From in and around May 2015 and continuing through at least in and around April 2023, WANG fraudulently caused to be submitted, through Company 1, grant proposals to NIH based upon purported scientific research involving Drug A and Test A, including Western blotting. As a result of the applications containing WANG's false and fraudulent representations, NIH awarded Company 1 approximately $16 million in funding from approximately 2017 to 2021. NIH's payments were initiated electronically to Company 1 from NIH facilities in the District of Maryland at periodic intervals, and WANG was indirectly paid from these proceeds. WANG used NIH grant funds provided indirectly through University 1 for, among other things, his salary, the salaries of his research assistants, and laboratory supplies and equipment, including to support his continued research for Company 1.

11.    WANG's work under these grants was related to the early phases of Company 1's development of Drug A and Test A, typically referred to by the U.S. Food and Drug Administration (FDA) as Phase 1 and Phase 2.

12.    WANG further received a stock-option agreement and a bonus plan from Company 1, each of which was tied to Company 1's stock performance.

4

### B. Purpose of the Scheme

13.     It was the purpose of the scheme for WANG to fraudulently obtain NIH funding to enrich himself through continued and future compensation by (a) making materially false, fraudulent, and misleading statements to NIH relating to his scientific research underlying Drug A and Test A, and (b) concealing and causing the concealment of the true facts about said research.

### C. Manner and Means of the Scheme

14.     The manner and means by which WANG sought to accomplish the purpose of the scheme included, among others:

a.  WANG contributed to, reviewed, approved, and caused to be submitted to NIH grant applications and other documents that contained materially false, fraudulent, and misleading statements about his scientific research in order to obtain funding for himself and Company 1.

b.  WANG made, and caused to be made, materially false, fraudulent, and misleading statements to NIH about, among other things: (i) the mechanism by which Drug A was designed to treat Alzheimer's disease; (ii) the improvement of certain indicators associated with advanced Alzheimer's disease neurodegeneration in patients treated with Drug A; (iii) the mechanism by which Test A was designed to detect Alzheimer's disease; and (iv) the nature and scope of his scientific experiments, including the truth and accuracy of the images and information provided as representations of the underlying scientific experiments.

c.  WANG fabricated and falsified the results of his scientific research to NIH, including Western blotting, such that the results were not accurately represented in the research record. He did so by, among other things, manipulating data and images of Western

blots to artificially add bands, subtract bands, and change their relative thickness and/or darkness, and then drawing conclusions about the presence or absence of the bands and their relative thickness and/or darkness that were not based upon truthful scientific testing.

d. WANG authored, reviewed, approved, and caused to be submitted to various scientific journals articles that contained materially false, fraudulent, and misleading statements about his scientific research and then cited their publication in NIH grant applications to fraudulently enhance the credibility of said research to NIH.

e. WANG provided materially false, fraudulent, and misleading images and statements to various scientific journals after publication to substantiate the statements about his scientific research made in articles he authored to conceal his involvement in the scheme.

f. WANG failed to keep original scientific data and failed to provide all the relevant data he possessed to the government, University 1, scientific journals, and others in order to conceal the scheme.

### D. Execution of the Scheme

*WANG Caused to be Submitted Materially False, Fraudulent, and Misleading Statements to NIH for the Purpose of Obtaining Funding*

Grant 1

15. Beginning in and around August 2016 through in and around June 2018, Company 1 submitted multiple applications in response to NIH funding announcements, for which it was awarded approximately $5,113,068 for the development of Drug A (collectively, "Grant 1"). The awarded projects included the initial project (two phases—the second of which did not require a separate application), a renewal, and two administrative supplements. For each of the awarded

Grant 1 projects, WANG caused Company 1 to submit applications that contained materially false, fraudulent, and misleading statements about his scientific research.

16.     These applications also cited to journal articles published by WANG, along with others, including a 2012 article and a 2017 article related to the development of Drug A.  Both of these articles contained images of Western blots that WANG fabricated, including images that were submitted as part of Grant 1 and other successful NIH grant applications.

<u>Grant 2</u>

17.     From in and around January 2018 through in and around June 2018, Company 1 submitted multiple applications in response to NIH funding announcements, for which it was awarded approximately $3,906,146 for the development of Drug A (collectively, "Grant 2").  The awarded projects included the initial project (both phases) and two administrative supplements. For each of the awarded Grant 2 projects, WANG caused Company 1 to submit applications that contained materially false, fraudulent, and misleading statements about his scientific research.

18.     For example, on or about January 12, 2018, in response to an NIH funding announcement, WANG caused to be submitted to NIH a certain funding proposal ("Proposal 1"). Proposal 1 listed WANG as a co- Investigator and included a budget request for $118,975 for the total cost of his anticipated work at University 1, including salary and benefits.  Proposal 1 contained false statements and material omissions concerning, among other things, a Western blot

purporting to show Drug A's mechanism of action, as depicted in Figure 1 of the submission:



**Fig. 1** The conformational states of FLNA immunopurified from control or AD postmortem brain were separated on pH3-10 isoelectric focusing gels and then Western blotted with anti-FLNA. [Drug A] incubation (1 nM) largely restored the conformation of FLNA to its non-AD state. n = 6. #p < 0.00001 vs. non-diseased FLNA conformation (pI 5.9) within group; #p < 0.00001 vs. respective FLNA pI in AD without [Drug A] (with or without alk phos).

WANG provided Figure 1 and accompanying draft language to Company 1 for the NIH applications. In truth and in fact, WANG fabricated the Western blot on the left side of Figure 1 and the corresponding densitometry data related to it in the bar charts on the right side of Figure 1. Proposal 1 also included citations to the same published articles as described above.

19.     In or around November 2020, WANG, along with others, published another article related to the development of Drug A in which WANG presented, among other things, fabricated Western blots that purported to support his scientific research. The article disclosed that the clinical trial and research described in the article were funded by a grant award that was funded by NIH pursuant to Proposal 1.

Grant 3

20.     On or about January 17, 2019, in response to an NIH funding announcement, WANG caused to be submitted to NIH a funding proposal for the development of Drug A. This proposal listed WANG's laboratory at University 1 as one of the locations for scientific testing and included a budget request for his anticipated work. This proposal included citations to the same 2012 and 2017 published articles and the same Figure 1 as described above.

21.     On or about May 5, 2020, based upon WANG's fraudulent proposal, NIH awarded Company 1 funding and subsequently disbursed approximately $2,499,896 ("Grant 3").

Grant 4

22.     On or about July 14, 2020, in response to an NIH funding announcement, Company 1 submitted to NIH a funding proposal for the development of Drug A. This proposal included citations to the same published articles and the same Figure 1 as described above, along with a citation to the 2020 published article described above.

23.     On or about May 10, 2021, based upon this proposal, NIH awarded Company 1 funding and subsequently disbursed approximately $2,710,220 ("Grant 4").

Grant 5

24.     On or about January 5, 2017, in response to an NIH funding announcement, WANG caused to be submitted to NIH a funding proposal for the development of Test A. This proposal listed WANG as a Principal Investigator, his laboratory at University 1 as one of the locations for scientific testing, and a budget request for $250,298 for the total cost of his anticipated work, including salary and benefits. This proposal included citations to the same 2012 and 2017 published articles as described above and referenced the results from the same Figure 1 as described above.

9

25.     On or about November 18, 2019, WANG caused to be submitted to NIH an additional funding proposal ("Proposal 2"). Proposal 2 also listed WANG as a co-Principal Investigator and his laboratory at University 1 as one of the locations for scientific testing. Proposal 2 included a citation to one of the published articles referenced above, additional Western blots fabricated by WANG, and other false statements and material omissions.

26.     On or about January 23, 2020, based upon WANG's fraudulent Proposal 2, NIH awarded WANG and Company 1 approximately $450,142. In total across these Grant 5 awards, WANG and Company 1 received approximately $1,855,233 ("Grant 5").

> *WANG Caused to be Submitted Materially False, Fraudulent, and Misleading Information to Scientific Journals for the Purpose of Enhancing the Credibility of his Scientific Research and Concealing his Involvement in the Scheme*

27.     WANG published, along with others, scientific journal articles related to the development of Drug A and Test A containing, among other things, Western blots fabricated by WANG that purported to support his scientific research, including in journal articles described above and cited in NIH funding proposals. After a number of these scientific journals communicated concerns raised about certain Western blot images created by WANG that were included in published articles in 2021, journals requested that WANG provide raw, uncropped copies of the Western blot images. In response, Company 1, on WANG's behalf, sent the journals additional Western blot images fabricated by WANG.

## III.     THE CHARGES

### COUNT 1
### Major Fraud Against the United States
### (18 U.S.C. §§ 1031(a) and 2)

28.     Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

10

29.    From in and around May 2015 and continuing through at least in and around April 2023, in the District of Maryland, and elsewhere, the defendant,

**HOAU-YAN WANG,**

did knowingly execute, and attempt to execute, a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that such pretenses, representations, and promises were false and fraudulent when made, in a grant, contract, subcontract, subsidy, guarantee, insurance, and other form of Federal assistance, the value of such grant, contract, subcontract, subsidy, guarantee, insurance, and form of Federal assistance, and any constituent part thereof, being $1,000,000 or more.

### Purpose of the Scheme and Artifice

30.    Paragraph 13 of this Indictment is realleged and incorporated by reference as though fully set forth herein.

### Description of the Scheme and Artifice

31.    Paragraphs 14 through 27 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

### Acts in Execution or Attempted Execution of the Scheme and Artifice

32.    On or about the date set forth below, in the District of Maryland and elsewhere, the defendant, **HOAU-YAN WANG,** did knowingly execute, and attempt to execute, a scheme and artifice with the intent to defraud the United States and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, in a grant, being

$1,000,000 or more, through the following execution and attempted execution of the scheme and artifice:

| COUNT | APPROX. DATE | DESCRIPTION OF FRAUDULENT APPLICATION |
|---|---|---|
| 1 | January 12, 2018 | Submission of fraudulent Proposal 1 to NIH |

In violation of Title 18, United States Code, Sections 1031(a) and 2.

## COUNTS 2-3
### Wire Fraud
### (18 U.S.C. §§ 1343 and 2)

33. Paragraphs 1 through 27 of this Indictment are hereby realleged and incorporated by reference herein as though fully set forth herein.

34. From in and around May 2015 through and continuing through in and around April 2023, within the District of Maryland and elsewhere, the defendant,

**HOAU-YAN WANG,**

did knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice.

### Purpose of the Scheme and Artifice

35. Paragraph 13 of this Indictment is realleged and incorporated by reference as though fully set forth herein.

### Description of the Scheme and Artifice

36. Paragraphs 14 through 27 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

### Use of Wires

37. On or about the dates set forth below, each such date constituting a separate count of this Indictment, in the District of Maryland and elsewhere, the defendant, **HOAU-YAN WANG,** for the purpose of executing and attempting to execute the scheme and artifice to defraud,

13

did knowingly transmit and cause to be transmitted in interstate commerce by means of a wire

communication, certain signals, signs and sounds, as set forth below:

| COUNT | APPROX. DATE | DESCRIPTION OF WIRE |
|:-----:|:------------:|---------------------|
| 2 | March 22, 2019 | NIH's electronic ACH instructions submission to the Federal Reserve Board to initiate payments in connection with fraudulent Proposal 1, in the approximate amount of $32,815 |
| 3 | June 18, 2021 | NIH's electronic ACH instructions submission to the Federal Reserve Board to initiate payments in connection with fraudulent Proposal 2, in the approximate amount of $125,026 |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 4
### False Statements
### (18 U.S.C. §§ 1001 and 2)

38.     Paragraphs 1 through 27 of this Indictment are hereby realleged and incorporated by reference herein as though fully set forth herein.

39.     On or about November 18, 2019, in the District of Maryland and elsewhere, in a matter within the jurisdiction of the executive branch of the Government of the United States, the defendant,

### HOAU-YAN WANG,

did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, to wit: in a filed submission to NIH in connection with fraudulent Proposal 2, WANG fabricated the Western blots depicted in multiple figures and made false representations about the results of the experiments depicted.

In violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1.     Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c) in the event of the defendant's conviction on any of the offenses charged in Counts Two and Three of this Indictment.

2.     Upon conviction of any of the offenses set forth in Counts Two and Three of this Indictment, the defendant,

**HOAU-YAN WANG,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s) of conviction, including a money judgment in the amount of proceeds he obtained.

### Substitute Assets

3.     If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

        a.   cannot be located upon the exercise of due diligence;

        b.   has been transferred or sold to, or deposited with, a third party;

        c.   has been placed beyond the jurisdiction of the court;

        d.   has been substantially diminished in value; or

        e.   has been commingled with other property which cannot be divided without difficulty

the United States shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 21, United States

Code, Section 853, and Title 28, United States Code, Section 2461(c).

**DATED:** June 27, 2024, at Greenbelt, Maryland.

GLENN S. LEON
Chief
Fraud Section, Criminal Division
United States Department of Justice

A TRUE BILL:

6-27-24
Date

**SIGNATURE REDACTED**

Foreperson

17

# EXHIBIT 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported) July 01, 2024

# Cassava Sciences, Inc.
**(Exact name of registrant as specified in its charter)**

| Delaware | 001-41905 | 91-1911336 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification Number) |

**6801 N Capital of Texas Highway, Building 1; Suite 300**
**Austin, Texas 78731**
**(Address of principal executive offices, including zip code)**

**(512) 501-2444**
**(Registrant's telephone number, including area code)**

**(Former name or former address, if changed since last report.)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2 below):

☐ Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communication pursuant to Rule 14d-2(b) under the Exchange Act (17CFR 240.14d-2(b))

☐ Pre-commencement communication pursuant to Rule 13e-4(c) under the Exchange Act (17CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.001 par value | SAVA | Nasdaq Capital Market |
| Warrants, exercisable for shares of Common Stock* | SAVAW | Nasdaq Capital Market |

* In connection with the redemption of the Warrants on May 7, 2024, Nasdaq Stock Market LLC has filed a Form 25 relating to their removal from listing and deregistration under Section 12(b) of the Act.

Indicate by check mark whether the registrant is an emerging growth company as defined in as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 8.01. Other Events.**

*Update on Government Investigations*

Cassava Sciences, Inc. ("Cassava" or the "Company") has been engaging with the U.S. Department of Justice (the "DOJ") and the U.S. Securities and Exchange Commission (the "SEC") in connection with ongoing investigations into the Company and two senior employees of the Company. Cassava is cooperating with the DOJ and SEC in connection with these investigations.

In the course of ongoing discussions with the SEC regarding the Company's Phase 2b study of simufilam in Alzheimer's disease (the "Phase 2b Study"), the SEC recently provided the Company with new information obtained during its investigation. The Company's Board of Directors (the "Board") has empowered an *Ad Hoc* Investigation Committee (the "Committee"), comprising independent directors, to direct an investigation (the "Internal Investigation") of the information provided by the SEC. The Internal Investigation is also evaluating information contained in the DOJ indictment of Dr. Hoau-Yan Wang discussed below. This Committee, with the assistance of the Company's General Counsel, is supervising outside counsel conducting the Internal Investigation. The Committee is also empowered to oversee the Company's disclosures in filings with the SEC regarding matters at issue in the Internal Investigation. The Internal Investigation is continuing.

*Indictment of Dr. Hoau-Yan Wang*

On June 28, 2024, the DOJ announced that a federal grand jury in the U.S. District Court for the District of Maryland returned an indictment of Dr. Wang. The indictment alleges that Dr. Wang caused Cassava to submit grant applications to the U.S. National Institutes of Health ("NIH") that contained false and fraudulent representations about his research. Among other things, the indictment alleges that Dr. Wang made materially false, fraudulent, and misleading statements to NIH regarding the mechanism by which the Company's therapeutic product candidate, simufilam, was designed to treat Alzheimer's disease and the improvement of certain Alzheimer's disease indicators in patients treated with simufilam, and that Dr. Wang manipulated or otherwise fabricated research results, including Western Blot images that he prepared.

Dr. Wang, who is employed as a professor at the School of Medicine of the City University of New York ("CUNY"), previously served as a scientific collaborator and advisor to Cassava. Dr. Wang's research, including foundational research published together with Dr. Lindsay Burns, Cassava's SVP, Neuroscience, led to the discovery of simufilam. Among other work for Cassava, Dr. Wang's laboratory at CUNY conducted the final bioanalysis for the Phase 2b Study, which the Company reported as part of the final results of the Phase 2b Study.

Dr. Wang received compensation from the Company for his consulting and advisory work for Cassava. For over a decade until Cassava's termination of its consulting relationship with him, Dr. Wang was paid a cash stipend of $2,000 per month. He has also been awarded stock options pursuant to the Company's equity incentive plans, none of which have been exercised through the date of this report. As of the date of this report, Dr. Wang holds 18,571 stock options, all of which were granted between 2015 and 2019 and are fully vested, with a weighted average exercise price of $4.22 per share. Dr. Wang was previously a participant in the Company's cash incentive bonus plan (the "Cash Incentive Plan"), during which time the Company achieved target valuation milestones that established aggregate bonus payment amounts. The determination whether to make any payments of such amounts to participants and, if so, the allocation of amounts among participants (other than the Company's chief executive officer), remains subject to the discretion of the Compensation Committee of the Board. In all cases, the payment of cash bonuses under the Cash Incentive Plan is subject to (i) Cassava's completion of a merger transaction or (2) the determination by the Compensation Committee of the Board that the Company has sufficient cash on hand to render such payment, neither of which may ever occur. To date, Dr. Wang has not been allocated any cash bonus payment pursuant to the Cash Incentive Plan. The Company has not paid any cash bonus to Dr. Wang or to any other participant under the Cash Incentive Plan as of the date of this report. Prior to Dr. Wang's indictment, the Company terminated its consulting relationship with him, and the Board removed him as a participant in the Cash Incentive Plan.

*Supplemental Disclosures*

Based on the Committee's preliminary review of information gathered in the Internal Investigation to date, the Company is supplementing its prior disclosures, initially reported in September 2020, regarding the Phase 2b Study.

The Phase 2b Study was designed as a 28-day, approximately 60-patient, randomized, double-blind, placebo-controlled, multiple dose study. One objective of the Phase 2b Study was to measure changes in levels of cerebrospinal fluid ("CSF") biomarkers in study participants from baseline value to Day 28. Based on CSF biomarker assays and bioanalysis conducted by Dr. Wang, Cassava reported statistically significant improvements in biomarkers in treatment groups as compared to the placebo group. To date, the Internal

Investigation has determined that certain statistical information contained in an attachment to an email sent by a senior employee of Cassava to Dr. Wang before the bioanalysis could have been used to unblind him as to some number of Phase 2b Study participants.

Another objective of the Phase 2b Study was to measure changes in cognitive outcome measures using the Cambridge Neuropsychological Test Automated Battery, or CANTAB, (a validated, computer-based battery of tests) over the 28-day study period. Neither Dr. Wang nor his laboratory at CUNY was involved in the cognition portion of the Phase 2b Study.

With respect to the cognition portion of the Phase 2b Study, Cassava is reporting in this 8-K information regarding its *post hoc* statistical analysis with respect to selected CANTAB outcome measures for the Phase 2b Study. This information was previously disclosed in a draft preprint manuscript that was publicly available as of the first quarter of 2021. The Phase 2b Study's CANTAB tests were not powered for statistical significance and were therefore evaluated only for effect size.

In September 2020, the Company reported on study participants' episodic memory and spatial working memory, as assessed using CANTAB, over the 28-day study period. The Company reported the primary outcome measurements of Paired Associates Learning total errors adjusted, in respect of episodic memory, and total errors in respect of Spatial Working Memory. Other outcome measurements that were generated by the CANTAB tests were not reported by the Company.

Although the 28-day Phase 2b Study enrolled 64 patients, the statistical analysis of the CANTAB outcome measurements reported by the Company reflected certain study participant exclusions. With respect to the analysis of episodic memory measures, approximately 42% of study participants were excluded from the reported analysis (approximately 38% of study participants from the 50 mg arm, approximately 52% of study participants from the 100 mg arm and approximately 36% from the placebo arm). For these episodic memory test exclusions, the most and least impaired subjects were excluded by baseline score ($\leq 11$ or $\geq 54$ out of 70 total possible errors) before the effect size was calculated. These cutoffs were employed to remove subjects with very few errors (ceiling effects), as well as subjects who performed so poorly that they may not have understood the task evaluated by the test. Analysis of both CANTAB test data sets also excluded subjects with no detectable plasma simufilam (3 patients) (*i.e.*, treatment arm study participants who did not appear to have taken simufilam), patients who were $\geq 25\%$ noncompliant with the study's treatment regimen by pill counts (2 patients), patients with no baseline test (1 patient), and patients who, according to study investigators, did not understand the test instructions (1 patient). Accordingly, reported results reflected N=14, 13, 10 for episodic memory, and N=22, 17, 18 for spatial working memory for placebo, 50 and 100 mg, respectively. Because the results first reported in September 2020 reflect calculations of effect size after these exclusions, the Company's reported results reflect an analysis of a substantially smaller analysis-set population than the full Phase 2b Study population.

*Independent Analysis of Phase 3 Trial Data*

The Company is currently conducting two randomized, placebo-controlled Phase 3 clinical trials of oral simufilam in patients with mild-to-moderate Alzheimer's disease. Both trials are fully enrolled. The trials have randomized a total of approximately 1,900 patients with mild-to-moderate Alzheimer's disease at baseline. All efficacy data from the Company's Phase 3 program remain blinded. There are no interim analyses on efficacy outcomes.

Phase 3 data and samples for bioanalysis will be directly provided to and analyzed by independent, third-party commercial consulting firms. Neither Dr. Wang nor his laboratory at CUNY has any involvement in the Company's ongoing Phase 3 clinical trials of simufilam.

**Cautionary Note Regarding Forward-Looking Statements:**

*This report contains forward-looking statements, including statements made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, that may include but are not limited to statements regarding: ongoing government investigations, the Company's ongoing Internal Investigation, and potential findings or outcomes of such investigations; statements relating to clinical trials of Cassava's product candidates; and statements relating to the potential benefits, if any, of Cassava's product candidates. These statements may be identified by words such as "anticipate," "believe," "could," "expect," "forecast," "intend," "may," "plan," "possible," "potential," "will," and other words and terms of similar meaning. Such statements are subject to a number of risks, uncertainties and assumptions, including, but not limited to, those described in the section entitled "Risk Factors" in the Company's Annual Report on Form 10-K for the year ended December 31, 2023, and future reports filed with the SEC. In light of these risks, uncertainties and assumptions, the forward-looking statements and events discussed in this report are inherently uncertain and may not occur, and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Accordingly, you should not rely upon forward-looking statements as predictions of future events. Except as required by law, the Company disclaims any intention or responsibility for updating or revising any forward-looking statements.*

*Cassava's clinical results from earlier-stage clinical trials may not be indicative of future results from later-stage or larger scale clinical trials and do not ensure regulatory approval. You should not place undue reliance on these statements or any scientific data the Company presents or publishes or has presented or published previously.*

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**CASSAVA SCIENCES, INC.**
a Delaware corporation

Date: July 01, 2024

By: */s/ Eric J. Schoen*
Eric J. Schoen
Chief Financial Officer

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

SECURITIES AND EXCHANGE
COMMISSION,

                                        Plaintiff,

v.                                                      Case No. 24-cv-1150

CASSAVA SCIENCES, INC.; REMI              JURY TRIAL DEMANDED
BARBIER; and LINDSAY BURNS,

                                        Defendants.

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC" or "Commission")
alleges as follows:

## SUMMARY

1.      This case involves Defendant Cassava Sciences, Inc.'s ("Cassava")
misleading statements about the results of its Phase 2b clinical trials for Cassava's
drug candidate PTI-125,[1] a potential therapy for the treatment of Alzheimer's
disease, and the role of Defendants Remi Barbier, Cassava's founder and former
Chairman and CEO, and Dr. Lindsay Burns, Cassava's former Senior Vice President

---

[1] PTI-125 is also known as simufilam.

1

of Neuroscience, in those disclosures. The announced final Phase 2b results were misleading in five ways.

2.  First, Cassava claimed that "[b]ioanalyses were conducted under blinded conditions to eliminate any possibility of bias." That statement negligently omitted material information. Dr. Hoau-Yan Wang, a professor at City University of New York ("CUNY"), ran clinical laboratory tests on Cassava's behalf for Phase 2b. Before Dr. Wang began running the bioanalyses, Dr. Burns negligently provided information sufficient to allow Dr. Wang to partially unblind himself.

3.  Second, Defendants negligently did not disclose that the announced results of the bioanalyses were performed by Dr. Wang, the co-inventor of PTI-125, Cassava consultant, and member of Cassava's Scientific Advisory Board. Instead, public filings with the SEC referred to Dr. Wang's laboratory at CUNY generally as an "academic lab," which although technically correct, was incomplete and misleading. By Cassava failing to name Dr. Wang, investors were not made aware that the scientist performing the analysis had a conflict of interest due to his professional and financial ties to Cassava.

4.  Third, Cassava conducted an audit of Dr. Wang's laboratory at CUNY in 2022, and Cassava and Barbier negligently did not disclose the audit report's finding that Dr. Wang's laboratory was "**unacceptable** and **temporarily not qualified** to provide biomarker analysis and research for services for any future Cassava studies." (Emphases in original).

2

5.      Fourth, Cassava and Dr. Burns negligently failed to fully disclose Dr. Burns's removal of a large portion of patients in reported cognition data. The reported episodic memory results excluded data from 40% of patients who completed the cognition test. Cassava and Dr. Burns failed to disclose the average change in errors from baseline to day 28 for the full episodic memory data set (i.e., -3.4 points for the placebo group, -2.8 points for the 50 mg group, and -0.0 points for the 100mg group), which showed no similar directional improvement for either the 50 mg or 100 mg group compared with placebo. And Cassava and Dr. Burns did not disclose that Dr. Burns was unblinded when she decided which patients to exclude from the reported results.

6.      Fifth, Cassava and Dr. Burns negligently failed to disclose that the spatial working memory measurement reported in the Phase 2b results as showing cognitive improvement of up to 46% was a measurement selected by Dr. Burns only after she was unblinded. Cassava and Dr. Burns also failed to disclose that other spatial working memory results, including measurements identified as "key" prior to unblinding, did not show directional improvement in patients receiving PTI-125 compared with placebo.

7.      In September 2020, Cassava announced final Phase 2b results that claimed that PTI-125 taken for 28 days significantly improved every measured biomarker for Alzheimer's disease compared with subjects who took a placebo. Cassava also announced that patients who took PTI-125 showed improved cognition compared to patients who took the placebo.

3

8. Remi Barbier, Cassava's founder and former Chairman and CEO, participated in making Cassava's misleading statements about Phase 2b. In addition to providing information sufficient to partially unblind Dr. Wang, Dr. Burns was responsible for compiling misleading Phase 2b cognition results.

9. After Cassava reported its Phase 2b trial results, the company raised more than $260M in new funding.

## JURISDICTION AND VENUE

10. The SEC brings this action pursuant to the authority established in Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and (d)].

11. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

12. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], because Cassava is headquartered within this District, and Dr. Burns and Barbier reside within this District.

13. Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANTS

14. **Cassava Sciences, Inc. ("Cassava")** is a Delaware corporation with its principal place of business in Austin, Texas. Cassava is a pharmaceutical company

4

with one primary drug candidate, PTI-125, a potential therapeutic for the treatment of Alzheimer's disease. Cassava's shares are registered with the Commission pursuant to Securities and Exchange Act of 1934 ("Exchange Act") Section 12(b) and are listed on the Nasdaq Capital Market under the symbol "SAVA."

15.     **Remi Barbier**, age 64, is the Founder, and was Chair, and Chief Executive Officer of Cassava until July 2024. He is a resident of Austin, Texas.

16.     **Dr. Lindsay Burns**, age 59, was the Senior Vice President of Neuroscience at Cassava until July 2024. She is a resident of Austin, Texas. Dr. Burns co-invented PTI-125 with Dr. Wang.

## OTHER RELEVANT PARTY

17.     **Dr. Hoau-Yan Wang**, age 67, is a tenured associate professor at the City University of New York's School of Medicine. Dr. Wang co-invented PTI-125 along with Dr. Burns. Dr. Wang served on Cassava's Scientific Advisory Board, and Cassava retained Dr. Wang as a paid consultant until the company terminated his consulting agreement in June 2024.

## FACTS

### A.    Cassava's Background

18.     Barbier founded the company now known as Cassava in 1998. The relationship between the company now known as Cassava and Dr. Wang dates back to the early 2000s. Dr. Wang served as a consultant to the company until June 2024.

19.     Dr. Burns was Dr. Wang's main point of contact at Cassava. Dr. Burns and Dr. Wang collaborated as co-authors on multiple scientific journal articles and

5

grant applications throughout the time that Dr. Wang served as a consultant to the company.

20.     Dr. Wang and Dr. Burns discovered the molecule PTI-125, later named simufilam, which they claim binds to altered Filamin A proteins and remediates Alzheimer's disease-related pathology.

### B.     Cassava's Initial PTI-125 Trials

21.     Clinical trials for a new drug usually proceed through three phases before the FDA will consider a New Drug Application.

22.     In 2017, the FDA cleared Cassava's Investigational New Drug application for PTI-125, which allowed Cassava to begin clinical trials of the drug in humans. That same year, Cassava completed a Phase 1 human safety trial of PTI-125.

23.     In 2019, Cassava ran what it called a Phase 2a trial, consisting of 13 Alzheimer's patients who all took doses of PTI-125 for 28 days. There was no placebo group.

24.     One key objective of Cassava's Phase 2a trial was to measure changes in concentration of biomarkers—substances in cerebrospinal fluid ("CSF") believed to correspond with Alzheimer's disease pathology, neuroinflammation, and neurodegeneration. To measure changes in biomarkers, CSF was collected from patients before taking the drug and again after 28 days of treatment.

25.     Cassava asked Dr. Wang to analyze the CSF samples collected from the Phase 2a participants. According to Dr. Wang's results, all 13 patients showed

directional improvements in multiple biomarkers, suggesting that the drug may be causing changes in biomarker levels.

26.    In public announcements and SEC filings, Cassava disclosed that Dr. Wang and his laboratory at CUNY performed the biomarker tests for Phase 2a.

**C.    Cassava's Phase 2b Trial**

27.    In 2019, Cassava designed and began its Phase 2b clinical trial. That trial ultimately included 64 patients separated into three groups—one placebo group, one group taking a 50mg dose, and another group taking a 100mg dose. Each patient in each group was to take their respective treatment for 28 days.

28.    Phase 2b was to be conducted as a double-blinded clinical trial, which means neither the patient nor the tester is aware which patient received which treatment. Blinding is a standard practice in many clinical trials, in part because it helps reduce the potential impact of bias.

29.    Participants in Phase 2b had CSF drawn before treatment began and again after 28 days of treatment. Pursuant to the testing protocol, Cassava directed each clinical site to send patient CSF samples to the CUNY laboratory in New York where Dr. Wang performed research to be stored before laboratory analysis. Laboratory results were to be sent directly to Dr. Burns who then was to forward them to a biostatistics company hired by Cassava to compile unblinded results.

30.    Participants in Phase 2b also took a battery of cognition tests before treatment and then again after 28 days to assess any changes in cognition. Those

7

results were also sent first to Dr. Burns who then forwarded them to the biostatistics company to perform statistical analyses on unblinded test results.

### 1) Round 1 Biomarker Testing

31.    Cassava initially hired a laboratory in Europe to test the Phase 2b CSF samples for nine biomarkers. However, there were two biomarkers that Cassava wanted tested that the European laboratory could not measure. Cassava asked Dr. Wang to test CSF samples for those two biomarkers. All biomarker testing by the European lab (seven tests) and Dr. Wang (two tests) (collectively, "Round 1") were completed by early May 2020. Results were sent to Dr. Burns who forwarded them to the biostatistics company.

32.    On May 15, 2020, Cassava filed a Form 8-K with the Commission, attaching a press release with the headline "Top-line Results from a Phase 2b Study of PTI-125 in Alzheimer's Disease Does Not Meet Primary Endpoint."

33.    None of the tests performed by the European lab showed a meaningful effect of the drug treatment arms compared with the placebo. The Phase 2b Round 1 results also did not show a drug effect consistent with Dr. Wang's Phase 2a results.

34.    Dr. Burns and other Cassava employees and outside scientists expressed concern with the European laboratory's results due to unexplained data variability.

35.    In its May 15, 2020, press release, Cassava declared that the "study showed high variability in levels of CSF biomarkers over 28 days" and noted that it planned to re-analyze the biomarkers with the remaining patient CSF samples.

36.     After this disclosure, Cassava's stock price dropped from $7.61 a share to $1.63 a share by the end of trading that day.

### 2)     Dr. Burns Provides Data Sufficient to Allow Dr. Wang to Partially Unblind Himself

37.     On May 13, 2020, the biostatistics company sent to Dr. Burns a document summarizing the statistics for each Round 1 biomarker. The document included, among other things, statistics for the lowest (min) and highest (max) sample levels in each treatment arm and in the placebo group for Day 0 (before the trial) and Day 28 (after the trial). The document also identified the largest and smallest "change from baseline" or change in biomarker levels in each treatment arm and placebo group.

38.     That same day, at Cassava's request, the biostatistics company sent Cassava the unblinding codes, which allowed Cassava to know which patients participated in each treatment group. Dr. Burns received the unblinding codes.

39.     On May 14, 2020, Dr. Burns sent this document with min, max, and change from baseline data to Dr. Wang and asked him to evaluate the European laboratory's data. At the time she sent the document to Dr. Wang, Dr. Burns understood that Dr. Wang had completed the testing for two biomarkers in Round 1. She also knew that Dr. Wang had individual test results identified by patient identification code for the two biomarkers that he had tested for Round 1.

9

40.     The document sent by Dr. Burns on May 14, 2020, had sufficient information to allow Dr. Wang to match some of the test results that he ran in Round 1 with specific reported statistics.

41.     Ultimately, using the information he was provided, Dr. Wang was able to unblind himself to roughly a third of the patients in Phase 2b—eight patients in the placebo group; seven in the 50 mg group; and eight in the 100 mg group.

### 3)     Round 2 Biomarker Testing

42.     On or around June 1, 2020, Cassava directed Dr. Wang to perform a reanalysis of the Phase 2b clinical samples for the seven biomarkers tested by the European lab during Round 1 using the CSF samples remaining in his lab. Dr. Wang did not, as part of Round 2, re-run tests for the two biomarkers he analyzed in Round 1. Dr. Wang also agreed to run additional biomarker tests that had not been completed in Round 1. These combined tests constituted the Round 2 testing.

43.     When Dr. Wang conducted Round 2 testing, he was partially unblinded and knew for at least some patients whether they were in the placebo group or one of the treatment arms.

44.     On September 14, 2020, Cassava publicized Dr. Wang's results which showed statistically significant improvement in all biomarkers in the treatment groups as compared with the placebo group. The company issued a press release and provided an investor presentation with an accompanying slide deck, all of which were filed with the Commission under Form 8-K.

10

45.     The September 14, 2020, press release stated, "Bioanalyses were conducted under blinded conditions to eliminate any possibility of bias. An academic lab generated final results."

### 4)     Phase 2b Cognitive Testing

46.     The Phase 2b trial included cognition testing in addition to biomarker analysis.  Patients in the Phase 2b trial took the Cambridge Neuropsychological Test Automated Battery ("CANTAB"), a group of cognitive testing. The CANTAB administered in Phase 2b included four different types of tests, each measuring different neurological functions. Patients were tested prior to receiving the drug (or placebo) and again after 28 days.

47.     The primary CANTAB test for Alzheimer's patients was the Paired Associates Learning Total Errors Adjusted ("PALTEA"), which measures episodic memory. Cassava's two mandatory reports, its Statistical Analysis Plan ("SAP") and Trial Protocol, said that it would report statistics for *all subjects tested* as part of its cognitive testing.

48.     Dr. Burns received the PALTEA results in May 2020. The data showed no improvement in episodic memory in the drug treatment arms compared with the placebo group and they showed no meaningful improvement in patient cognition.

49.     After receiving these results, Dr. Burns, who was unblinded, first removed patients with missing data and patients who did not take the drug and then engaged in what she described as a "sensitivity analysis" where she removed the highest performing patients and lowest performing patients by baseline score cutoffs

11

across all groups until the results appeared to show separation between the placebo group and the treatment arms.

50. Dr. Burns ultimately removed 40% of the patient population from the PALTEA analysis. The methodology or criteria of subject removal that Dr. Burns utilized is not predefined in the clinical trial protocol nor the SAP.

51. Cassava did not disclose the full results of the PALTEA, but instead reported the results of Dr. Burns' sensitivity analysis as the final results. In some disclosures, Cassava included language noting that it calculated effect sizes "after removing the most and least impaired subjects." But until a Form 8-K filed on July 1, 2024, Cassava did not inform investors in any SEC filing that the reported PALTEA excluded results from 40% of patients.

52. Phase 2b cognitive testing also included an analysis of participants' Spatial Working Memory ("SWM") as a secondary outcome. Dr. Burns relied on the test's developer to identify Key Outcome Measures, which for Spatial Working Memory were "SWM Strategy" and "SWM between errors." Neither the test creator nor Dr. Burns identified any other key SWM measurement prior to receiving unblinded results, although the total errors measure reported by Cassava is a secondary outcome measure by the test developer.

53. When the biostatistics firm provided results for the two key Spatial Working Memory measurements identified by Cassava and the test developer, neither showed a clear benefit in the treatment arms.

12

54. Cassava did not report results for SWM between errors or SWM strategy to investors.

55. Instead, Dr. Burns selected, and Cassava reported, another measurement after she received unblinded results—SWM total errors. This was the only SWM result that was disclosed to investors.

**D. Cassava Discloses Results from Phase 2b**

56. On September 14, 2020, Cassava announced the results from Phase 2b in a press release, an updated presentation, an 8-K filing with the SEC, and an investor call.

57. In its September 14, 2020, press release, Cassava announced that "Alzheimer's patients treated with 50 mg or 100 mg of [PTI-125] twice-daily for 28 days showed statistically significant ($p<0.05$) improvements in biomarkers of disease pathology, neurodegeneration and neuroinflammation, versus Alzheimer's patients who took placebo." Cassava claimed that "[b]ioanalyses were conducted under blinded conditions to eliminate any possibility of bias" and, without identifying Dr. Wang, said that an "academic lab generated final results."

58. Cassava also claimed that "Alzheimer's patients treated with [PTI-125] showed directional improvements in validated tests of episodic memory and spatial working memory, versus patients on placebo (Effect Sizes 46-17%)."

59. Cassava also released a presentation on September 14, 2020, titled "Final Results of a Phase 2b Study of Sumifilam in Alzheimer's Disease."

13

60.     That presentation claimed that the biomarker results from Round 1 was "invalid data," in part because some biomarkers in the placebo group "moved in opposite directions," suggesting simultaneous improving and worsening in the same patients, and that changes in biomarkers in placebo patients were uncorrelated. The presentation claimed that changes in biomarkers from Round 2 were correlated, and therefore valid.

61.     The presentation claimed that the Phase 2b was a randomized, double-blind, placebo-controlled, multicenter clinical study. Cassava also claimed that PTI-125 "appears to stabilize or improve memory," noting "37% and 23% effect sizes in episodic memory vs placebo" and "17% and 46% effect sizes in spatial working memory vs placebo."

62.     While the presentation did note that "*effect sizes* vs. placebo were calculated by Hedge's g after removing the most and least impaired subjects across all groups by baseline score" (emphasis added), the presentation did not disclose that the episodic memory results were from a sensitivity analysis and not from the full population.

63.     The presentation did not explain that the episodic memory results were calculated only after removing 40% of the study population. The presentation failed to disclose the average change in errors from baseline to day 28 for the full episodic memory data set (i.e., -3.4 points for the placebo group, -2.8 points for the 50 mg group, and -0.0 points for the 100 mg group), which did not show similar directional improvement for either the 50 mg or 100 mg group compared with placebo.

14

64. The September 14, 2020, presentation also did not disclose that the key spatial working memory measurements identified by Cassava and the test developer prior to unblinding showed no improvement.

65. Cassava also held an investor call on September 14, 2020, where both Barbier and Dr. Burns were presenters.

66. On that conference call, Barbier claimed that "an academic lab conducted a second and final bioanalysis of the Phase 2b data" and that "the academic lab showed what we consider to be valid, proper, and expected data." He claimed that "ourselves and our advisors and pretty much anyone we've shown all the data to have confirmed that the second bioanalysis is a valid analysis."

67. Dr. Burns presented biomarker results and the cognitive results on the September 14, 2020 conference call. In her presentation, Dr. Burns described episodic memory results as "on average the placebo patients improved by one and half errors . . . but in contrast, the 50 mg dose group improved 5.7 errors on average resulting in a 37 percent effect size compared to that change in placebo." She continued that "the patients who took 100 milligrams improved by four and a half errors which is a 23 percent effect size."

68. Dr. Burns did not disclose during the investor call that the presented results for episodic memory were based on a sensitivity analysis. Dr. Burns also did not disclose during the presentation that the "averages" she referred to were calculated only after removing 40% of the study population. She did not disclose the average change in errors from baseline to day 28 for the full episodic memory data

15

set (i.e., -3.4 points for the placebo group, -2.8 points for the 50 mg group, and -0.0 points for the 100 mg group), which did not show similar directional improvement for either the 50 mg or 100 mg group compared with placebo.

69.     Dr. Burns also presented the spatial working memory results, but again did not disclose that the spatial working memory test measures identified before being unblinded did not show improvements in the treatment arms compared with placebo.

70.     Dr. Burns concluded by explaining that "any one of these [cognition] tests would indicate it's moving in the direction, but because we have directional improvement in both dose groups on two different tests, it gives us a lot more confidence." She explained that having both tests show directional improvement was encouraging because "it's not just two plus two, it's more like two plus two equals ten rather than four."

71.     Shortly after Cassava's September 14, 2020, announcements regarding its Round 2 Phase 2b results, the company's stock more than doubled, from $3.40 to $8.41 on September 14, 2020.

72.     On November 4, 2020, Cassava filed an 8-K attaching a presentation which provided additional biomarker results from Phase 2b supposedly showing that PTI-125 improved the integrity of the blood-brain barrier. Those tests were also conducted by Dr. Wang, although Cassava did not disclose that at the time. The press release and presentation continued to claim that the testing was conducted under

blinded conditions and compiled results from all Round 2 biomarker tests conducted by Dr. Wang.

73.    The presentation attached to the November 4, 2020, 8-K also included results for episodic memory, but failed to disclose that any data had been excluded from the analysis.

74.    On November 9, 2020, Cassava filed its Form 10-Q Quarterly Report. That report included results from Phase 2b. The 10-Q continued to claim that Phase 2b was "double-blind" and that PTI-125 "significantly (P<0.05) improved an entire panel of validated biomarkers of disease in patients with Alzheimer's disease compared to a placebo group" and that "Alzheimer's patients treated with [PTI-125] showed directional improvements in validated tests of episodic memory and spatial working memory, versus patients on placebo (Effect Sizes 46-17%)." That report did not disclose that the episodic memory results excluded data from 40% of the Phase 2b participants.

75.    On February 8, 2021, the Company filed a Form 8-K attaching an updated corporate presentation. The presentation summarized the biomarker results from Dr. Wang. The presentation also included the top-line results from Phase 2b cognition without disclosing that any patient data had been removed from episodic memory analysis and without disclosing that the other key spatial working memory measurements showed no improvement compared with placebo.

76.    Cassava continued to include Phase 2b results in filings with the SEC, including detailed results in annual reports filed March 1, 2022, and February 28,

17

2023, and summaries of Phase 2b results in an annual report filed February 28, 2024, and Forms 10-Q filed April 29, 2021, August 4, 2021, November 15, 2021, May 5, 2022, August 4, 2022, November 7, 2022, May 1, 2023, August 3, 2023, November 7, 2023, and May 10, 2024. In each of those filings, Cassava claimed that the bioanalyses were conducted under blinded conditions.

77.    Cassava offered and sold securities during this period, and in October 2023, Barbier and Dr. Burns received stock options from Cassava.

## E.    Cassava Raises Funds from Public Investors Based on Phase 2b Results

78.    On November 16, 2020, Cassava filed an updated prospectus supplement to sell more than 9 million shares at $8 per share, netting Cassava around $70 million after underwriting fees. The prospectus incorporated by reference certain documents, including Form 10-Q filed November 9, 2020, Form 8-K filed September 14, 2020, and Form 8-K filed November 4, 2020.

79.    In February 2021, Cassava announced that given the results of Phase 2b and prior clinical results, it planned to proceed to Phase 3.

80.    Cassava subsequently filed a new shelf registration statement in February 2021 to register sales of approximately $200 million, which it executed on, netting more than $190 million after paying underwriter fees. Cassava incorporated documents into the shelf registration and subsequent prospectus, including Form 10-Q filed November 9, 2020, Form 8-K filed September 14, 2020, and Form 8-K filed November 4, 2020.

F.   **Publicized Concerns About Dr. Wang**

81.   In August 2021, two individuals filed a citizen petition with the FDA—
a mechanism designed for the public to petition the FDA regarding administrative
and regulatory decisions—asking the agency to perform a review of the drug and
claims made by the company. Citizen petitions are public documents and, thus,
Cassava was alerted to the claims contemporaneously.

82.   The citizen petition included claims, that, among other things, Dr. Wang
had manipulated images of tests known as western blots to various academic journals
as well as, collaboratively with Cassava, to the National Institutes of Health to
support grant applications.

83.   Barbier and Dr. Burns were made aware of the claims raised by the
citizen petition around the time it was filed.

G.   **Audit of Dr. Wang's Laboratory**

84.   Following complaints raised in the citizen petition, the FDA performed
a review of Dr. Wang's laboratory at CUNY.  Following the FDA's review, Cassava
initiated its own audit of Dr. Wang's laboratory related to his work on the Phase 2b
trial. Between April and September 2022, Cassava's Senior Director of Clinical
Quality Systems reviewed documents related to the Phase 2b trial and conducted a
site visit to Dr. Wang's laboratory at CUNY.

85.   Cassava's audit found critical issues with the laboratory and Dr. Wang's
practices, including a "lack of procedures, proper document practices, equipment and

freezer qualification, and software access control." Most notably, Cassava found a "lack of experiment logbooks/notebooks for all study/research work being performed."

86.     Based on these failings, Cassava determined that Dr. Wang's laboratory at CUNY were "considered **unacceptable** and **temporarily not qualified** to provide biomarker analysis and research services for any future Cassava studies." (Emphases in original).  Cassava concluded that Dr. Wang's laboratory at CUNY "should not be contracted for any further biomarker analysis and research work" until a "follow-up audit is conducted to confirm the observations have been closed out." Both Barbier and Dr. Burns were generally aware of the findings in the report. However, Cassava did not sever its relationship with Dr. Wang at that time. Nor did Cassava inform investors of Cassava's internal findings regarding Dr. Wang. It was not until June 2024 that Cassava officially ended its contractual relationship with Dr. Wang.

## OVERVIEW OF SECURITIES LAW VIOLATIONS

### A. Defendants Negligently Misrepresented Material Facts

87.     Sections 17(a)(2) and 17(a)(3) of the Securities Act make it unlawful for any person, in the offer or sale of a security, to "obtain money or property by means of any untrue statement of material fact" or a material omission necessary to make statements made not misleading, or to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

20

88. <u>Defendants incorrectly claimed that Phase 2b bioanalyses were</u>
<u>conducted under blinded conditions</u>. Defendants negligently stated in SEC filings,
press releases, presentations, and verbally that the Phase 2b bioanalyses were
conducted under blinded conditions. Those statements were untrue because Dr.
Wang, who performed the bioanalyses, was at least partially unblinded after
receiving information from Dr. Burns in May 2020. The misstatements were material
because, as even Cassava noted, "blinded conditions . . . eliminate any possibility of
bias." Blinding was even more important in this instance because Dr. Wang, the co-
inventor of the drug and an individual with a financial stake in its success, was the
scientist performing the bioanalyses.

89. <u>Defendants failed to disclose that Dr. Wang conducted the bioanalyses</u>
<u>in Round 2 and Dr. Wang's laboratory was later deemed unacceptable by Cassava's</u>
<u>internal audit</u>. Defendants' negligent failure to name Dr. Wang or his laboratory as
the parties that ran the assays deprived the investing public of the ability to consider
any conflicts of interest between Dr. Wang and Cassava. It also made it considerably
more difficult for investors to question whether Dr. Wang remained blinded or
whether he might have manipulated results to ensure investors perceived his
invention as a success. Furthermore, Defendants negligently failed to inform
investors that Cassava determined pursuant to their internal audit that Dr. Wang's
laboratory was unacceptable and temporarily not qualified to provide biomarker
analysis and research services for any future Cassava studies.

90. <u>Defendants misled investors by reporting cognition results that excluded 40% of subjects</u>. Defendants negligently failed to disclose that the episodic memory results were calculated only after removing 40% of the study population until July 2024. Defendants did not disclose the average change in errors from baseline to day 28 for the full episodic memory data set (i.e., -3.4 points for the placebo group, -2.8 points for the 50 mg group, and -0.0 points for the 100 mg group), which the full data set did not show similar directional improvement for either the 50 mg or 100 mg group compared with placebo.

91. While one presentation filed with the SEC did note that "*effect sizes* vs. placebo were calculated by Hedge's g after removing the most and least impaired subjects across all groups by baseline score" (emphasis added), the presentation failed to disclose that episodic memory results displayed in the graph were from a sensitivity analysis, not from data from the full population.

92. <u>Cassava and Dr. Burns selected a secondary outcome measurement to report for spatial working memory and did not report results from other key spatial working memory outcome measures</u>. Dr. Burns worked with the CANTAB developer to select key secondary measurements for spatial working memory before she was unblinded. After those measurements did not show promising results, she decided to select a new spatial working memory measurement that showed improvements in treatment arms compared with placebo. By failing to disclose the other tests that did not show directional improvement and failing to disclose that Dr. Burns only selected

the reported measurement, Defendants negligently misrepresented the full truth of the results.

93.   <u>Misstatements about Phase 2b were material.</u> PTI-125 is Cassava's primary asset and its only realistic potential source of revenue. The company's financial status leading up to the stock sales in November 2020 and February 2021 also show the materiality of the news about Phase 2b. Several banks advised the company that Cassava would be unable to raise sufficient capital for Phase 3 testing until announcing the Phase 2b results. Following the Phase 2b result disclosures, the company's stock price rose dramatically, enabling the company to raise hundreds of millions of dollars for its Phase 3 testing.

**B.    Recordkeeping and Reporting Requirements**

94.   Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11 and 13a-13 thereunder require issuers to timely file annual, current and quarterly reports, respectively, with the Commission. Implicit in these provisions is the requirement that the information provided be accurate. Exchange Act Rule 12b-20 requires that periodic reports contain all information necessary to ensure that statements made in them are not materially misleading.

95.   Cassava made its misstatements in at least 15 publicly filed annual and quarterly disclosures between September 14, 2020 and February 2024 and in multiple periodic filings.  Following notice of the issues related to potential biomarker test manipulation in 2021, Cassava continued to both affirmatively include misrepresentations in its publicly filed disclosures and presentations as well as

incorporate prior misrepresentations by reference into its continued disclosures. Barbier was ultimately responsible for ensuring the accuracy of the company's filings, and he filed quarterly certifications declaring that the disclosures were accurate. Dr. Burns should have known that certain provisions of the company's filings contained misleading information.

## FIRST CLAIM FOR RELIEF

### (Against Cassava for Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)])

96.     The SEC realleges and incorporates by reference paragraphs 1 through 95 above.

97.     By reason of the conduct described above, Cassava, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (i) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser. As alleged above, Cassava's negligent actions included: stating in public filings that the Phase 2b study was conducted under "blinded conditions;" reporting that the Phase 2b study was conducted by an "academic lab" and failing to name Dr. Wang or the subsequent findings against him by Cassava's internal audit; portraying a sensitivity analysis related to the Phase 2b

24

episodic cognitive results as the full and final results of the clinical trial; and failing to disclose that the spatial working memory measurement reported in the Phase 2b results was a post-hoc measurement selected by Dr. Burns in place of pre-selected measurements that did not show positive outcomes.

98.    While engaging in the conduct described above, Cassava acted negligently.

99.    By engaging in the conduct described above, Cassava violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

## SECOND CLAIM FOR RELIEF

### (Against Barbier for Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)])

100.    The SEC realleges and incorporates by reference paragraphs 1 through 95 above.

101.    By reason of the conduct described above, Barbier, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (i) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser. As alleged above, Barbier's negligent actions

included: reporting that the Phase 2b study was conducted by an "academic lab;" failing to name Dr. Wang as the sole scientist conducting the biomarker analysis for Phase 2b; and failing to disclose that Cassava deemed Dr. Wang's laboratory unacceptable pursuant to an internal audit.

102. While engaging in the conduct described above, Barbier acted negligently.

103. By engaging in the conduct described above, Barbier violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

## THIRD CLAIM FOR RELIEF

### (Against Dr. Burns for Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)])

104. The SEC realleges and incorporates by reference paragraphs 1 through 95 above.

105. By reason of the conduct described above, Dr. Burns, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (i) obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit  upon the purchaser. As alleged above, Dr. Burns' negligent actions

26

included: stating in public filings that the Phase 2b study was conducted under "blinded conditions;" portraying a sensitivity analysis related to the Phase 2b episodic cognitive results as the full and final results of the clinical trial; and failing to disclose that the spatial working memory measurement reported in the Phase 2b results was a post-hoc measurement selected by Dr. Burns in place of pre-selected measurements that did not show positive outcomes.

106. While engaging in the conduct described above, Dr. Burns acted negligently.

107. By engaging in the conduct described above, Dr. Burns violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

## FOURTH CLAIM FOR RELIEF

### (Against Cassava for Violating Section 13(a)(1) of the Securities Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. § 78m(a) and 17 C.F.R. § 240.12b-20, 13a-1, 13a-11, and 13a-13])

108. The SEC realleges and incorporates by reference paragraphs 1 through 95 above.

109. Cassava violated Exchange Act Section 13(a)(1) and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder by including false and misleading information in disclosure documents filed with the Commission pursuant to the Exchange Act.

110. By engaging in the conduct described above, Cassava violated, and unless restrained and enjoined will continue to violate Exchange Act Section 13(a)(1) and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Finding that Defendants committed the alleged violations;

### II.

Permanently enjoining all Defendants, their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, from violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

### III.

Permanently enjoining Cassava, its agents, servants, employees, and attorneys, and those persons in active concert or participation with any of it, who receive actual notice of the judgment by personal service or otherwise, from violating Exchange Act Section 13(a)(1) [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. § 240.12b-20, 13a-1, 13a-11, and 13a-13];

### IV.

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

## V.

Pursuant to the Court's inherent authority to fashion appropriate equitable relief in this matter, prohibiting Barbier and Burns from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

## VI.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

## VII.

Granting such other and further relief as this Court may determine to be just and necessary.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Securities and Exchange Commission demands that this case be tried to a jury.

Dated:  Washington, D.C.                    Respectfully submitted,
        September___, 2024

                                  By: _____

Zachary A. Avallone
Tel. No. 202.795.0987
Email: avallonez@sec.gov
Melissa Armstrong
Tel. No. 202.551.4724
Email: armstrongme@sec.gov

United States Securities and Exchange
Commission
100 F Street, N.E.
Washington, D.C. 20549

# EXHIBIT 4

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Release No. 11311 / September 26, 2024**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 101201 / September 26, 2024**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-22210**

| | |
|---|---|
| In the Matter of<br><br>HOAU-YAN WANG,<br><br>Respondent. | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Hoau-Yan Wang ("Dr. Wang" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings,

1

Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

1. This matter involves false and misleading statements about reported biomarker results from Cassava Sciences, Inc.'s ("Cassava") Phase 2b clinical trial for Cassava's drug candidate PTI-125,[2] a potential therapy for the treatment of Alzheimer's disease. In filings with the SEC, Cassava claimed that Phase 2b bioanalyses were conducted under blinded conditions and claimed that patients taking the drug showed significant improvement across every measured biomarker for Alzheimer's disease compared with patients who took a placebo. Because of the conduct of Dr. Wang described herein, those claims were false.

2. Dr. Wang conducted the analyses that Cassava announced as the final results of Phase 2b. Respondent used information provided by Cassava to partially unblind himself before performing those bioanalyses. By partially unblinding himself, Dr. Wang was able to manipulate the reported results to show that patients taking the placebo had little change in biomarkers on average while patients taking PTI-125 showed significant improvement on average.

3. After Cassava reported its Phase 2b trial results, the company raised more than $260 million in new funding, in part based on false biomarker results provided by Respondent.

### Respondent

4. **Dr. Hoau-Yan Wang** is a tenured associate professor at the City University of New York's ("CUNY") School of Medicine. Dr. Wang served on Cassava's Scientific Advisory Board, and Cassava retained Dr. Wang as a paid consultant through June 2024. Dr. Wang co-invented PTI-125 along with Cassava's Senior Vice President of Neuroscience.

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2] PTI-125 is also known as simufilam.

2

## Other Relevant Persons or Entities

5.   **Cassava Sciences, Inc. ("Cassava")** is a Delaware corporation with its principal place of business in Austin, Texas. Cassava is a pharmaceutical company with one primary drug candidate, PTI-125, a potential therapeutic for Alzheimer's disease. Cassava's shares are registered with the Commission pursuant to Section 12(b) of the Exchange Act and are listed on the Nasdaq Capital Market under the symbol "SAVA."

## Cassava's Initial PTI-125 Trials

6.   Clinical trials for a new drug usually proceed through three phases before the FDA will consider a New Drug Application.

7.   In 2017, the FDA cleared Cassava's Investigational New Drug application for PTI-125, which allowed Cassava to begin clinical trials of the drug in humans. That same year, Cassava completed a Phase 1 human safety trial of PTI-125.

8.   In 2019, Cassava ran what it called a Phase 2a trial, consisting of 13 Alzheimer's patients who all took doses of PTI-125 for 28 days. There was no placebo group.

9.   One key objective of Cassava's Phase 2a trial was to measure changes in concentration of biomarkers—substances in cerebrospinal fluid ("CSF") believed to correspond with Alzheimer's disease pathology, neuroinflammation, and neurodegeneration. To measure changes in biomarkers, CSF was collected from patients before taking the drug and again after 28 days of treatment.

10. Cassava asked Dr. Wang to analyze the CSF samples collected from the Phase 2a participants. According to Dr. Wang's results, all 13 patients showed directional improvements in multiple biomarkers, suggesting that the drug may be causing changes in biomarker levels.

11. In public announcements and SEC filings, Cassava disclosed that Dr. Wang and his lab at CUNY performed the biomarker tests for Phase 2a.

## Cassava's Phase 2b Trial

12. In 2019, Cassava designed and began its Phase 2b clinical trial. That trial ultimately included 64 patients separated into three groups—one placebo group, one group taking 50 mg doses of PTI-125, and another group taking 100 mg doses of PTI-125. Each patient in each group was to take their respective treatment for 28 days.

3

13. Phase 2b was to be conducted as a double-blinded clinical trial, which means neither the patient nor the tester is aware which patient received which treatment. Blinding is a standard practice in many clinical trials, in part because it helps reduce the potential impact of bias.

14. Participants in Phase 2b had CSF drawn before treatment began and again after 28 days of treatment. Pursuant to the testing protocol, Cassava directed each clinical site to send patient CSF samples to the CUNY laboratory in New York where Dr. Wang performed research to be stored before laboratory analysis. Laboratory results were to be sent directly to Cassava's Senior Vice President of Neuroscience who then was to forward them to a biostatistics company hired by Cassava to compile unblinded results.

## Phase 2b Round 1 Biomarker Testing

15. Cassava initially hired a laboratory in Europe to test the Phase 2b CSF samples for nine biomarkers. However, there were two biomarkers that Cassava wanted tested that the European lab could not measure. Cassava asked Dr. Wang to test CSF samples for those two biomarkers. All biomarker testing by the European lab (seven tests) and Dr. Wang (two tests) (collectively, "Round 1") were completed by early May 2020. Results were sent to Cassava's Senior Vice President of Neuroscience, who forwarded them to the biostatistics company.

16. On May 15, 2020, Cassava filed a Form 8-K with the Commission, attaching a press release with the headline "Top-line Results from a Phase 2b Study of PTI-125 in Alzheimer's Disease Does Not Meet Primary Endpoint."

17. None of the tests performed by the European lab showed a meaningful effect of the drug treatment arms compared with the placebo. The Phase 2b Round 1 results also did not show a drug effect consistent with Dr. Wang's Phase 2a results.

## Dr. Wang Partially Unblinds Himself to Certain Phase 2b Patients

18. On May 13, 2020, the biostatistics company sent Cassava's Senior Vice President of Neuroscience a document summarizing the statistics for each Round 1 biomarker. The document included, among other things, statistics for the lowest (min) and highest (max) sample levels in each treatment arm and in the placebo group for Day 0 (before the trial) and Day 28 (after the trial). The document also identified the largest and smallest "change from baseline" or change in biomarker levels in each treatment arm and placebo group.

19. On May 14, 2020, Cassava's Senior Vice President of Neuroscience sent this document with min, max, and change from baseline data to Dr. Wang.

4

20. That document had sufficient information to allow Dr. Wang to match the test results that he ran in Round 1 with specific reported statistics.

21. Ultimately, using the information he was provided, Dr. Wang was able to unblind himself to roughly a third of the patients in Phase 2b—eight patients in the placebo group; seven in the 50 mg group; and eight in the 100 mg group.

22. Dr. Wang recorded his process for unblinding certain patients in a set of spreadsheets that matched the individual patient identification numbers with known biomarker results from Round 1.

### Dr. Wang Conducts Phase 2b Round 2 Biomarker Testing

23. On or around June 1, 2020, Cassava directed Dr. Wang to perform a reanalysis of the Phase 2b clinical samples for the seven biomarkers tested by the European lab during Round 1 using the CSF samples remaining in Dr. Wang's lab. Dr. Wang did not, as part of Round 2, re-run tests for the two biomarkers he analyzed in Round 1. Dr. Wang also agreed to run additional biomarker tests that had not been completed in Round 1. These combined tests constituted the Round 2 testing.

24. Dr. Wang was partially unblinded before he began running bioanalyses for Round 2.

25. By unblinding himself to a portion of the Phase 2b patients, Dr. Wang caused Cassava to make misleading statements that all analyses were "conducted under blinded conditions to eliminate the possibility of bias."

26. Dr. Wang manipulated the Phase 2b biomarker data, using the knowledge he gained through the unblinding process to show an exaggerated response to the treatment arms as compared to the placebo group.

27. For every biomarker that Dr. Wang tested in Round 2, generally all patients showed improvements in biomarkers *except for* those patients who Dr. Wang had identified through his unblinding process as having taken the placebo.[3] Moreover, Dr. Wang reported results for unblinded 50 mg and 100 mg patients generally that reflected more improvement than patients who Dr. Wang did not

---

[3] Dr. Wang's spreadsheets that recorded his process of matching individual patient identification numbers to treatment groups contained two errors. Dr. Wang marked patient 07-002 as placebo when that patient was actually in the 50 mg group. Dr. Wang made this error on May 15, 2020, before he began any testing for Round 2. Second, Dr. Wang mistakenly identified patient 13-019 as part of the 100 mg group when that patient actually was in the 50 mg group because Dr. Wang's results showed two patients with the same value rounded to the nearest thousandth.

unblind. This pattern is evidenced in Dr. Wang's results for two tested biomarkers, Total Tau and Phosphorylated Tau.

28. The following scatterplots are representative of Dr. Wang's manipulation across each of the seven Phase 2b biomarkers tested in Round 2. These scatterplots portray patient data in the placebo, 50 mg, and 100 mg groups for Total Tau and Phosphorylated Tau, two neurodegeneration biomarkers. As seen below, the patients unblinded by Dr. Wang (those marked by red diamonds) move anomalously to the rest of the blinded subjects (those marked by blue dots). The plots also illustrate the two incorrectly identified patients.



6



29. The same general pattern occurred for the remaining biomarkers that Dr. Wang analyzed in Round 2 of Phase 2b testing.

30. This pattern *does not* exist in the two biomarkers that Dr. Wang analyzed in Round 1, prior to his unblinding.

31. When unblinded patients are removed from the analysis of each Round 2 biomarker, the results no longer show a significant difference between placebo, 50 mg, and 100 mg.

32. The results from the subjects unblinded by Dr. Wang appear to drive the Phase 2b Round 2 results reported by Cassava.

33. Dr. Wang knew these manipulated results would be reported to the market.

**Cassava Publicizes Results from Dr. Wang's Phase 2b Results**

34. On September 14, 2020, Cassava publicized Dr. Wang's results which showed statistically significant improvement in all biomarkers in the treatment groups as compared with the placebo group. The company issued a press release and provided an investor presentation with an accompanying slide deck, all of which were filed with the Commission under Form 8-K.

35. The September 14, 2020, press release stated that "Bioanalyses were conducted under blinded conditions to eliminate any possibility of bias. An academic lab generated final results." Cassava further announced that "Alzheimer's patients treated with 50 mg or 100 mg of [PTI-125] twice-daily for 28 days showed statistically significant (p<0.05) improvements in biomarkers of disease pathology, neurodegeneration and neuroinflammation, versus Alzheimer's patients who took placebo."

36. Shortly after Cassava's announcements regarding its Round 2 Phase 2b results, the company's stock more than doubled, from $3.40 to $8.41 on September 14, 2020.

## Investors Purchase Cassava Shares Based on Phase 2b Results Manipulated by Dr. Wang

37. On November 16, 2020, Cassava filed an updated prospectus supplement to sell more than 9 million shares at $8 per share, netting Cassava around $70 million after underwriting fees. The prospectus incorporated by reference certain documents, including the Form 8-K filed September 14, 2020.

38. Cassava subsequently filed a new shelf registration statement in February 2021 to register sales of approximately $200 million, which it executed on, netting more than $190 million after paying underwriter fees. Cassava incorporated documents into the shelf registration and subsequent prospectus, including the Form 8-K filed September 14, 2020.

39. Dr. Wang owned Cassava stock and unexercised options. He also qualified to participate in Cassava's Cash Incentive Plan, which allowed Cassava's Board of Directors discretion to authorize cash payments from a pool based on meeting valuation benchmarks and other triggers. Dr. Wang also was a long-term consultant for Cassava, for which he received a monthly payment.

## Dr. Wang Violated Securities Act Sections 17(a)(1) and (3) and Exchange Act Section 10(b) and Rules 10b-5(a) and (c)

40. Securities Act Section 17(a)(1) makes it unlawful for any person, in the offer or sale of a security, to "employ any device, scheme, or artifice to defraud." Securities Act Sections 17(a)(2) and 17(a)(3) make it unlawful for any person, in the offer or sale of a security, to "obtain money or property by means of any untrue statement of material fact" or a material omission necessary to make statements made not misleading, or to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

41. Section 10(b) of the Exchange and Rules 10b-5(a) and (c) prohibit, in connection with the purchase or sale of a security, employing any device, scheme,

or artifice to defraud, and engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

42. Securities Act Section 17(a)(1), Exchange Act Section 10(b), and Rules 10b-5(a) and (c) require a showing that the defendant acted with scienter. Reckless conduct generally satisfies the scienter requirement.

43. Dr. Wang retained information provided by Cassava to unblind himself as to a portion of Phase 2b clinical trial patients. Dr. Wang used his knowledge about certain unblinded patients to manipulate the results of Phase 2b biomarker results, which he transmitted to Cassava to be used for public disclosures about the Phase 2b trial's purported success.

44. Dr. Wang obtained money or property in the form of stock option awards from Cassava.

45. As a result of Dr. Wang's conduct described above, he violated Securities Act Sections 17(a)(1) and (3) and Exchange Act Section 10(b)(5) and Rules 10b-5(a) and (c).

## Dr. Wang Caused Cassava's Violations of Securities Act Sections 17(a)(2) and (3)

46. Securities Act Sections 17(a)(2) and 17(a)(3) make it unlawful for any person, in the offer or sale of a security, to "obtain money or property by means of any untrue statement of material fact" or a material omission necessary to make statements made not misleading, or to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

47. In administrative proceedings, the Commission may impose sanctions upon any person that is, was, or would be a cause of a violation, due to an act or omission the person knew or should have known would contribute to such violation. In order to establish that a person caused a non-scienter based violation, a showing of negligence will suffice.

48. Cassava falsely disclosed to the public that all its bioanalyses related to Phase 2b were "conducted under blinded conditions to eliminate the possibility of bias." By unblinding himself as to a portion of Cassava's Phase 2b patients, Dr. Wang caused Cassava's violations of Securities Act Sections 17(a)(2) and (3).

## Findings

49. As a result of the conduct described above, the Commission finds that Respondent violated Section 17(a) of the Securities Act, and Section 10(b)

9

and Rules 10b-5(a) & (c) of the Exchange Act. Respondent caused Cassava's violations of Securities Act Sections 17(a)(2) and 17(3).

## IV.

In view of the foregoing, the Commission deems it appropriate, in the public interest, and for the protection of investors to impose the sanctions agreed to in Respondent Wang's Offer.

Accordingly, pursuant to Section 8A of the Securities Act, and 21C of the Exchange Act, it is hereby ORDERED that:

A.      Respondent Wang shall cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

B.      Respondent Wang shall pay civil penalties of $50,000.00 to the Securities and Exchange Commission. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment shall be made in the following installments:

- Within 30 days of the entry of the Order, Respondent shall pay $30,000;
- Respondent shall make a second payment of $5,000 within 120 days of the entry of the Order;
- Respondent shall make a third payment of $5,000 within 210 days of the entry of the Order;
- Respondent shall make a fourth payment of $5,000 within 300 days of the entry of the Order; and
- Respondent shall make a final payment within 364 days of the entry of the Order.

Prior to making the final payment set forth herein, Respondent shall contact the staff of the Commission for the amount due.  Payments shall be applied first to post order interest, which accrues pursuant to pursuant to 31 U.S.C. 3717. If Respondent fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Order, including post-order interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Commission.

Payment must be made in one of the following ways:

(1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

10

(2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Hoau-Yan Wang as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Mark Cave, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

C.     Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund is created for penalties referenced in paragraphs IV.B. above. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, he shall not argue that he is entitled to, nor shall he benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that he shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

## V.

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under this Order or any other judgment, order, consent order, decree or

settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondent of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).


By the Commission.


Vanessa A. Countryman
Secretary

# EXHIBIT 5



**U.S. Securities and Exchange Commission**

Home / Newsroom / Press Releases / SEC Charges Cassava Sciences, Two Former Executives for Misleading Claims About Alzheimer's Clinical Trial

PRESS RELEASE

# SEC Charges Cassava Sciences, Two Former Executives for Misleading Claims About Alzheimer's Clinical Trial

## Cassava-affiliated university scientist also charged for manipulating clinical trial results

**FOR IMMEDIATE RELEASE** | 2024-151

Washington D.C., Sept. 26, 2024 — The Securities and Exchange Commission today announced Cassava Sciences, Inc., its founder and former CEO, Remi Barbier, and its former Senior Vice President of Neuroscience, Dr. Lindsay Burns, will pay more than $40 million to settle charges related to misleading statements made in September 2020 about the results of a Phase 2 clinical trial for the company's purported therapeutic for the treatment of Alzheimer's disease.

In a related order, the SEC charged Cassava consultant, Dr. Hoau-Yan Wang, an associate medical professor at the City University of New York's Medical School and the therapeutic's co-developer, for manipulating the reported clinical trial results.

According to the SEC's order, Wang received information that unblinded him to some aspects of the Phase 2 clinical data, which he used to identify about a third of the patients

enrolled in the trial. In a blinded clinical trial, to avoid bias in the results, no one involved in the trial knows the treatment assignment of individual patients, including whether the patient received a placebo or an active dose of the therapeutic. Using information that unblinded him to aspects of the trial data, Wang was able to manipulate the data to create the appearance that the drug had caused dramatic improvements in biomarkers associated with Alzheimer's disease, such as total tau and phosphorylated tau, which are common indicators of neurodegeneration in Alzheimer's patients. The order also finds that Wang knew Cassava would disclose the manipulated data when announcing the results of its Phase 2 clinical trial, and Cassava did in fact publicize the data in a press release and investor deck issued on September 14, 2020. The SEC's related civil complaint alleges that Cassava and Burns misled investors with claims that the Phase 2 trial was conducted in blinded conditions, even though Wang had been unblinded.

The SEC's complaint further alleges that Cassava misled investors by announcing that the company's therapeutic significantly improved patient cognition. Among other things, Cassava claimed that the Phase 2 results showed significant improvement in episodic memory of the Alzheimer's patients involved in the clinical trial. In reporting the results, however, Cassava failed to disclose that the full set of patient data – as opposed to the subset of data hand-selected by Burns – showed no measurable cognitive improvement in the patients' episodic memory. Cassava and Barbier also failed to disclose Wang's role in the clinical trial, despite his personal, financial, and professional interest in the therapeutic's success.

"Our capital markets can and should be a powerful engine for innovation in the development of new and potentially life-altering therapeutics," said Mark Cave, Associate Director of the SEC's Division of Enforcement. "Today's actions – which include charges against senior executives and significant monetary relief against Cassava – reflect our commitment to upholding public confidence in the market's ability to accelerate legitimate scientific advances."

The SEC's complaint, filed in the U.S. District Court for the Western District of Texas, charges Cassava, Barbier, and Burns with violating antifraud provisions of the federal securities laws and charges Cassava with violating reporting provisions of the federal securities laws. Without admitting or denying the allegations, Cassava, Barbier, and Burns consented to civil injunctions against future violations and agreed to pay civil penalties of $40 million, $175,000, and $85,000, respectively. Barbier and Burns agreed to be subject to officer-and-director bars of three and five years, respectively. The settlements are subject to court approval.

The SEC's order alleges that Wang violated antifraud provisions of the federal securities laws and that he aided and abetted Cassava's violations of the reporting provisions. Without admitting or denying the violations, Dr. Wang consented to cease and desist from future violations and to pay a $50,000 penalty.

The SEC's investigation was conducted by Matthew Spitzer, Ernesto Amparo, and Zachary Avallone and was supervised by Sarah Hall, Melissa Armstrong, and Mr. Cave. Eugene Canjels from the Commission's Division of Economic Risk and Analysis provided assistance.

###

Last Reviewed or Updated: Sept. 26, 2024

## RESOURCES

- **SEC Order**
- **SEC Complaint**

# EXHIBIT 6

| From: | Blackwood, Emma K.F. |
|---|---|
| To: | Kevin Lavelle |
| Cc: | Caprez, Timothy; Beidel, Jennifer; Rachel Jensen |
| Subject: | RE: WANG fourth Rolling Production |
| Date: | Tuesday, October 15, 2024 1:01:09 PM |
| Attachments: | image001.png |
| | DYK21006-logo_RGB_FINAL(Custom)_d7656d32-7389-4b1f-8183-04753cc3fce5.png |

## EXTERNAL SENDER

Kevin—

Thank you for your follow-up. Dr. Wang continues to assert the act of production privilege over the SEC transcripts and related communications, and this position remains unchanged. The act of production privilege protects against compelled testimonial communication that may be self-incriminating. In this case, producing the testimony itself would implicitly communicate facts and the existence, location, and authenticity of documents (deposition exhibits) that are not already a "foregone conclusion." Since these elements are not independently known to the Plaintiffs and could be used to incriminate Dr. Wang, we must decline to produce this testimony based on his constitutional rights, as mentioned previously. *In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1328 (11th Cir. 2012).

As to your requests for other specific communications, beyond those previously produced by Dr. Wang before he was a defendant in a criminal case, he is also asserting his constitutional right against self-incrimination not to produce those or to confirm or deny their existence.

Thanks,
Emma

**Emma K.F. Blackwood**
Attorney

D 512-703-6311
EBlackwood@dykema.com ▪ dykema.com

**BIO  VCARD  LINKEDIN**

111 Congress Avenue, Suite 1800
Austin, Texas 78701

# Dykema

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Friday, October 11, 2024 4:11 PM
**To:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Cc:** Caprez, Timothy <TCaprez@dykema.com>; Beidel, Jennifer <JBeidel@dykema.com>; Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production

**\*\*\* EXTERNAL\*\*\***

Emma,

Thank you for the response. Your email does not attach Dr. Wang's privilege log.  We agreed, over two weeks ago, that one would be provided. As the log contains just a few documents, please provide it by close of business Monday, otherwise we understand that Dr. Wang is no longer asserting any privilege.

As to the balance of your email, our responses are in red below.

-Kevin

---

**From:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Sent:** Thursday, October 10, 2024 2:00 PM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Cc:** Caprez, Timothy <TCaprez@dykema.com>; Beidel, Jennifer <JBeidel@dykema.com>; Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production

EXTERNAL SENDER
Kevin—

While your follow-up requests have not been styled as formal document requests or interrogatories, we believe you to be requesting the following:

First, you have asked us to confirm "that there have been no communications between Dr. Wang, or his counsel, and Defendants, or their counsel, regarding the SEC transcripts.  Please also confirm whether or not there are communications more broadly between Dr. Wang's counsel and Defendants' counsel regarding the issues in this case."  We have reviewed your requests and are unaware of any that call for communications involving Dr. Wang's counsel or Defendants' counsel on any topic.  If you believe these communications are responsive to your requests, please indicate which requests.  To the extent you are requesting communications involving Defendants, we objected on the basis that those documents are in the possession, custody, or control of Defendants and you should seek the documents from those Defendants rather than from us as a third-party.

It is incorrect that our document requests did not call for communications "involving Dr. Wang's counsel or Defendants' counsel."  Rather, the requests specifically encompass Dr. Wang, and those "act[ing] on his behalf," which include, by extension, his counsel. And while we understand your objections, they do not state, as the Federal Rules require, whether these responsive documents are being withheld. Please comply with the Federal Rules and specify whether or not there are responsive communications regarding the subject matter of the document requests.

Second, you asked for certain documents referenced in the SEC settlement.  Your characterization of that settlement as establishing that Dr. Wang unblinded himself is incorrect.  As you know, that

settlement was entered into on a no-admit, no-deny basis.  Nevertheless, and referring back to and incorporating the objections set forth in our written responses to your document requests, the spreadsheets referenced have been produced at the following Bates numbers: WANG_CIV_0002658, WANG_CIV_0002659, and WANG_CIV_0002660.

Thank you.

Third, you asked:  "please also produce the May 14, 2020 email Dr. Wang used to un-blind himself in Cassava's Phase 2b trial, referenced in paragraph 19 of the September 26, 2024 Cease and Desist Order, the spreadsheets referenced in paragraphs 22 and 27 of the order, and the documents reflecting Dr. Wang's ownership of Cassava stock referenced in paragraph 39 of the order."  We believe these to be extensions of Requests 23, 50, and 54, all of which we objected to on the basis that these are documents in Cassava's possession, custody, or control that you should get from them and not from us as a third-party.

Regarding the May 14, 2020 email, Defendants have represented that the document is not in their possession. Accordingly, we request that Dr. Wang, as the recipient of the email, produce it.  Please confirm that you will do so by close of business Monday.

Fourth, you asked: "Could you please explain how Dr. Wang is able to consent to the entry of an SEC order on the same subject matter as his SEC deposition transcripts without admitting or denying the order's findings, but is unable to produce the SEC transcripts without admitting or denying their accuracy?"  If that is intended as an interrogatory, please style it as such.

As you already know, Dr. Wang, as a non-party, is not subject to interrogatories.  Plaintiffs do, however, wish to understand the scope and context of the "Act of Production" privilege that Dr. Wang has asserted. If, as Dr. Wang's counsel, you are unwilling or unable to answer the question, please let us know by close of business Monday.


Thanks,
Emma


**Emma K.F. Blackwood**
Attorney

D 512-703-6311
EBlackwood@dykema.com · dykema.com

**BIO   VCARD   LINKEDIN**

111 Congress Avenue, Suite 1800
Austin, Texas 78701



---

**From:** Blackwood, Emma K.F.

**Sent:** Thursday, October 3, 2024 3:24 PM
**To:** Kevin Lavelle <[KLavelle@rgrdlaw.com](mailto:KLavelle@rgrdlaw.com)>
**Cc:** Caprez, Timothy <[TCaprez@dykema.com](mailto:TCaprez@dykema.com)>; Rachel Jensen <[RachelJ@rgrdlaw.com](mailto:RachelJ@rgrdlaw.com)>; Beidel, Jennifer <[JBeidel@dykema.com](mailto:JBeidel@dykema.com)>
**Subject:** RE: WANG fourth Rolling Production

Kevin—

The court reporter information for Dr. Wang's SEC testimonies is as follows:

- Volume 1 (August 22, 2023) – Barbara Moore, CRR, RMR, Registered Court Reporter, District of Columbia
- Volume 2 (March 20, 2024) – Jennifer Corb, Court Reporter and Notary Public, Commonwealth of Pennsylvania

I am currently addressing your other requests and anticipate providing responses by this time next week.

Thanks,
Emma

---

**From:** Beidel, Jennifer <[JBeidel@dykema.com](mailto:JBeidel@dykema.com)>
**Sent:** Thursday, October 3, 2024 2:00 PM
**To:** Kevin Lavelle <[KLavelle@rgrdlaw.com](mailto:KLavelle@rgrdlaw.com)>
**Cc:** Blackwood, Emma K.F. <[EBlackwood@dykema.com](mailto:EBlackwood@dykema.com)>; Caprez, Timothy <[TCaprez@dykema.com](mailto:TCaprez@dykema.com)>; Rachel Jensen <[RachelJ@rgrdlaw.com](mailto:RachelJ@rgrdlaw.com)>
**Subject:** RE: WANG fourth Rolling Production

Emma is working on compiling the responses. She can give you a better timeline on completion than I can. Thanks.

**Jennifer L. Beidel**
Member

D 248-203-0506 • M 215-470-0667
[JBeidel@dykema.com](mailto:JBeidel@dykema.com) • dykema.com

**BIO   VCARD   LINKEDIN**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304

**Dykema**

---

**From:** Kevin Lavelle <[KLavelle@rgrdlaw.com](mailto:KLavelle@rgrdlaw.com)>
**Sent:** Thursday, October 3, 2024 2:10 PM
**To:** Beidel, Jennifer <[JBeidel@dykema.com](mailto:JBeidel@dykema.com)>
**Cc:** Blackwood, Emma K.F. <[EBlackwood@dykema.com](mailto:EBlackwood@dykema.com)>; Caprez, Timothy <[TCaprez@dykema.com](mailto:TCaprez@dykema.com)>;

Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production

**\*\*\* EXTERNAL\*\*\***

Jennifer, as we have not head back from you on my below two emails, please kindly provide a response by close of business tomorrow.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Friday, September 27, 2024 11:49 AM
**To:** 'Beidel, Jennifer' <JBeidel@dykema.com>
**Cc:** 'Blackwood, Emma K.F.' <EBlackwood@dykema.com>; 'Caprez, Timothy'
<TCaprez@dykema.com>; Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production

Jennifer, I am following-up on my email below.  Could you kindly advise when the privilege log will be provided, along with the other information requested?  As the privilege log contains only a few documents, please produce it as soon as possible, as we would like to get this resolved by a court sooner rather than later.

We saw Dr. Wang's settlement with the SEC yesterday.  Could you please explain how Dr. Wang is able to consent to the entry of an SEC order on the same subject matter as his SEC deposition transcripts without admitting or denying the order's findings, but is unable to produce the SEC transcripts without admitting or denying their accuracy?

Relatedly, please also produce the May 14, 2020 email Dr. Wang used to un-blind himself in Cassava's Phase 2b trial, referenced in paragraph 19 of the September 26, 2024 Cease and Desist Order, the spreadsheets referenced in paragraphs 22 and 27 of the order, and the documents reflecting Dr. Wang's ownership of Cassava stock referenced in paragraph 39 of the order. We understood that Dr. Wang produced to Plaintiffs all documents produced to the government, but we have been unable to locate these documents in his production.  If we are mistaken, please identify the Bates number of the document.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Tuesday, September 24, 2024 4:35 PM
**To:** 'Beidel, Jennifer' <JBeidel@dykema.com>
**Cc:** 'Blackwood, Emma K.F.' <EBlackwood@dykema.com>; 'Caprez, Timothy'
<TCaprez@dykema.com>; Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production

Jennifer,

On September 17th, you represented to me that you would provide a copy of Dr. Wang's SEC deposition transcript and exhibits by the end of the week, i.e., by September 20th.  As we discussed during our call today, Dr. Wang has now decided to assert his Fifth Amendment rights over the SEC transcript documents based on the Act of Production doctrine and will not be producing them but instead provide a privilege log for those documents. Please provide a date by which that log will be provided.

On the call, we requested authority for the proposition that the production of the SEC transcripts to Plaintiffs would be an admission of the transcripts' accuracy.  You were unable to cite any on the call but, if you do find such authority, please let us know and we will consider it before filing any motion to compel.

We further understand that Dr. Wang was represented by counsel at your firm during the SEC depositions, that a court reporter was present, and that Dr. Wang has not reviewed the transcripts for accuracy. Please let us know the name of the court reporter and their agency.

Finally, please confirm, as discussed during the call, that there have been no communications between Dr. Wang, or his counsel, and Defendants, or their counsel, regarding the SEC transcripts. Please also confirm whether or not there are communications more broadly between Dr. Wang's counsel and Defendants' counsel regarding the issues in this case.

Please let us know if anything needs to be clarified.

-Kevin

**From:** Kevin Lavelle
**Sent:** Tuesday, September 24, 2024 11:19 AM
**To:** 'Beidel, Jennifer' <JBeidel@dykema.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Caprez, Timothy <TCaprez@dykema.com>; Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production

Perhaps it was the use of a double negative when you said "we have no non-privileged communications on this issue" that was confusing, but that is typically taken to mean that there are privileged communications on the issue. Looking forward to speaking at 1 to clear up any misunderstanding. If there are no responsive communications on the issue, privileged or otherwise, let us know.

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Tuesday, September 24, 2024 10:59 AM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Caprez, Timothy <TCaprez@dykema.com>;

Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production

EXTERNAL SENDER
I most decidedly did not say that.


**Jennifer L. Beidel**
Member

D 248-203-0506 ▪ M 215-470-0667
JBeidel@dykema.com ▪ dykema.com

**BIO**   **VCARD**   **LINKEDIN**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304

**Dykema**

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Tuesday, September 24, 2024 1:56 PM
**To:** Beidel, Jennifer <JBeidel@dykema.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Caprez, Timothy <TCaprez@dykema.com>;
Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production


**\*\*\* EXTERNAL\*\*\***

We will call you then at 248-203-0506.

You said you have privileged communications on the issue. Those communications are responsive to
request nos. 47-48, 50, among others.

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Tuesday, September 24, 2024 10:46 AM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Caprez, Timothy <TCaprez@dykema.com>;
Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production

EXTERNAL SENDER
1 Pacific today works.  In response to what request do you believe there are privileged
communications to log?


**Jennifer L. Beidel**
Member

D 248-203-0506 ▪ M 215-470-0667
JBeidel@dykema.com ▪ dykema.com

**BIO   VCARD   LINKEDIN**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304



---

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Tuesday, September 24, 2024 1:14 PM
**To:** Beidel, Jennifer <JBeidel@dykema.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Caprez, Timothy <TCaprez@dykema.com>; Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production

**\*\*\* EXTERNAL\*\*\***

When during the times provided are you available to meet and confer?

Please provide a privilege log for the withheld communications and let us know the privilege(s) asserted.

---

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Tuesday, September 24, 2024 9:25 AM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Caprez, Timothy <TCaprez@dykema.com>; Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production

EXTERNAL SENDER
We have no non-privileged communications on this issue.  The Act of Production of the transcript could be construed as Dr. Wang's consent to the accuracy of the contents, when, in fact, he did not review the transcript for accuracy.

**Jennifer L. Beidel**
Member

D 248-203-0506 ▪ M 215-470-0667
JBeidel@dykema.com ▪ dykema.com

**BIO   VCARD   LINKEDIN**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Tuesday, September 24, 2024 11:56 AM
**To:** Beidel, Jennifer <JBeidel@dykema.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Caprez, Timothy <TCaprez@dykema.com>; Rachel Jensen <RachelJ@rgrdlaw.com>
**Subject:** RE: WANG fourth Rolling Production

**\*\*\* EXTERNAL\*\*\***

We are available at 1 pm Pacific today or between 930 am – noon Pacific tomorrow. Let us know when works and a number to best reach you at.

The meet and confer would be more productive if you provided an explanation in advance of how the Act of Production privilege is applicable to Dr. Wang's SEC deposition transcripts. Are you not willing to do so? Please also be prepared to let us know if there are responsive communications between Dr. Wang, or his counsel, and the Cassava defendants or their counsel, regarding the SEC transcripts.

-Kevin

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Tuesday, September 24, 2024 8:36 AM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Caprez, Timothy <TCaprez@dykema.com>
**Subject:** RE: WANG fourth Rolling Production

EXTERNAL SENDER
We are available to meet and confer.  Let us know when is convenient for you.

**Jennifer L. Beidel**
Member

D 248-203-0506 • M 215-470-0667
JBeidel@dykema.com • dykema.com

**BIO   VCARD   LINKEDIN**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304

**Dykema**

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Monday, September 23, 2024 7:05 PM
**To:** Beidel, Jennifer <JBeidel@dykema.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Caprez, Timothy <TCaprez@dykema.com>

**Subject:** RE: WANG fourth Rolling Production

**\*\*\* EXTERNAL\*\*\***

Jennifer, I am surprised to receive this about face after your assurances that the transcripts would be provided last week.  Please let me know when you are available this week to meet and confer on the issue. In advance of that call, please explain how the Act of Production privilege is applicable to Dr. Wang's SEC deposition transcripts.

Please also let me know if Dr. Wang, or his counsel, has had any communications with Cassava, Remi Barbier or Lindsay Burns, or their counsel, regarding Dr. Wang's SEC transcripts. Such communications are responsive to Plaintiffs' subpoena.

-Kevin

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Monday, September 23, 2024 12:58 PM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Caprez, Timothy <TCaprez@dykema.com>
**Subject:** RE: WANG fourth Rolling Production

EXTERNAL SENDER
Kevin,

We will not be producing the transcript pursuant to the Act of Production privilege.

Thanks,
Jennifer

**Jennifer L. Beidel**
Member

D 248-203-0506 • M 215-470-0667
JBeidel@dykema.com • dykema.com

**BIO   VCARD   LINKEDIN**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304

**Dykema**

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Monday, September 23, 2024 3:03 PM
**To:** Beidel, Jennifer <JBeidel@dykema.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>

**Subject:** RE: WANG fourth Rolling Production

**\*\*\* EXTERNAL\*\*\***

Jennifer, I am following-up on this.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Friday, September 20, 2024 3:47 PM
**To:** 'Beidel, Jennifer' <JBeidel@dykema.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Subject:** RE: WANG fourth Rolling Production

Jennifer, can you please send me the transcripts and exhibits today?

-Kevin

---

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Tuesday, September 17, 2024 11:06 AM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Subject:** Re: WANG fourth Rolling Production

EXTERNAL SENDER
We'll get it to you this week.


**Jennifer L. Beidel**
Member

D 248-203-0506 • M 215-470-0667
JBeidel@dykema.com • dykema.com

**BIO   VCARD   LINKEDIN**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304



On Sep 17, 2024, at 2:01 PM, Kevin Lavelle <KLavelle@rgrdlaw.com> wrote:


**\*\*\* EXTERNAL\*\*\***

Jennifer, I know you are busy, but I would appreciate an update on this as we have an

upcoming status conference with the Court on outstanding discovery coming up.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Tuesday, September 10, 2024 10:02 PM
**To:** 'Beidel, Jennifer' <JBeidel@dykema.com>
**Cc:** 'Blackwood, Emma K.F.' <EBlackwood@dykema.com>
**Subject:** RE: WANG fourth Rolling Production

Jennifer, I know you were on vacation last week, so I wanted to follow-up on this.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Wednesday, September 4, 2024 4:02 PM
**To:** 'Beidel, Jennifer' <JBeidel@dykema.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Subject:** RE: WANG fourth Rolling Production

Jennifer, we spoke to one of the SEC attorneys a number of weeks ago who was surprised that Dr. Wang's transcripts had not been provided to you yet. Can you please confirm whether you have received them in these intervening weeks?

Thanks,
Kevin

---

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Wednesday, July 3, 2024 12:55 PM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Subject:** RE: WANG fourth Rolling Production

EXTERNAL SENDER
They have said they are providing it, but have not done so yet.  We do not have a timeline.  It has been pending since we told you we were submitting it.

**Jennifer L. Beidel**
Member

D 248-203-0506 • M 215-470-0667
JBeidel@dykema.com • dykema.com

**BIO   VCARD   LINKEDIN**

39577 Woodward Avenue, Suite 300

12

Bloomfield Hills, Michigan 48304

<image001.png>

---

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Wednesday, July 3, 2024 3:30 PM
**To:** Beidel, Jennifer <JBeidel@dykema.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Subject:** RE: WANG fourth Rolling Production


**\*\*\* EXTERNAL\*\*\***

Thank you.

Can you please clarify a few points: has the SEC provided a response that they are providing it, but have not done so yet? Or has the SEC not responded to your request?

If the former, did the SEC provide an indication of when it will be provided? If the latter, how long has your request been pending with the SEC?

-Kevin

---

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Wednesday, July 3, 2024 12:24 PM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Subject:** RE: WANG fourth Rolling Production

EXTERNAL SENDER
We requested it but did not receive it yet.


**Jennifer L. Beidel**
Member

D 248-203-0506 • M 215-470-0667
JBeidel@dykema.com • dykema.com

**BIO   VCARD   LINKEDIN**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304

<image001.png>

---

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Wednesday, July 3, 2024 3:23 PM
**To:** Beidel, Jennifer <JBeidel@dykema.com>

**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Subject:** RE: WANG fourth Rolling Production


**\*\*\* EXTERNAL\*\*\***

Jennifer, while I understand you are busy, we do need a response on this. Have a nice 4th of July.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Monday, June 24, 2024 9:27 AM
**To:** 'Beidel, Jennifer' <JBeidel@dykema.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Subject:** RE: WANG fourth Rolling Production

Jennifer, I don't believe we got a response on this? When was the transcript requested and what was the result?

-Kevin

---

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Monday, January 8, 2024 4:38 PM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Subject:** Re: WANG fourth Rolling Production

EXTERNAL SENDER
Kevin,

We have been incredibly busy on a number of fronts. We are requesting the transcript from the SEC and will let you know the result.

Jennifer


**Jennifer L. Beidel**
Member

D 248-203-0506 ▪ M 215-470-0667
JBeidel@dykema.com ▪ dykema.com

**BIO   VCARD**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304

On Jan 8, 2024, at 7:06 PM, Kevin Lavelle <KLavelle@rgrdlaw.com> wrote:

**\*\*\* EXTERNAL\*\*\***

Emma, having heard no response, we understand Dr. Wang does not wish to engage on this issue and will not be providing an answer. Plaintiffs reserve all rights, including to compel Dr. Wang to request his transcripts and related exhibits from any government agencies. Plaintiffs also reserve the right to seek costs associated with any such motion.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Thursday, January 4, 2024 4:17 PM
**To:** 'Blackwood, Emma K.F.' <EBlackwood@dykema.com>
**Cc:** 'Beidel, Jennifer' <JBeidel@dykema.com>
**Subject:** RE: WANG fourth Rolling Production

Emma, we need a response on requesting Dr. Wang's SEC testimony. It's been over a month now. Please provide an answer by close of business tomorrow.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Tuesday, January 2, 2024 2:34 PM
**To:** 'Blackwood, Emma K.F.' <EBlackwood@dykema.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG fourth Rolling Production

Emma,

Received, thank you. Can you please also provide a response to our request regarding Dr. Wang's transcripts and exhibits from his SEC testimony?

-Kevin

---

**From:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Sent:** Tuesday, January 2, 2024 11:46 AM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>

**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG fourth Rolling Production

EXTERNAL SENDER
Hi Kevin,

Please be advised that you will be receiving a notification via email from
FTPADMIN containing a link for Dr. Hoau-Yan Wang's forth rolling
production containing communications between Dr. Wang and Dr. Juan
Lerma, the editor of the journal *Neuroscience*. The username is your email
address, and because you have previously used the Dykema FTP site, your
password is the same as what you selected before. Once you have
accessed the Dykema FTP site, you will be able to download the
document production. Dr. Wang's document production is in a password
protected folder. Please note that this is a different password from the
one used to access the Dykema FTP site. The password to access the
password protected folder is: **Zu4ULDx7fhA@@kGL**

Please let us know if you have any issues accessing the files.

Thanks,
Emma


**Emma K.F. Blackwood**
Attorney

D 210-554-5225
EBlackwood@dykema.com • dykema.com

**BIO   VCARD   LINKEDIN**

112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205

<image001.png>

---

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Wednesday, December 20, 2023 4:45 PM
**To:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG Third Rolling Production


**\*\*\* EXTERNAL\*\*\***

Jen and Emma, I am again following-up on the two items below given that
we are shortly headed into Christmas and New Year's.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Wednesday, December 13, 2023 4:16 PM
**To:** 'Blackwood, Emma K.F.' <EBlackwood@dykema.com>
**Cc:** 'Beidel, Jennifer' <JBeidel@dykema.com>
**Subject:** RE: WANG Third Rolling Production

Jen and Emma, in addition to the below outstanding request, it also appears that Dr. Wang's production does not include the communications by which he supplied purported uncropped or original western blots to Dr. Juan Lerma, the editor of the journal *Neuroscience*. It appears such data was supplied to *Neuroscience* in and around November-December 2021, but we have been unable to find those communications in the documents produced. Please produce those documents.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Monday, December 11, 2023 3:04 PM
**To:** 'Blackwood, Emma K.F.' <EBlackwood@dykema.com>
**Cc:** 'Beidel, Jennifer' <JBeidel@dykema.com>
**Subject:** RE: WANG Third Rolling Production

I am following-up on the below.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Monday, December 4, 2023 2:37 PM
**To:** 'Blackwood, Emma K.F.' <EBlackwood@dykema.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG Third Rolling Production

Jen, Emma,

While I understand Dr. Wang does not currently have a copy of his SEC deposition transcript(s) and related exhibits, Plaintiffs request that Dr. Wang obtain a copy of those materials from the SEC, as documents under his custody or control, and produce them pursuant to Plaintiffs' subpoena. Please let me know if Dr. Wang agrees to do so.

P.S., Megan is currently on parental leave, so there is no need to continue copying her for the time being.

-Kevin

---

**From:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Sent:** Monday, November 13, 2023 10:06 AM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG Third Rolling Production

EXTERNAL SENDER
Megan and Kevin,

My office will be sending you a link today to our third rolling document production. Please let us know if you have issues opening it. In addition, attached is a cover letter from my colleague.

Best,
Emma

**Emma K.F. Blackwood**
Attorney

D 210-554-5225
EBlackwood@dykema.com • dykema.com

**BIO**   **VCARD**   **LINKEDIN**

112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205

<image001.png>

---

**From:** Blackwood, Emma K.F.
**Sent:** Friday, November 10, 2023 1:33 PM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)

Kevin,

The documentation that you requested concerning items 2 and 3 below is included in our third rolling production, which we intend to send to you shortly. Concerning the redaction on item 2, the top email is a communication between Dr. Wang and my colleague, Jen Beidel, and has

18

been redacted for privilege.

Thanks,
Emma

---

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Thursday, November 9, 2023 9:22 AM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>; Blackwood, Emma K.F.
<EBlackwood@dykema.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)

1.  He testified but we did not receive the transcript or exhibits, and so cannot produce them.

We will look into numbers 2 and 3 and respond.


**Jennifer L. Beidel**
Member

D 248-203-0506 ▪ M 215-470-0667
JBeidel@dykema.com ▪ dykema.com

**BIO**   **VCARD**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304

<image001.png>

---

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Wednesday, November 8, 2023 1:11 PM
**To:** Beidel, Jennifer <JBeidel@dykema.com>; Blackwood, Emma K.F.
<EBlackwood@dykema.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)


**\*\*\* EXTERNAL\*\*\***

Jen, while we are waiting to hear back from CUNY on the 483, I do have a few follow-up questions/requests on the production:

1. The SEC subpoenaed Dr. Wang for testimony. WANG_CIV_0000089. Has Dr. Wang testified yet? And, if so, have you received a copy of the transcript? We request the transcript and any exhibits be produced to plaintiffs.

2. WANG_CIV_0000007 includes an email Dr. Wang wrote to the FBI

referencing a number of attachments. Please produce this document with its attachments and provide an explanation of the redaction to the top of the email chain.

3. WANG-SDNY_0001387 appears to be responses to the FBI that reference "Raw data obtained in studies or clinical trials are included in the attached files" in No. 3. Please produce those attachments and the other attachments referenced in the document.

-Kevin

---

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Saturday, November 4, 2023 8:18 AM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>; Blackwood, Emma K.F. <EBlackwood@dykema.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)

EXTERNAL SENDER
That was a 483 directed at CUNY and CUNY responded, with our input. Any requests for those materials should be directed to CUNY. Happy to discuss.

**Jennifer L. Beidel**
Member

D 248-203-0506 · M 215-470-0667
JBeidel@dykema.com · dykema.com

**BIO   VCARD**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304

<image001.png>

---

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Friday, November 3, 2023 1:25 PM
**To:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)

**\*\*\* EXTERNAL\*\*\***

Jen and Emma,

We understand that Dr. Wang received and responded to a September

16, 2022 FDA Inspectional Observances (Form 483) letter for Cassava's Phase 2b clinical trial for PTI-125. Please produce all documents and communications regarding the Form 483 letter, including any final inspection report. Such documents are responsive to plaintiffs' subpoena. Please also let us know whether Dr. Wang received any other Form 483 letters concerning PTI-125. We are available to discuss.

-Kevin

---

**From:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Sent:** Monday, October 23, 2023 12:55 PM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)

EXTERNAL SENDER
Megan and Kevin,

My office will be sending you a link today to our second rolling document production. Please let us know if you have issues opening it. In addition, attached is a cover letter from my colleague.

Best,
Emma


**Emma K.F. Blackwood**
Attorney

D 210-554-5225
EBlackwood@dykema.com • dykema.com

**BIO   VCARD   LINKEDIN**

112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205

<image001.png>

---

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Tuesday, October 10, 2023 1:20 PM
**To:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)

*** EXTERNAL***

Emma, it has been a month since the documents produced to the government were re-produced to plaintiffs, and, as you know, we need the government correspondence to understand the contents of that production. Please confirm when the correspondence will be provided.

-Kevin

---

**From:** Kevin Lavelle
**Sent:** Thursday, October 5, 2023 3:11 PM
**To:** 'Blackwood, Emma K.F.' <EBlackwood@dykema.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)

Emma, I'm following up on this again.

-Kevin

---

**From:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Sent:** Wednesday, September 27, 2023 3:00 PM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)

EXTERNAL SENDER
Hi Kevin,

Apologies for the delay in response. We are working on the production for the related correspondence with the various agencies and will get back to you early next week.

Thanks,
Emma


**Emma K.F. Blackwood**
Attorney

D 210-554-5225
EBlackwood@dykema.com • dykema.com

**BIO   VCARD   LINKEDIN**

112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205

<image001.png>

22

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Friday, September 22, 2023 11:09 AM
**To:** Blackwood, Emma K.F. <EBlackwood@dykema.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)

**\*\*\* EXTERNAL\*\*\***

Jen, I'm following- up on the below.

-Kevin

**From:** Kevin Lavelle
**Sent:** Monday, September 18, 2023 4:46 PM
**To:** 'Blackwood, Emma K.F.' <EBlackwood@dykema.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)

Hi Jen, when can we expect that the related correspondence with the DOJ/SEC/SDNY will be produced?

-Kevin

**From:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Sent:** Monday, September 11, 2023 12:34 PM
**To:** Kevin Lavelle <KLavelle@rgrdlaw.com>; Megan Rossi <MRossi@rgrdlaw.com>
**Cc:** Beidel, Jennifer <JBeidel@dykema.com>
**Subject:** RE: WANG Production Export (DOJ, SDNY and SEC)

EXTERNAL SENDER
Megan and Kevin,

Shortly you should receive an email from Dykema File Exchange containing WANG Production Export which includes Wang's production to the DOJ, SDNY and SEC. To access the export, please use password **Oa25U8Uae#|\*** when prompted. The export contains 11,997 documents, 99,428 images and 3,439 natives.

Please let me know if you do not receive a separate email from Dykema File Exchange, or otherwise have issues accessing the files.

Thanks,
Emma

**Emma K.F. Blackwood**
Attorney

D 210-554-5225
EBlackwood@dykema.com • dykema.com

**BIO   VCARD   LINKEDIN**

112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205

<image001.png>

---

**From:** Kevin Lavelle <KLavelle@rgrdlaw.com>
**Sent:** Wednesday, September 6, 2023 12:10 PM
**To:** Beidel, Jennifer <JBeidel@dykema.com>; Megan Rossi
<MRossi@rgrdlaw.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Subject:** RE: CUNY Contacts

**\*\*\* EXTERNAL\*\*\***

Thanks, Jen.

-Kevin

---

**From:** Beidel, Jennifer <JBeidel@dykema.com>
**Sent:** Wednesday, September 6, 2023 9:50 AM
**To:** Megan Rossi <MRossi@rgrdlaw.com>; Kevin Lavelle
<KLavelle@rgrdlaw.com>
**Cc:** Blackwood, Emma K.F. <EBlackwood@dykema.com>
**Subject:** CUNY Contacts

EXTERNAL SENDER
Megan and Kevin:

See below, as discussed.

Jen

Arita C. Winter, MS
Director of Research Compliance

Office of Human Subjects Research Program (HRPP)

Hunter College of CUNY

695 Park Ave, Room E1204, New York, NY 10065

Email: aw4338@hunter.cuny.edu

Phone: (212) 650-3053

Fax: (212) 650-3055

Website: www.hunter.cuny.edu/irb

Rosemarie D. Wesson, Ph.D., P.E.

Associate Provost for Research

The City College of New York

160 Convent Avenue, A218

New York, NY  10031

 Phone:  212-650-6902

Email:  rwesson@ccny.cuny.edu

**Jennifer L. Beidel**
Member

D 248-203-0506 • M 215-470-0667
JBeidel@dykema.com • dykema.com

**BIO   VCARD**

39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304

<image001.png>

*** Notice from Dykema Gossett PLLC: This Internet message may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately.

Neither this information block, the typed name of the sender, nor anything else in this message is intended to constitute an electronic signature unless a specific statement to the contrary is included in this message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any

unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited.

**If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

**NOTICE: This email message is for the sole use of the intended
recipient(s) and may contain information that is confidential and
protected from disclosure by the attorney-client privilege, as
attorney work product, or by other applicable privileges.  Any
unauthorized review, use, disclosure or distribution is prohibited.
If you are not the intended recipient, please contact the sender
by reply email and destroy all copies of the original message.**

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE CASSAVA SCIENCES, INC. | § | Master File No. 1:21-CV-751-DAE |
| SECURITIES LITIGATION | § | |
| | § | CLASS ACTION |
| This Document Relates to: | § | |
| | § | |
| ALL ACTIONS. | § | |
| _____ | § | |

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Consolidated

Complaint filed on October 25, 2022. (Dkt. # 81.) The Court held a hearing on

Defendants' Motion on April 26, 2023. After careful consideration of the

memoranda filed in support of and in opposition to the Motion, as well as the

arguments advanced at the hearing, the Court, for the reasons below, **GRANTS IN**

**PART** and **DENIES IN PART** Defendants' Motion to Dismiss.

BACKGROUND

This case arises from four securities class action lawsuits brought

against Cassava Sciences, Inc. ("Cassava") and Cassava executives Remi Barbier,

Eric Schoen, Lindsay Burns, and Nadav Friedmann (the "Individual Defendants,"

and together with Cassava, "Defendants"). After this Court consolidated the cases

into a single action (dkt. # 58), Lead Plaintiff Mohammad Bozorgis and additional

1

plaintiffs Ken Calderone and Manohar Rao (collectively, "Plaintiffs") filed a

Consolidated Complaint on behalf of those who purchased or otherwise acquired

Cassava securities between September 14, 2020, and July 26, 2022 (the "Class

Period") (dkt. # 68).

Plaintiffs allege securities fraud claims against Defendants under

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15

U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  (Id. ¶¶ 520–24.)

Plaintiffs also bring claims for control person liability against the Individual

Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  (Id.

¶¶ 525–26.)

I.    The Company

Cassava is a small biotechnology company based in Austin, Texas.

(Dkt. # 68 ¶ 73.)  Cassava's primary drug candidate is simufilam, a small-molecule

drug designed to treat Alzheimer's disease.  (Id. ¶ 80.)  Some analysts have

predicted that simufilam could generate billions of dollars in annual revenue within

the next decade should it prove to be an effective treatment for Alzheimer's

disease.  (Id. ¶ 81.)

Cassava was founded by Remi Barbier ("Barbier"), who serves as its

Chairman, President, and Chief Executive Officer.  (Id. ¶¶ 1, 59.)  Lindsay Burns

("Dr. Burns") is Cassava's Senior Vice President of Neuroscience.  (Id. ¶ 61.)

2

Both are members of Cassava's product development and management teams. (Id. ¶¶ 59, 61.) Nadav Friedmann ("Dr. Friedmann") served as Cassava's Chief Operating Officer and Chief Medical Officer and was a member of its board of directors.[1] (Id. ¶¶ 64, 65.) Eric Schoen ("Schoen") is Cassava's Chief Financial Officer. (Id. ¶ 67.) Hoau-Yan Wang ("Dr. Wang")[2] is an Associate Medical Professor at the City University of New York ("CUNY") School of Medicine and is a member of Cassava's scientific advisory board, a Cassava consultant, and the co-inventor of simufilam. (Id. ¶ 57.)

Cassava's predecessor entity, Pain Therapeutics, Inc., began operating in 1998. (Id. ¶ 74.) Pain Therapeutic's primary drug candidate, a painkiller named Remoxy, never received approval from the United States Food and Drug Administration ("FDA"). (Id.) On August 6, 2018, after Pain Therapeutics announced that it had received a Complete Response Letter from the FDA denying its Remoxy New Drug Application, its stock price "lost nearly all of its value." (Id. ¶¶ 74, 75.) In March 2019, Pain Therapeutics rebranded as Cassava and announced that it would be "align[ing] its resources on advancing its drug and diagnostic assets in Alzheimer's disease." (Id. ¶ 75.)

---

[1] On January 27, 2023, a Suggestion of Death of Defendant Nadav Friedmann was filed. (Dkt. # 91.)

[2] Dr. Wang is not a defendant in this case.

3

Cassava developed simufilam during research conducted at the company from about 2008 to 2018. (Id. ¶ 80.) (During this time, Cassava also developed SavaDx, a diagnostic product candidate aimed at detecting Azheimer's disease.) (Id.) Simufilam is intended to restore a protein, filamin A, that Cassava's scientists state is misshapen in the brains of Alzheimer's patients. (Id. ¶ 83.) Dr. Burns and Dr. Wang published their research on filamin A and simufilam in several peer-reviewed scientific journals. (Id. ¶ 87.)

In July 2017, the company announced that the FDA had approved its Investigational New Drug application to study simufilam in patients with Alzheimer's disease. (Id. ¶ 88.) The press release noted that "[t]he underlying science for [simufilam] has been published in Journal of Neuroscience, Neurobiology of Aging, Journal of Biological Chemistry, PLOS-One and other peer-reviewed scientific journals." (Id.)

Following the successful completion of its Phase 1 and Phase 2a clinical studies, Cassava launched a Phase 2b study (a placebo-controlled, blind trial) in September 2019. (Id. ¶¶ 88, 89.) The bioanalysis for the study was conducted by a lab at Lund University. (Id. ¶ 94.) On May 15, 2020, Cassava announced that the Phase 2b study "did not meet its primary endpoint" because it did not show that simufilam lowered certain biomarkers of Alzheimer's disease. (Id. ¶¶ 8, 90.) Cassava's stock price tumbled. (Id. ¶ 91.)

4

II.    The Class Period

A few months later, on September 14, 2020, Cassava issued a press release announcing the "final results" of its Phase 2b study. (Id. ¶¶ 93, 268.) The press release stated that all samples "were sent to outside labs for bioanalysis" to measure the biomarkers and that "[a]n academic lab generated final results." (Id. ¶ 271.) According to Cassava, "an initial bioanalysis by a different lab showed highly anomalous data . . . . With its validity in question, the initial bioanalysis serves no useful purpose." (Id.) But the "final results" showed that simufilam "significantly improved an entire panel of validated biomarkers" of Alzheimer's disease. (Id. ¶ 269.)

Cassava did not disclose, however, that the reanalysis had been conducted by Dr. Wang's lab[3] and contained "highly anomalous" results. (Id. ¶ 96.) Immediately following the press release and an investor conference call—during which Barbier stated that the reanalysis was performed by an "academic lab"—Cassava's stock price climbed. (Id. ¶¶ 276, 279.)

A few weeks earlier, in August 2020, Cassava's Board of Directors had approved a "cash incentive bonus plan" that tied cash bonuses to increases in

---

[3] Plaintiffs note that a previous presentation by Cassava about the results of the simufilam Phase 2a study *did* disclose that Dr. Wang was a Cassava consultant and that Dr. Wang and others at CUNY conducted the biomarker analysis. (Id. ¶¶ 259, 260.)

Cassava's stock price.  (Id. ¶¶ 2, 98, 100–03.)  Thus, "Barbier and other Cassava

executives stood ready to cash in on the Phase 2b study reanalysis."[4]  (Id. ¶ 98.)

Cassava reached the first valuation milestone under the bonus plan in October

2020.  (Id. ¶ 101.)  On November 13, 2020, Cassava sold 9,375,000 shares of

common stock for $75 million.  (Id. ¶ 288.)

In February 2021, Cassava's stock leapt again after Cassava reported

results from another trial that indicated simufilam may renew cognitive function in

patients with Alzheimer's disease.  (Id. ¶ 10.)  Cassava sold over four million

shares of its common stock at $49 per share on February 10, 2021.  (Id. ¶¶ 10, 11.)

On February 22, 2021, Cassava announced that the FDA and Cassava had reached

an agreement on key elements of a Phase 3 program for simufilam.  (Id. ¶ 297.)

On July 26, 2021, a Cassava poster authored by Dr. Burns, Dr. Wang,

and others on the Phase 2b trial was presented at the Alzheimer's Association

International Conference.  (Id. ¶ 218.)  However, a key plasma biomarker data

point had been inserted into the placebo group rather than the 100mg group.  (Id.

¶¶ 222, 329.)

By July 29, 2021, Cassava's stock price had reached $146 per share.

(Id. ¶ 6.)  But on August 18, 2021, a Citizen Petition was filed with the FDA

---

[4] Dr. Wang was apparently also a participant in an unspecified Cassava bonus plan.
(Id. ¶ 104.)

6

raising "grave concerns about the quality and integrity of the laboratory-based studies" involving simufilam.  (Id. ¶ 105.)  The Citizen Petition noted that all the foundational research supporting simufilam came from journal articles "with two common co-authors": Dr. Wang and Dr. Burns.  (Id. ¶ 106.)

The Citizen Petition cited three primary concerns: 1) the Western blots in the journal articles contained "a series of anomalies that are strongly suggestive of systematic data manipulation and misrepresentation"; 2) Cassava's presentation of its Phase 2b "final results" raised questions about the validity of the data, while the July 26, 2021 poster showed "signs of data anomalies or manipulation"; and 3) some experiments conducted by Dr. Wang and Dr. Burns were on postmortem human brain tissue and presented data that also bore "hallmarks of manipulation."  (Id. ¶ 107.)  The Petition further noted that Cassava (and before that, Pain Therapeutics) has funded Dr. Wang's lab at CUNY for over fifteen years.  (Id. ¶ 108.)

The authors of the Citizen Petition were later revealed to be Dr. David Bredt and Dr. Geoffrey Pitt.  (Id. ¶ 105.)  After reviewing Cassava's pre-clinical research, Drs. Bredt and Pitt had noticed that some images of Cassava's Western-blot tests "looked . . .  as though they had been tweaked by a program such as Photoshop."  (Id. ¶ 120.)  The science behind simufilam also "didn't make sense."

7

(Id.)  Although neither worked for short seller firms, both shorted Cassava's stock.

(Id. ¶ 112.)

On August 25, 2021, Cassava issued a public statement before the

market opened to respond to the Citizen Petition, which had been "posted on-line

[on August 24, 2021] after market hours."  (Id. ¶ 316.)  Cassava called the

Petition's claims "false and misleading," declared that Cassava "stands behind its

science, its scientists and its scientific collaborators," and provided a list of

statements labeled either "fiction" or "fact."  (Id. ¶¶ 316, 317.)  Two of the

statements concerned the biomarker data from the reanalysis:

> **Fiction**: Biomarker data is generated by Cassava Sciences or its
> science collaborators and therefore are falsified.
>
> **Fact**: Cassava Sciences' plasma p-tau data from Alzheimer's patients
> was generated by [Quanterix], an independent company, and
> presented at the recent Alzheimer's Association International
> Conference[].

(Id. ¶ 317.)  Despite its denials, Cassava's stock fell sharply.  (Id. ¶ 15.)  Two days

later, Cassava's stock fell again when Quanterix issued the following statement:

"Cassava previously engaged Quanterix' Accelerator laboratory to perform sample

testing based on blinded samples provided by Cassava.  Quanterix or its employees

did not interpret the test results or prepare the data charts presented by Cassava at

the Alzheimer's Association International Conference (AAIC) in July 2021 or

otherwise."  (Id. ¶ 323.)  Cassava responded the same day and confirmed that

"Quanterix' sole responsibility with regard to this clinical study was to perform sample testing, specifically, to measure levels of p-tau in plasma samples collected from study subjects."  (Id. ¶ 324.)

That day, Dr. Elisabeth Bik, an expert in identifying manipulation in biomedical images, posted online that she had reviewed the photos included in the Citizen Petition and "agree[d] with most of those concerns."  (Id. ¶¶ 132, 135.) She also stated that "[a]t least five other articles from the Wang lab at CUNY appear to show image concerns."  (Id. ¶ 135.)  Cassava's stock price continued to fall after an August 30, 2021 supplement to the Citizen Petition "identified new instances of scientific misconduct by Cassava and Dr. Wang."  (Id. ¶¶ 18, 19.)  A few days later, it fell again after Cassava issued a press release in which Barbier again denied the allegations in the Citizen Petition but did acknowledge "visual errors" in "one publication and one poster presentation."  (Id. ¶ 20.)

Cassava's stock price jumped by almost 50% on November 4, 2021, after Cassava issued a press release stating that it "had been informed by the *Journal of Neuroscience* that there is no evidence of data manipulation in an article it published in July 2012 describing a new approach to treating Alzheimer's disease."  (Id. ¶¶ 22, 23, 339.)  Cassava explained that the journal had requested "raw data for the article, including images of original, uncropped Western blots. Having received that data and completed its review, the *Journal of Neuroscience*

9

stated: 'No evidence of data manipulation was found for Western blot data.'"  (Id. ¶ 22.)  But Cassava's stock price then dropped again when Dr. Bik posted a few days later that she had reviewed the images and they did not appear to be the originals.[5]  (Id. ¶¶ 24, 25.)

Cassava's stock price dropped even lower when Cassava disclosed in November 2021 that "[c]ertain government agencies have asked us to provide them with corporate information and documents."  (Id. ¶¶ 26, 27.)  A *Wall Street Journal* article subsequently revealed that the U.S. Securities and Exchange Commission and the National Institutes of Health were investigating the research manipulation claims, and that CUNY had begun to investigate Dr. Wang's lab.  (Id. ¶ 28.)

Cassava's stock price further declined after a third supplement to the Citizen Petition was filed in November 2021 (alleging that several biomarkers analyzed by Dr. Wang's lab in the Phase 2a study "also appear to have wildly anomalous baseline measures" and that certain of Drs. Wang and Burns's experiments "seem scientifically undoable"), and then again when a fourth

---

[5] Emails between the editor-in-chief of the *Journal of Neuroscience* and Dr. Wang from November 3, 2021, reflect that Dr. Wang provided a PowerPoint "containing the requested uncropped blots"—rather than the original blots—because it was "more difficult than [Dr. Wang] anticipated to find the blots."  (Id. ¶ 355.)  The *Journal of Neuroscience* later changed its editorial note into an Expression of Concern.  (Id. ¶¶ 33, 357.)

supplement was filed in December 2021 (alleging that Drs. Bredt and Pitt had found "irrefutable evidence of data manipulation/fabrication"). (<u>Id.</u> ¶¶ 29–32, 372–73, 380.) In 2022, several journals retracted papers authored by Dr. Wang and Dr. Burns, and another journal issued an Expression of Concern.[6] (<u>Id.</u> ¶¶ 37–39.)

On February 10, 2022, the FDA denied the Citizen Petition, stating that it was "being denied solely on the grounds that your requests are not the appropriate subject of a citizen petition." (<u>Id.</u> ¶ 411.) Cassava's press release the same day contained a statement from Barbier: "The news is very welcome but not surprising . . . . We said from the outset that the allegations are false. I think the message may be that the FDA's citizen petition privilege is not to be trifled with by stock market participants." (<u>Id.</u> ¶ 412.)

Even so, Cassava's stock price fell again after *The New York Times* published an April 18, 2022 article in which nine "prominent experts" said that "they did not trust [Cassava's] methods, results or even the premise underlying

---

[6] One journal, *Neuroscience*, stated in an editorial note on December 20, 2021, that it found "no evidence" of manipulation in a 2005 paper by Drs. Burns and Wang. (<u>Id.</u> ¶ 387.) The journal reported that it "asked the authors for images of the original, uncropped Western blots from this study" and "[a]fter careful examination of these original material . . . found no evidence of manipulation of the Western blot data or other figures of this publication." (<u>Id.</u>) But Drs. Wang and Burns allegedly did not provide the original, uncropped Western blots to *Neuroscience*. (<u>Id.</u> ¶¶ 389, 396.)

[simufilam's] supposed effectiveness." (Id. ¶¶ 40, 41.)  And the price fell yet again

when *Reuters* revealed that the Department of Justice had opened a criminal probe

into Cassava's research results.  (Id. ¶¶ 43, 44.)

    In short, Plaintiffs allege that Cassava misrepresented the research on

simufilam by manipulating data and failing to disclose conflicts of interest.  By

misrepresenting its research results, Defendants were able to raise millions of

dollars to fund simufilam's development and stood to personally profit from cash

bonuses.

## LEGAL STANDARDS

    Under Rule 12(b)(6), a court may dismiss a complaint for "failure to

state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In

analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all

well pleaded facts as true, viewing them in the light most favorable to the

plaintiff.'"  United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d

343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d

191, 205 (5th Cir. 2007)).

    To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead

"enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v.</u>

<u>Iqbal</u>, 556 U.S. 662, 678 (2009).

In addition, when alleging claims under Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must:

(1) specify each statement alleged to have been misleading, i.e. contended to be fraudulent;

(2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby;

(6) explain the reason or reasons why the statement is misleading, i.e. why the statement is fraudulent.

<u>ABC Arbitrage Plaintiffs Grp. v. Tchuruk</u>, 291 F.3d 336, 350 (5th Cir. 2002).

Further, if an allegation regarding a statement or omission is "made on information

and belief, the plaintiff must (7) state with particularity all facts on which that

belief is formed, *i.e.*, set forth a factual basis for such belief." <u>Id.</u> (citing 15 U.S.C.

§ 78u–4(b)(1)). According to the Fifth Circuit, "this is the 'who, what, when,

where, and how' required under Rule 9(b) in our securities fraud jurisprudence and

under the PSLRA." <u>Id.</u>

DISCUSSION

The elements of a securities-fraud claim under Section 10(b) and Rule 10b–5 are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 157 (2008).

Defendants contend that the Complaint violates basic pleading rules by "puzzle pleading." Defendants also challenge the adequacy of the Complaint's allegations regarding material misrepresentations or omissions, scienter, and loss causation.

I.   Puzzle Pleading

"Puzzle pleading" requires a court to "wade through a complaint and pick out properly pleaded segments." Owens v. Jastrow, 789 F.3d 529, 537 (5th Cir. 2015); see also In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 841 (N.D. Cal. 2000) (declining to solve the puzzle of "try[ing] to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading").

According to Defendants, the Complaint is a "paradigm example" of puzzle pleading and should be dismissed on this ground alone. (Dkt. # 81 at 12–

14

13.)  Defendants assert that the Complaint is improperly pleaded because Plaintiffs

did not tie each of the alleged misstatements to the reason or reasons each

statement is false or misleading, "leaving the reader to decipher which of the 15

purported reasons apply to each of the 47 alleged misstatements."  (Id.)  Plaintiffs

respond that the Complaint contains a dedicated section in which Plaintiffs set out

each of the alleged false and misleading statements, with the relevant portions

bolded and italicized, followed by the corresponding adverse facts.  (Dkt. # 86 at

3.)  Plaintiffs argue that the Motion to Dismiss itself demonstrates that Defendants

were able to identify the statements and the reasons for their alleged falsity.  (Id.)

The Court does not find this Complaint to be a paradigm example of

puzzle pleading.  The reader can logically connect the bolded and italicized

statements to the reasons Plaintiffs allege they are false or misleading.  See

Rougier v. Applied Optoelectronics, Inc, No. 4:17-CV-2399, 2019 WL 6111516, at

*8 (S.D. Tex. Mar. 27, 2019) (declining to dismiss a complaint because the

plaintiff's explanations for the falsity of the statements logically corresponded with

each alleged misstatement); In re Concho Res. Inc., No. 4:21-CV-2473, 2023 WL

2297425, at *17 (S.D. Tex. Feb. 23, 2023) (same); cf. Primo v. Pac. Biosciences of

California, Inc., 940 F. Supp. 2d 1105, 1112 (N.D. Cal. 2013) (noting that while

the plaintiffs made "some attempt to connect the alleged omissions to particular

statements," they did so "in a general manner that require[d] the reader to guess

15

what particular statements they mean or how those statements were rendered false and misleading").  Because the Court is able to discern which reasons apply to each allegedly false or misleading statement without undue effort, the Court will not dismiss the Complaint on the ground that it engages in impermissible puzzle pleading.

## II.    Actionable Misstatements or Omissions

Defendants argue Plaintiffs have failed to adequately plead an actionable misstatement or omission.  (Dkt. # 81 at 13.)  Defendants contend that the misstatements or omissions detailed in the Complaint are not actionable either because there is no duty to disclose, because they are not supported by particularized allegations of fact, or because they are true.  (Id. at 2, 13, 15, 19.)

### A.    Disclosure Obligations

Defendants assert that Plaintiffs' arguments about Defendants' failure to disclose "run[] contrary to the well-settled principle that there is no duty to 'confess' to unadjudicated allegations of wrongdoing."  (Id. at 2.)  Plaintiffs respond that they do not allege "an independent duty to disclose uncharged criminal behavior," but that Defendants' statements were false and misleading because Defendants omitted important information when making public statements.  (Dkt. # 86 at 17.)

Along with pleading "the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading," <u>Carroll v. Fort James Corp.</u>, 470 F.3d 1171, 1174 (5th Cir. 2006), a plaintiff must establish "a substantial likelihood" that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231–32 (1988). "[D]etermining materiality is a 'fact-specific inquiry that requires consideration of the source, content, and context' of the allegedly omitted information." <u>Rougier</u>, 2019 WL 6111516, at *8 (citing <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 563 U.S. 27, 43 (2011)).

Although "corporate officials need not present an overly gloomy or cautious picture of the company's current performance," its public statements must still be "reasonably consistent with reasonably available data." <u>Abrams v. Baker Hughes Inc.</u>, 292 F.3d 424, 433 (5th Cir. 2002) (citing <u>Novak v. Kasaks</u>, 216 F.3d 300, 309 (2d Cir. 2000)). "[A] duty to speak the full truth arises when a defendant undertakes a duty to say anything." <u>In re Concho Res. Inc.</u>, 2023 WL 2297425, at *17 (quoting <u>Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.</u>, 58 F.4th 195, 217 (5th Cir. 2023)).

Defendants had a duty to disclose certain facts relating to its clinical trial results. According to Plaintiffs, Defendants failed to disclose that:

17

- The Phase 2a study and 2b reanalysis "suffered from highly anomalous baseline measurements." (Dkt. # 86 at 19.)

- Defendants "intentionally removed unfavorable data" from Cassava's presentation of the Phase 2b results. (Id.)

- The Phase 2b reanalysis was conducted by Dr. Wang's lab. (Id. at 20.)

- Quanterix did not interpret the test results or prepare the data for the Phase 2b reanalysis. (Id. at 21.)

- The missing data point from the AAIC poster reflected a 150% increase rather than a 38% increase. (Id.)

      A reasonable investor could certainly have viewed these omissions—particularly the omission related to the involvement of Dr. Wang's lab—as significantly altering the total mix of information available. See Frater v. Hemispherx Biopharma, Inc., 996 F. Supp. 2d 335, 346 (E.D. Pa. 2014) (concluding that a "factfinder could easily determine that announcements that [the company's] studies demonstrated [a drug's] effectiveness implied those studies' empirical validity and analytic soundness"); The MJK Fam. LLC v. Corp. Eagle Mgmt. Servs., Inc., No. CIV.09-12613, 2009 WL 4506418, at *8 (E.D. Mich. Nov. 30, 2009) (collecting cases holding that undisclosed conflicts of interest are material).

Plaintiffs further claim that Defendants touted the research by Cassava that supported simufilam but failed to disclose that this research was "rife with manipulated data." (Dkt. # 86 at 14.) Taking Plaintiffs' allegations as true—as the Court must do at this stage—the Court finds that, if ultimately proven, the statements regarding manipulated or falsified data would be actionable.

The Court agrees with Defendants that "an investigation is not a violation." See In re Key Energy Servs., Inc. Sec. Litig., 166 F. Supp. 3d 822, 863 (S.D. Tex. 2016) (collecting cases holding same). But the initiation of government investigations into Cassava is not the only evidence relied on by Plaintiffs to support their claims of extensive data manipulation. The Complaint details specific instances of allegedly intentional manipulation and supports these allegations with "photographic evidence." In addition, Plaintiffs describe the response from scientific journals (which included retractions and expressions of concern) and independent experts who reviewed Cassava's research. Cf. In re KBR, Inc. Sec. Litig., No. CV H-17-1375, 2018 WL 4208681, at *3 (S.D. Tex. Aug. 31, 2018) ("Plaintiffs simply assumed the worst based on the fact that certain governmental agencies have announced the opening of investigations . . . ."); Parker v. Hyperdynamics Corp., 126 F. Supp. 3d 830, 843 (S.D. Tex. 2015) ("The only authoritative evidence in the record that FCPA violations occurred is [the company's] disclosure of subpoena requests" by the DOJ and SEC).

19

The materiality of Cassava's alleged omissions regarding its research is supported by the drops in stock price that accompanied each revelation of an alleged omission or misrepresentation.  <u>Frater</u>, 996 F. Supp. 2d at 347.  The Court concludes Plaintiffs have sufficiently pled actionable misstatements and omissions by Defendants to survive a motion to dismiss.

B.    <u>Particularized Allegations</u>

Defendants argue that because the allegations of data manipulation and other misconduct have never been adopted or advanced by any entity or person with personal knowledge of the underlying facts, the Complaint does not meet the PSLRA's requirement that the Complaint be supported by particularized allegations of fact.[7]  (Dkt. # 81 at 15.)

However, the "the PSLRA acknowledges that complaints will often have to be pleaded based on acquired information."  <u>Bond v. Clover Health Invs., Corp.</u>, 587 F. Supp. 3d 641, 667 (M.D. Tenn. 2022).  "[T]he particularity rules should not be interpreted to require the pleading of facts which, because of the lack of discovery, are in defendants' exclusive possession."  <u>In re Fleming Cos. Inc.</u>

---

[7] Defendants also argue that the PSLRA does not permit opinions to substitute for facts.  (<u>Id.</u> at 13.)  Plaintiffs respond that "detailed facts and supporting documentation (including photographic evidence) pled in the Complaint show specific and widespread instances of data manipulation based on first-hand analysis of Cassava's own data."  (Dkt. # 86 at 15.)  Upon reviewing the Complaint, the Court agrees that Plaintiffs have included sufficient factual allegations to support the claims of data manipulation.

Sec. & Derivative Litig., No. CIVA503MD1530TJW, 2004 WL 5278716, at *6

(E.D. Tex. June 16, 2004) (citing ABC Arbitrage, 291 F.3d at 348).

Other courts have found it permissible for plaintiffs to rely on short-

seller reports to allege falsity at the motion to dismiss stage. Bond, 587 F. Supp.

3d at 668 (citing McIntire v. China MediaExpress Holdings, Inc., 927 F. Supp. 2d

105 (S.D.N.Y. 2013); Snellink v. Gulf Res., Inc., 870 F. Supp. 2d 930, 939 (C.D.

Cal. 2012). This is because the reliability of short-seller reports—here, the Citizen

Petitions—is a question of fact that the Court cannot resolve at this time. See

McIntire, 927 F. Supp. 2d at 123–24 (collecting cases).

C.    Literal Truth

Finally, Defendants argue that several statements are not actionable

because they are true. (Dkt. # 81 at 19, 20.) But it is well-settled that "[t]he ability

of a statement to provide accurate information, rather than the statement's literal

truth, is the benchmark by which statements to the market are measured in

securities fraud cases." KB Partners I, L.P. v. Pain Therapeutics, Inc., No. A-11-

CA-1034-SS, 2015 WL 7760201, at *9 (W.D. Tex. Dec. 1, 2015) (citing Lormand

v. U.S. Unwired, Inc., 565 F.3d 228, 248 (5th Cir. 2009)); see also Omnicare, Inc.

v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 192 (2015)

("[L]iteral accuracy is not enough: An issuer must as well desist from misleading

investors by saying one thing and holding back another.") For example, while it

21

may be literally true that Dr. Wang's lab is an "outside lab," a factfinder might find this statement misleading given Dr. Wang's ties to Cassava. See Bond, 587 F. Supp. 3d at 672 ("[T]here is a point at which a speaker's use of elision and obfuscation becomes actionable, even if he has in his back pocket an anticipated defense that nothing he said was technically untrue.")

III.    Scienter

The PSLRA requires that a complaint in a securities case support allegations of scienter with "facts giving rise to a strong inference that the defendant acted with the required state of mind." Six Flags Ent. Corp., 58 F.4th at 214 (citing 15 U.S.C. § 78u-4(b)(2)(A)). "A complaint adequately pleads scienter by alleging facts that support the defendant acted with an 'intent to deceive, manipulate, or defraud or severe recklessness.'" Id. (citing Lormand, 565 F.3d at 251).

When evaluating scienter, a court must (1) take the factual allegations as true, (2) "consider the complaint's allegations in its entirety," and (3) "take into account plausible inferences opposing as well as supporting a strong inference of scienter." Id. The inference of scienter must be "cogent and compelling." Id. (citing Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 314 (2007)).

Defendants assert that Plaintiffs have not alleged specific facts that give rise to a strong inference of scienter. (Dkt. # 81 at 23.) Defendants also argue

that Plaintiffs' allegations regarding Defendants' motives do not support an inference of scienter and that Plaintiffs rely on generalized and group pleading. (Id. at 24, 27.)

A.    Specific Facts

Selective reporting supports an inference of scienter.  Ho v. Flotek Indus., Inc., 248 F. Supp. 3d 847, 852 (S.D. Tex. 2017), aff'd sub nom. Alaska Elec. Pension Fund v. Flotek Indus., Inc., 915 F.3d 975 (5th Cir. 2019).  Plaintiffs have made several allegations regarding selective reporting by Defendants, including that Defendants did not divulge that the "outside lab" for the reanalysis was in fact Dr. Wang's lab (despite disclosing Dr. Wang's involvement with the 2a trial results), and that the Phase 2b "final results" contained anomalous data.

Scienter can also be "supported by the reaction" of the scientific community "to the disclosure of Defendants' manipulation of data."  In re Fibrogen, Inc., No. 21-CV-02623-EMC, 2022 WL 2793032, at *22 (N.D. Cal. July 15, 2022).  Plaintiffs allege that the main reaction of ten prominent scientists to Cassava's research papers was "Oh, my God, how could they get away with this?" (Dkt. # 68 ¶ 123.)  According to one scientist, "numerous top Alzheimer's experts, plus forensic image specialists . . . were stunned by the apparent extreme manipulations."  (Id. ¶ 127.)  An author of the Citizen Petition claimed that "[i]n my thirty-five years of research, I've never seen such a long trail of apparently

23

clear misrepresented scientific data." (Id. ¶ 128.)  When *The New York Times* "contacted nine prominent experts for comment about the scientific underpinnings of Cassava's trials," all the experts said that they "did not trust the company's methods, results or even the premise underlying the drug's supposed effectiveness." (Id. ¶ 425.)

Further, when confronted with the Citizen Petition, Cassava issued a statement almost immediately, calling the Petition's claims "false and misleading" and declaring that Cassava "stands behind its science, its scientists and its scientific collaborators."  Such denials can indicate that a defendant was "either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial." In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d 696, 711–12 (W.D. Tex. 2010).

B.  Motive

Contrary to Defendants' assertions, the allegations here suggest that Defendants had motive to inflate Cassava's stock price.  Weeks before releasing the "final results" of Phase 2b, Cassava's Board instituted a new cash bonus plan tying executive bonuses to short-term increases in Cassava's stock price.  Plaintiffs point out that, although Defendants never ultimately received the hundreds of millions of dollars in bonus payments provided for by the plan, Defendants "obviously did not orchestrate the unforeseen filing of the Citizen Petition" and the

24

bonus plan nonetheless "allowed Defendants to profit regardless of the long-term value of Cassava's stock price." (Dkt. # 86 at 30.) Barbier allegedly earned nearly $27 million in salary, bonuses, and stock option grants as CEO of Pain Therapeutics even though the stock price of Pain Therapeutics ultimately lost 98% of its value. (Dkt. # 68 ¶ 76.)

Defendants have not explained the timing of the cash bonus plan or the reason for its structure. Although "incentive compensation" typically cannot be the basis on which an allegation of fraud is predicated," Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1068 (5th Cir. 1994), the circumstances and structure of this cash bonus plan support an inference of scienter. See Six Flags Ent. Corp., 58 F.4th at 215 (quoting Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc., 935 F.3d 424, 431 (5th Cir. 2019) ("[P]erformance-based compensation can establish motive in circumstances 'when the potential bonus is extremely high and other allegations support an inference of scienter.'")

In addition, by pumping up Cassava's stock price, Defendants were able to raise much-needed working capital for the future development of simufilam. This can be probative of scienter. See Skiadas v. Acer Therapeutics Inc., No. 1:19-CV-6137-GHW, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) (noting that when a company needs to fundraise to survive, an executive "has a stronger incentive to bet the farm in a reckless gamble because the

25

alternative is certain failure"); In re Portal Software, Inc. Sec. Litig., No. C-03-
5138 VRW, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (the contention
that the defendants "were motivated to inflate artificially [the company's] stock
price in the short term in order to conduct a successful secondary public offering
and obtain much-needed operating capital does allege facts of a palpable motive
for fraud").

> C.  Generalized or Group Pleading

The PSLRA requires that plaintiffs "distinguish among those they sue
and enlighten *each defendant* as to his or her particular part in the alleged fraud.
As such, corporate officers may not be held responsible for unattributed corporate
statements solely on the basis of their titles." Southland Sec. Corp. v. INSpire Ins.
Sols., Inc., 365 F.3d 353, 365 (5th Cir. 2004).

The "core operations" theory of scienter provides that "special
circumstances, *taken together with an officer's position*, may support a strong
inference of scienter." Six Flags Ent. Corp., 58 F.4th at 219 (emphasis added).
Relevant factors may include: (1) the size of the company; (2) whether the
transactions are "critical to the company's continued vitality"; (3) whether the
misrepresented information "would have been readily apparent to the speaker";
and (4) whether "the defendant's statements were internally inconsistent with one

another." Id. at 219 (quoting Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc., 810 F.3d 951, 959 (5th Cir. 2016)).

Barbier served as Cassava's Chief Executive Officer; Dr. Burns as Senior Vice President of Neuroscience; Dr. Friedmann as Chief Operating Officer and Chief Medical Officer; and Schoen as Chief Financial Officer. (Dkt. # 68 ¶¶ 59–68.)

The first two circumstances are clearly present. Cassava is a small company, with only eight or nine employees in 2019 and eleven in 2020. (Id. ¶ 440.) Simufilam is Cassava's primary drug candidate, and the company has no other revenue. (Id.)

As for the third circumstance, Plaintiffs note that Barbier, Dr. Burns, and Dr. Friedmann authored Cassava's 2020 paper on the (allegedly manipulated) 2a study results. (Dkt. # 86 at 24.) Dr. Burns, who is married to Barbier, co-authored the research papers and Cassava presentations alleged to contain manipulated data. (Dkt. # 68 ¶ 61.) Barbier, Dr. Burns, and Dr. Friedmann were members of Cassava's product development and management teams. (Id. ¶¶ 59–64.) Each of these Defendants had important responsibilities at Cassava: "global responsibilities for the scientific direction, management, operations, strategy, and financing of the Company" (Barbier), "monitor[ing] the proof-of-concept research, lead selection and efficacy experiments for [simufilam] and over[seeing] IND-

27

enabling studies, chronic toxicity studies, and first-in-human and first-in-patient clinical trials" (Dr. Burns), and "over[seeing] the clinical development of simufilam" (Dr. Friedmann).

The presence of these circumstances contributes to an inference of scienter as to these three Defendants with respect to the alleged material misstatements regarding Cassava's research. See also Frater, 996 F. Supp. 2d at 350 ("The defendants are sophisticated scientists running a regulated, publicly traded corporation . . . .")

The scienter allegations regarding Schoen are weaker. Schoen, as CFO, does not appear to have been directly involved with Cassava's scientific research. He is not alleged to have authored the journal articles or posters in question. And Defendants are correct that "a basis for scienter beyond signatures on SEC filings is required." (Dkt. # 90 at 11 n.17) (citing Izadjoo v. Helix Energy Sols. Grp., Inc., 237 F. Supp. 3d 492, 520 (S.D. Tex. 2017)).

However, Plaintiffs have alleged facts supporting an inference that, at least as to Cassava's failure to disclose that the "outside lab" conducting the reanalysis for the Phase 2b study was Dr. Wang's lab, Schoen possessed the requisite scienter. On September 14, 2020, the day that Cassava announced its Phase 2b "final results," a Form 8-K—signed by Schoen and attaching Cassava's September 14, 2020 press release and presentation regarding the results—was filed

28

with the SEC.  (Dkt. # 68 ¶ 268.)  The misleading nature of certain statements in the press release—"[a]ll CSF samples were sent to outside labs for bioanalysis" and "[a]n academic lab generated final results"—would have been readily apparent given the importance of these results to Cassava, even to someone without a science background.  Schoen's participation in the Company's cash bonus plan, though not sufficient on its own, also supports an inference of scienter.  (Id. ¶ 68.)

Although it is a closer call, the Court concludes that the necessary strong inference of scienter has been adequately pleaded as to Schoen.

In conclusion, accepting the factual allegations as true, and considering inferences supporting as well as opposing scienter, the Court finds that Plaintiffs have adequately alleged scienter as to each Defendant.

## IV.  Loss Causation

Finally, Defendants contend that Plaintiffs have not established loss causation.  (Dkt. # 81 at 29.)  Defendants state that none of the corrective disclosures identified by Plaintiffs reveal a "truth" that was misstated or omitted—rather, most of the disclosures contain "uncharged or unadjudicated public accusations of wrongdoing."  (Id. at 31.)

For a complaint to adequately plead loss causation, "it need only set forth 'a short and plain statement of the claim showing that the pleader is entitled to relief' and provide the defendant with 'fair notice of what the plaintiff's claim is

29

and the grounds upon which it rests.'" Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc., 769 F.3d 313, 320 (5th Cir. 2014) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346 (2005)).  The complaint must include "sufficient allegations the misrepresentations actually *caused* plaintiffs' loss—it is insufficient to simply allege the misrepresentation 'touches upon' a later economic loss."  In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d at 725–26; see also Congregation of Ezra Sholom v. Blockbuster, Inc., 504 F. Supp. 2d 151, 167 (N.D. Tex. 2007) ("To allege loss causation adequately, Plaintiffs must explicitly allege a corrective disclosure—i.e., a statement that corrects a previous misrepresentation or discloses a prior omission—that, when disclosed, negatively affected the value of the security.").

"[T]he truth can be gradually perceived in the marketplace through a series of parties disclosures"—for example, the market may learn of possible fraud from newspapers and journals, analysts' questioning financial results, and whistleblowers.  Amedisys, 769 F.3d at 322 (citing In re Enron Corp. Sec., Derivative & ERISA Litig., No. MDL–1446, 2005 WL 3504860, at *16 (S.D. Tex. 2005)).  Plaintiffs may thus rely on sources like the Citizen Petitions, news articles, Quanterix's press release, and Dr. Bik's postings.

Plaintiffs have alleged that immediately following each partial disclosure, Cassava's stock price dropped.  Viewed collectively, these partial

disclosures "gradually informed the market of the relevant truth" regarding Cassava's clinical trial results and published research, "and, thus, collectively constitute a corrective disclosure that adequately pleads loss causation." Parmelee v. Santander Consumer USA Holdings, Inc., No. 3:16-CV-783-K, 2018 WL 276338, at *6 (N.D. Tex. Jan. 3, 2018).

V.      Control Person Liability

        Individual Defendants argue that the § 20(a) control person liability claim must be dismissed because Plaintiffs failed to allege a primary claim under § 10(b) and Rule 10b-5.  However, Plaintiffs have adequately alleged the primary claim as to Barbier, Schoen, Dr. Burns, and Dr. Friedmann.  Plaintiffs' § 20(a) claim is therefore not subject to dismissal on this basis.  See Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp., 514 F. Supp. 3d 942, 957 (S.D. Tex. 2021).

VI.     Rule 25a Dismissal

        On January 27, 2023, Defendants filed a Suggestion of Death of Defendant Nadav Friedmann.  (Dkt. # 91).  The Federal Rules of Civil Procedure provide:

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

31

Fed. R. Civ. P. 25(a)(1).

More than ninety days have passed since Defendants notified the Court and parties of the death of Dr. Friedmann. Because no motion for substitution has been filed, Plaintiffs' claims against Dr. Friedmann must be dismissed. See Ray v. Koester, 85 F. App'x 983, 985 (5th Cir. 2004) (affirming dismissal following the plaintiff's failure to timely file a motion to substitute).

CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss the Complaint (Dkt. # 81) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' claims against Defendant Nadav Friedmann are **DISMISSED WITH PREJUDICE** pursuant to Federal Rule of Civil Procedure 25(a)(1). The Motion to Dismiss Plaintiffs' claims as to all other Defendants is **DENIED**.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, May 11, 2023.

_____
David Alan Ezra
Senior United States District Judge

32

EXHIBIT 8

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Texas

| | |
|---|---|
| In re CASSAVA SCIENCES, INC. SEC. LITIG. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  1:21-cv-00751-DAE |
| This Document Relates To: | ) |
| ALL ACTIONS | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:           Hoau Yan Wang c/o Jennifer L. Beidel
39577 Woodward Avenue, Suite 300, Bloomfield Hills, MI  48304

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A.

| | |
|---|---|
| Place: PHILLIPI & ASSOCIATES<br>P.O. Box 250-267<br>Franklin, MI  48025 | Date and Time:<br><br>07/13/2023 9:00 am |

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| | |
|---|---|
| Place: | Date and Time: |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      06/13/2023

| | | |
|---|---|---|
| *CLERK OF COURT* | OR | *Megan Rossi* |
| _____<br>*Signature of Clerk or Deputy Clerk* | | _____<br>*Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Lead Plaintiff
Mohamman Bozorgi and Additional Plaintiff Ken Calderone                   , who issues or requests this subpoena, are:

Megan A. Rossi, 655 W. Broadway, Suite 1900, San Diego, CA 92101; mrossi@rgrdlaw.com, 619/231-1058

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1:21-cv-00751-DAE

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c)  Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d)  Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e)  Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g)  Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**
**(Hoau-Yan Wang)**

## I.    DEFINITIONS

Unless stated otherwise, the terms set forth below are defined as follows:

1.      "Action" refers to the lawsuit docketed under the caption *In re Cassava Sci., Inc. Sec. Litig.*, No. 1:21-cv-00751-DAE.

2.      "All," "any," and "each," shall each be construed as encompassing any and all.

3.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request ("Request" or "Requests") all responses that might otherwise be construed to be outside of its scope.

4.      The "Bonus Plan" refers to the "cash incentive bonus plan" approved by Cassava's board of directors on or about August 26, 2020 and referenced in Cassava's Form 8-K filed with the SEC (defined below) on September 1, 2020.

5.      "Cassava" or the "Company" refers to Cassava Sciences, Inc., any of its direct or indirect subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees (defined below), agents, accountants and advisors, and all other persons acting or purporting to act on its behalf.

6.      "Citizen Petition" refers to the Citizen Petition dated August 18, 2021, and filed with the United States Food and Drug Administration on or about that time by attorneys at Labaton Sucharow LLP, which raised concerns on behalf of Drs. David S. Bredt and Geoffrey Pitt regarding Simufilam (defined below).  The Citizen Petition includes each supplement to the Citizen Petition, including those dated on or about: (i) August 30, 2021; (ii) September 9, 2021; (iii) November 17, 2021; and (iv) December 8, 2021.

- 1 -

7.      "Compensation" means any compensation, payment, bonus, benefit, indemnification, salary, fee, interest in or under a profit sharing or participating agreement or scheme, or any other interest or benefit of any value.

8.      "Communication" or "communications" means emails, text messages, letters, chat logs, recordings, or any other transmittal of information (in the form of facts, ideas, inquiries or otherwise), including any attachments thereto.

9.      "Complaint" means the Amended Complaint for Violations of the Federal Securities Laws, filed August 18, 2022 (ECF 68).  A copy of the Complaint is attached hereto.

10.     "Class Period" refers to the time period of September 14, 2020 through July 26, 2022.

11.     "Concerning" means in connection with, referring to, relating to, describing, evidencing, reflecting, mentioning, supporting, contravening, embodying, touching upon, assessing, stating, recording, summarizing or constituting.

12.     "CUNY" refers to the City University of New York and any of its direct or indirect subsidiaries, divisions, or affiliates (foreign or domestic), agencies, predecessors, successors, present and former officers, directors, employees, agents, accountants and advisors, and all other persons acting or purporting to act on its behalf.

13.     "CUNY Investigation" refers to any examination, inquiry, or investigation relating to CUNY's investigation of Dr. Wang, including, without limitation, the CUNY investigation as detailed in ¶¶28, 33, 38, 357-358, 367-368, 388, 407, and 417 of the Complaint.

14.     "Defendants" refers to Cassava Sciences, Inc., Remi Barbier, Lindsay Burns, and Eric J. Schoen.

15.     "Document" or "documents" shall have the broadest meaning permissible under Federal Rule of Civil Procedure 34(a)(1)(A) and shall include, but not be limited to, any and all communications, writings, drawing, graphs, charts, photographs, sound recordings, images, other

- 2 -

data or data compilations, and electronically stored information.  A draft or non-identical copy is a separate document within the meaning of this term.

16.     "DOJ" refers to the United States Department of Justice and any of its direct or indirect subsidiaries, divisions, or affiliates (foreign or domestic), agencies, predecessors, successors, present and former officers, directors, employees, agents, accountants and advisors, and all other persons acting or purporting to act on its behalf, including United States Attorneys and their offices.

17.     "DOJ Investigation" refers to any examination, inquiry or investigation relating to the DOJ's investigation of Cassava by the DOJ, including, without limitation, the DOJ investigation as detailed in ¶¶44, 365-366, and 435 of the Complaint.

18.     "Electronically stored information" or "ESI" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind), mechanical, facsimile, electronic, magnetic, digital or other programs (whether private, commercial, or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including any word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "email," operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts or any miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, backup file, deleted file, or file fragment.  "Electronic data" also includes, without limitation, any items stored on computer memory or memories, hard drives, zip drives, CD-ROM discs or in any other vehicle for electronic or digital data storage or transmittal, files, folder tabs or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

- 3 -

19.     "Employee" refers to any person who at any time acted or purported to act on your (defined below) behalf or under your supervision, direction or control, including, without limitation, past and current directors, officers, principals, partners, executives, analysts, investment bankers, consultants, advisors, representatives, agents, trustees, independent contractors, assigns, businesses or similar persons or entities.

20.     "Including" shall be construed as "including, but not limited to," and shall not limit the scope of any Requests.

21.     "Individual Defendants" refers to Remi Barbier, Lindsay Burns, and Eric J. Schoen and any employee, agent, or Person acting on their behalf.

22.     "Meeting" refers to the contemporaneous presence of any natural persons (including by telephone or by any other electronic means) for any purpose, whether such presence was by chance or prearranged, and whether the meeting was formal or informal, or occurred in connection with some other activity.

23.     "Modify" means to alter, enhance, duplicate, adjust, splice, or recast.

24.     "NIH" refers to the National Institutes of Health and any of its direct or indirect subsidiaries, agencies, divisions, or affiliates (foreign or domestic), predecessors, successors, present and former officers, directors, employees, agents, advisors, and all other persons acting or purporting to act on its behalf.

25.     "NIH Investigation" refers to any investigation, inquiry or examination of Cassava by the NIH, including, without limitation, the NIH's investigation of Cassava as detailed in ¶¶28, 365, and 367 of the Complaint.

26.     "Person" or "persons" means any natural person or any legal entity, including, without limitation, any business, corporation, partnership or governmental entity or association.

- 4 -

27.     "SavaDx" refers to Cassava's secondary investigational diagnostic product candidate, a blood-based biomarker/diagnostic to detect Alzheimer's disease.

28.     "SEC" refers to the United States Securities and Exchange Commission and any of its direct or indirect subsidiaries, agencies, divisions, or affiliates (foreign or domestic), predecessors, successors, present and former officers, directors, employees, agents, accountants and advisors, and all other persons acting or purporting to act on its behalf.

29.     "SEC Investigation" refers to any investigation, inquiry or examination of Cassava by the SEC, including, without limitation, the SEC's investigation of Cassava as detailed in ¶¶28, 365, and 367 of the Complaint.

30.     "Simufilam" or "PTI-125" refers to Cassava's lead product candidate, a small molecule drug for the treatment of Alzheimer's or other neurodegenerative diseases.

31.     "Source Data" means the actual data acquired during the experimental process.  For blots, this constitutes the actual piece of X-ray film, or, if the data were acquired digitally, the original scan of the complete blot in the file format in which it was originally saved, in the proprietary format generated by the imaging system.  For micrographs, the Source Data constitute an image file containing the complete microscope field as it was originally saved by the imaging system in the proprietary format generated by the imaging system. Images that have been cropped and/or imported into another application to compose a labelled figure do not constitute Source Data. Source Data for digital images also includes the metadata to the Source Data, including logging data documenting changes made to the digital image files.

32.     "You" or "your" means Dr. Wang, any employee, agent or Person acting or purporting to act on his behalf, and any the person responding to these Requests.

## II.     INSTRUCTIONS

1.      In responding to these requests, you shall produce responsive documents and electronic data that are in your possession, custody, or control, or in the possession, custody, or control of your predecessors, successors, parents, subsidiaries, divisions, or affiliates or any of your respective partners, directors, officers, managing agents, agents, employees, attorneys, accountants, or other representatives.  A document or electronic data is within your control if you have the right to secure the document or electronic data or a copy of the document or electronic data from another person having possession or custody of the document or electronic data.

2.      You are required to produce for inspection and copying original documents and electronic data as they are kept in the usual course of business in their original folders, binders, covers, and containers or facsimile thereof, or, with respect to electronic data, in their native format as explained in more detail below.  In the case of documents that were already produced pursuant to federal, state, or local governmental or administrative investigations, those documents may be produced in the same manner as they were previously produced by you.  If the original is not in your custody, you are required to provide a copy thereof, and all non-identical copies which differ from the original or from the other copies produced for any reason, including, without limitation, the making of notes thereon.

3.      Your response must either state that inspection and related activities will be permitted as requested, or state with specificity the grounds for objecting to the request, including the reasons for the objection.  Where you are objecting to a request, you must state whether any responsive materials are being withheld on the basis of that objection.  Where you are objecting to only part of the request, you must state with specificity which part of the Request you are objecting to, and permit inspection of the rest.

4.      If a document, electronic data, or information is withheld pursuant to a claim of privilege, as to each such withheld document or information state the following:

(a)      The privilege claimed;

(b)      A precise statement of the facts upon which said claim of privilege is based, including sufficient information to evaluate the nature or validity of the privilege claimed;

(c)      The following information describing each purportedly privileged document: (i) the name(s) of the author(s); (ii) the name(s) of the sender(s); (iii) the name(s) of the person(s) to whom the document and copies, if any, were sent; (iv) the job title of each individual identified in (i), (ii), and (iii) above; (v) a brief description of the nature and subject matter of the document; and (vi) the nature of the privilege.

(d)      A precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file.

5.      If a portion of any document or electronic data responsive to these Requests is withheld under claim of privilege, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

6.      You are to produce each document requested herein in its entirety, with attachments and enclosures without deletion or excision (except as qualified by Instruction Nos. 4 and 5 above) regardless of whether you consider the entire document to be relevant or responsive to the requests. All pages now stapled or fastened together should be produced, stapled or fastened together, and each document that you cannot legibly copy should be produced in its original form.  Documents not otherwise responsive to any of the discovery requests herein must be produced if such documents mention, discuss, refer to, or explain the documents which are called for by these requests, or if such documents are attached to documents called for by these Requests and constitute routing slips,

- 7 -

transmittal memoranda or letters, comments, evaluations, or similar materials. Whenever a document or group of documents is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, a copy of the label of such cover or other container must be attached to the document or group of documents.

7.      Whenever a document or electronic data is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full, and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

8.      If a document responsive to these Requests was at any time in your possession, custody, or control, but is no longer available for production, as to each such document, state the following information:

(a)      Whether the document is missing or lost;

(b)      Whether it has been destroyed;

(c)      Whether the document has been transferred or delivered to another person and, if so, at whose request;

(d)      Whether the document has been otherwise disposed of; and

(e)      A precise statement of the circumstances surrounding the disposition of the document and the date of its disposition.

9.      If in responding to these Requests you claim any ambiguity in interpreting a Request or a definition or instruction applicable thereto, such a claim shall not be utilized by you as a basis for refusing to produce responsive documents, but set forth as part of your response to the language deemed to be ambiguous and the interpretation chosen or used in responding to the request.

10.     Whenever necessary to bring within the scope of a Request a response that might otherwise be construed to be outside of its scope:

- 8 -

(a)    The use of a verb in any tense shall be construed as the use of the verb in all other tenses;

(b)    The use of the word in its singular form shall be deemed to include within its use the plural form as well, and vice versa;

(c)    The use of the words "any," or "all" shall be construed to include within their use "any," "some," "each," or "all"; and

(d)    The words "and" and "or" shall be construed either conjunctively or disjunctively as necessary.

11.    For each Request to which you are providing documents, your response must identify the particular responsive documents by Bates number.

12.    In responding to these Requests, you shall produce all responsive documents available at the time of production and you shall supplement your responses as required by Rule 26(e) of the Federal Rules of Civil Procedure.

13.    In accordance with Federal Rule of Civil Procedure 26(b)(5), if any responsive documents are withheld on a claim of privilege, that claim must be expressly made and any withheld materials described in such a manner that, without revealing the information itself privileged or protected, will enable other parties to assess the claim.

## III.    PRODUCTION OF HARD COPY DOCUMENTS – FORMAT

Hard-copy documents should be scanned as single-page, Group IV, 300 DPI TIFF images with an .opt image cross-reference file and a delimited database load file (*i.e.*, .dat).  The database load file should contain the following fields: "BEGNO," "ENDNO," "PAGES," "VOLUME," and "CUSTODIAN."  The documents should be logically unitized (*i.e.*, distinct documents shall not be merged into a single record, and single documents shall not be split into multiple records) and be produced in the order in which they are kept in the usual course of business.  If an original document

- 9 -

contains color, and the color is necessary to understand the meaning or content of the document, the document shall be produced as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image.  Multi-page OCR text for each document should also be provided.  The OCR software shall maximize text quality.  Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

## IV.    PRODUCTION OF ESI

1.      Format: Except where otherwise noted in this section, electronically stored information ("ESI") should be produced in single-page, black and white, TIFF Group IV, 300 DPI TIFF images.  Spreadsheet and presentation type files, audio and video files, photo or graphic images, and documents with tracked changes reflected in the metadata should be produced in native format.  Short message communications (*e.g.*, text messages, WhatsApp, Slack, iMessage, Teams, G-Chat, Bloomberg, etc.) will be produced in RSMF with all available metadata and attachments. Except for messages that contain privileged content, the complete communication will be produced, separated into 24-hour increments.  To the extent RSMF cannot be provided, the parties shall meet and confer on the appropriate metadata fields and format of production.  If an original document being produced in image format contains color, the document should be produced as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image.  Parties are under no obligation to enhance an image beyond how it was kept in the usual course of business.  TIFFs/JPGs should show any and all text, hidden content, and images that would be visible to the reader using the native software that created the document.  For example, TIFFs/JPGs of email messages should include the BCC line, and documents should display comments and hidden content.

2.      Format – Native Files: If a document is produced in RSMF or in native format, a single-page, Bates stamped image slip sheet stating the document has been produced in native format

should also be provided, with the exception of PowerPoint presentations.  PowerPoint documents should be produced in native format along with single-page, 300 DPI TIFF/JPG images which display both the slide and speaker's notes.  Each native file should be named according to the Bates number it has been assigned, and should be linked directly to its corresponding record in the load file using the NATIVELINK field.  To the extent that either party believes that specific documents or classes of documents, not already identified within this protocol, should be produced in native format, the parties should meet and confer in good faith.

      3.      De-Duplication: Each party shall remove exact duplicate documents based on MD5 or SHA-1 hash values, at the family level.  Attachments should not be eliminated as duplicates for purposes of production, unless the parent email and all attachments are also duplicates.  An email that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an email that does not include content in those fields, even if all remaining content in the email is identical.  Removal of near-duplicate documents and email thread suppression is not acceptable.  De-duplication should be done across the entire collection (global de-duplication) and the CUSTODIAN-ALL field should list each custodian, separated by a semicolon, who was a source of that document and the FILEPATH-DUP field will list each file path, separated by a semicolon, that was a source of that document.  Should the CUSTODIAN-ALL or FILEPATH-DUP metadata fields produced become outdated due to rolling productions, an overlay file providing all the custodians and file paths for the affected documents should be produced prior to substantial completion of the document production.

      4.      Technology-Assisted Review: Predictive coding/technology-assisted review shall not be used for the purpose of culling the documents to be reviewed or produced without notifying the requesting party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies.

5.      Metadata: All ESI shall be produced with a delimited, database load file that contains the metadata fields listed in Table 1, attached hereto.  The metadata produced should have the correct encoding to enable preservation of the documents' original language.  For ESI other than email and e-docs that do not conform to the metadata listed in Table 1, such as text messages, Instant Bloomberg, iMessage, Google Chat, Yammer, Slack, Google Docs, etc., the parties should meet and confer as to the appropriate metadata fields to be produced.

6.      Embedded Objects: Embedded files shall be produced as attachments to the document that contained the embedded file, with the parent/child relationship preserved.  The embedded files should be marked with a "YES" in the load file under the "Is Embedded" metadata field.  The parties agree logos need not be extracted as separate documents as long as they are displayed in the parent document.

7.      Attachments: If any part of an email or its attachments is responsive, the entire email and attachments should be produced, except any attachments that must be withheld or redacted on the basis of privilege.  The parties should meet and confer about whether there is an appropriate basis for withholding a family document for any reason other than attorney-client or work product privilege.  The attachments should be produced sequentially after the parent email.  The parties shall use their best efforts to collect and produce point-in-time documents that are links in documents and emails, including, but not limited to, Google G Suite, Microsoft 365, etc.  Documents extracted from links shall be populated with the BEGATTACH and ENDATTACH metadata fields to show the family relationship.  If documents cannot be extracted from links at the time of collection, the Parties agree to promptly meet and confer to discuss alternative methods of collection and production.

8.      Compressed File Types: Compressed file types (*e.g.*, .ZIP, .RAR, .CAB, .Z) should be decompressed so that the lowest level document or file is extracted.

9.      Structured Data: To the extent a response to discovery requires production of electronic information stored in a database, the parties should meet and confer regarding methods of production.  Parties should consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file.

10.      Exception Report: The producing party shall compile an exception report enumerating any unprocessed or unprocessable documents, their file type, and the file location.

11.      Encryption: To maximize the security of information in transit, any media on which documents are produced may be encrypted.  In such cases, the producing party shall transmit the encryption key or password to the receiving party, under separate cover, contemporaneously with sending the encrypted media.

12.      Redactions: If documents that the parties have agreed to produce in native format need to be redacted, the parties should implement redactions while ensuring that proper formatting and usability are maintained.  Spreadsheets requiring redaction should be redacted using native redaction software and produced in native format.

## V.      RELEVANT TIME PERIOD

Unless otherwise specifically indicated, the Requests herein refer to the period from January 1, 2020 to the present (the "Relevant Period"), and shall include documents and information that relate to such period, even if dated, prepared, generated, used, published, or received outside of the Relevant Period.  If a document prepared before this period is necessary for a correct or complete understanding of any document covered by a Request, you must produce the earlier document as well.  If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the Request.

- 13 -

## VI.    DOCUMENTS REQUESTED

<u>REQUEST NO. 1</u>:

All Documents produced to or received by You from the SEC concerning the SEC Investigation, including, without limitation, any document or discovery requests, whether formal or informal.

<u>REQUEST NO. 2</u>:

All transcripts of testimony, exhibits thereto or documents given by You to the SEC concerning the SEC Investigation.

<u>REQUEST NO. 3</u>:

All presentations given or produced to the SEC by You concerning the SEC Investigation.

<u>REQUEST NO. 4</u>:

All Documents cited to or referenced in any presentation given or produced to the SEC by You concerning the SEC Investigation.

<u>REQUEST NO. 5</u>:

All Communications between You and the SEC concerning the SEC Investigation, including, but not limited to, any correspondence, memoranda, discovery requests, or discovery responses.

<u>REQUEST NO. 6</u>:

All Documents produced or received by You from the DOJ concerning the DOJ Investigation, including, without limitation, any document or discovery requests, whether formal or informal.

<u>REQUEST NO. 7</u>:

All transcripts of testimony and exhibits thereto given by You to the DOJ concerning the DOJ Investigation.

- 14 -

REQUEST NO. 8:

All presentations given or produced to the DOJ by You concerning the DOJ Investigation.

REQUEST NO. 9:

All Documents cited to or referenced in any presentation given or produced to the DOJ by You concerning the DOJ Investigation.

REQUEST NO. 10:

All Communications between You and the DOJ concerning the DOJ Investigation, including, but not limited to, any correspondence, memoranda, discovery requests, or discovery responses.

REQUEST NO. 11:

All Documents produced to or received by You from the NIH concerning the NIH Investigation, including, without limitation, any document or discovery requests, whether formal or informal.

REQUEST NO. 12:

All transcripts of testimony and exhibits thereto given by You to the NIH concerning the NIH Investigation.

REQUEST NO. 13:

All presentations given or produced to the NIH by You concerning the NIH Investigation.

REQUEST NO. 14:

All Documents cited to or referenced in any presentation given or produced to the NIH by You concerning the NIH Investigation.

REQUEST NO. 15:

All Communications between You and the NIH concerning the NIH Investigation, including, but not limited to, any correspondence, memoranda, discovery requests, or discovery responses.

- 15 -

REQUEST NO. 16:

All Documents concerning CUNY's Inquiry Report as identified in ¶368 of the Complaint regarding your misconduct including, but not limited to, correspondence regarding such inquiry.

REQUEST NO. 17:

All Documents produced to or received by You from CUNY concerning to the CUNY Investigation, including, without limitation, any document or discovery requests, whether formal or informal.

REQUEST NO. 18:

All transcripts of testimony and exhibits thereto given by You to CUNY concerning the CUNY Investigation.

REQUEST NO. 19:

All transcripts of testimony, exhibits thereto or documents given by You to CUNY concerning the CUNY Investigation.

REQUEST NO. 20:

All presentations given or produced to CUNY by You concerning the CUNY Investigation.

REQUEST NO. 21:

All Documents cited to or referenced in any presentation given or produced to CUNY by You concerning the CUNY Investigation.

REQUEST NO. 22:

All Communications concerning the CUNY Investigation, including, but not limited to, any correspondence, memoranda, discovery requests, or discovery responses.

REQUEST NO. 23:

All Documents concerning any actual or potential Compensation from Cassava to You.  The scope of this Request is not limited by the Relevant Period.

- 16 -

REQUEST NO. 24:

All Documents concerning Cassava's funding of Your lab, including, all Documents related to donations, grants, direct payments, reimbursements, and supplies.

REQUEST NO. 25:

All Source Data for the images in Your and Dr. Burns' 2008 paper "High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor-Gs Coupling Underlying Opioid Tolerance and Dependence," published in *PLOS ONE*, including, but not limited to, Figure 7A.  The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 26:

All Documents concerning Your and Dr. Burns' 2008 paper "High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor-Gs Coupling Underlying Opioid Tolerance and Dependence," published in *PLOS ONE*, including, but not limited to, Communications with *PLOS ONE*.  The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 27:

All Source Data for the images in Your and Dr. Burns' 2012 *Journal of Neuroscience* paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A," including, but not limited to, Figure 1A, Figure 6B, Figure 9A, Figure 11A, Figure 12A, and Figure 8.  The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 28:

All Documents concerning Your and Dr. Burns' 2012 paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A," published in *Journal of Neuroscience*, including, but not limited to, Communications with *Journal of Neuroscience*.  The scope of this Request is not limited by the Relevant Period.

- 17 -

REQUEST NO. 29:

All Documents concerning the *Journal of Neuroscience's* November 10, 2021 Erratum regarding the paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A," including, but not limited to, all data You provided to the *Journal of Neuroscience* pertaining to the Erratum.

REQUEST NO. 30:

All Source Data for the images, and data underlying the charts, in Your and Dr. Burns' 2017 paper in *Neurobiology of Aging* "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis," including, but not limited to, Figure 12, Figure 8B, Figure 3B, Figure 6, Figure 7, Figure 1B, Figure 2A, and Figure 9.  The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 31:

All Documents concerning Your and Dr. Burns' 2017 paper "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis," published in *Neurobiology of Aging*, including, but not limited to, Communications with *Neurobiology of Aging*. The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 32:

All Documents reflecting use of Santa Cruz Biotechnology catalog # SC-5544 to detect alpha7 nAChR in the 2017 *Neurobiology of Aging* paper "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis" and the 2012 *Journal of Neuroscience* paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A."  The scope of this Request is not limited by the Relevant Period.

- 18 -

REQUEST NO. 33:

All Documents concerning *Neurobiology of Aging's* March 22, 2022 Expression of Concern regarding the paper "PTI-125 binds and reverses an altered conformation of filamin A to reduce Alzheimer's disease pathogenesis," including, but not limited to, all data provided to the journal.

REQUEST NO. 34:

All Documents concerning use of carbon-14 for detecting high affinity binding for Simufilam and filamin A in the 2017 *Neurobiology of Aging* paper "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis."  The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 35:

All Source Data for the images in Your and Dr. Burns' 2005 *Neuroscience* paper "Ultra-low-dose naloxone suppresses opioid tolerance, dependence and associated changes in mu opioid receptor-G protein coupling and Gbetagamma signaling," including, but limited to, Figure 5A, Figure 5B, Figure 12A, Figure 2, and Figure 3 The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 36:

All Documents concerning Your and Dr. Burns' 2005 paper "Ultra-low-dose naloxone suppresses opioid tolerance, dependence and associated changes in mu opioid receptor-G coupling and Gbetagamma signaling," published in *Neuroscience*, including, but not limited to, Communications with *Neuroscience* and an Expression of Concern contemplated by the journal. The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 37:

All Documents concerning *Neuroscience's* December 21, 2021 Editorial Note regarding the paper "Ultra-low-dose naloxone suppresses opioid tolerance, dependence and associated changes in

- 19 -

mu opioid receptor-G protein coupling and Gbetagamma signaling," including, but not limited to, all data You provided to the journal.

REQUEST NO. 38:

All Source Data for the images, and data underlying the charts, in Your poster entitled "SavaDx, a Novel Plasma Biomarker to Detect Alzheimer's Disease, Confirms Mechanism of Action of Simufilam," presented at the 2021 Alzheimer's Association International Conference, including, but not limited to, Figure 4, Figure 5, Figure 2, and Figure 1.

REQUEST NO. 39:

All Source Data for the images in Your and Drs. Burns, Barbier and Friedmann's 2020 *Journal of Prevention of Alzheimer's Disease* article entitled, "PTI-125 Reduces Biomarkers of Alzheimer's Disease in Patients," including, but not limited to, Figure 3A, Figure 4C, and Figure 5A. The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 40:

All Documents concerning Your and Drs. Burns, Barbier and Friedmann's 2020 paper "PTI-125 Reduces Biomakers of Alzheimer's Disease in Patients," published in *The Journal of Prevention of Alzheimer's Disease*, including, but not limited to, Communications with *The Journal of Prevention of Alzheimer's Disease*.

REQUEST NO. 41:

All Source Data for the images, and data underlying the charts, in Cassava's 12th International Conference on Clinical Trials on Alzheimer's Disease presentation in 2020, entitled "Sumifilam [sic] Significantly Improves Eleven CSF Biomarkers in a Randomized, Placebo-controlled, One-month Clinical Trial in Alzheimer's Disease Patients," including, but not limited to, Figure 3A.

- 20 -

REQUEST NO. 42:

All Source Data for the images in Your and Dr. Burns' 2006 *Journal of Neurobiology* paper, "Gbetagamma that interacts with adenylyl cyclase in opioid tolerance originates from a Gs protein," including, but not limited to, Figure 3.  The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 43:

All Documents concerning Your and Dr. Burns' 2006 paper "Gbetagamma that interacts with adenylyl cyclase in opioid tolerance originates from a Gs protein," published in *Journal of Neurobiology*, including, but not limited to, Communications with *Journal of Neurobiology*.  The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 44:

All Source Data for the images in Your and Dr. Burns' 2008 *The Journal of Pain* paper, "Oxycodone Plus Ultra-Low-Dose Naltrexone Attenuates Neuropathic Pain and Associated μ-Opioid Receptor-Gs Coupling," including, but not limited to, Figure 1.  The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 45:

All Documents concerning Drs. Burns and Wang's 2008 paper "Oxycodone Plus Ultra-Low-Dose Naltrexone Attenuates Neuropathic Pain and Associated μ-Opioid Receptor-Gs Coupling," published in *The Journal of Pain*, including, but not limited to, Communications with *The Journal of Pain*.  The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 46:

All Documents received from, produced to and Communications with any academic journal inquiring about or referencing data manipulation, falsification, fabrication or duplication concerning

Cassava, Simufilam, SavaDx, or filamin A.  The scope of this Request is not limited by the Relevant Period.

REQUEST NO. 47:

All Documents concerning actual, potential, or alleged data manipulation, falsification, fabrication, or duplication concerning Cassava, Simufilam, SavaDx, or filamin A.

REQUEST NO. 48:

Calendars, date books, telephone logs, telephone bills (local, long distance, and cellular), time sheets, expense reports, visitor logs, and/or appointment books reflecting Cassava-related activities, maintained by you.

REQUEST NO. 49:

Documents sufficient to identify all personal and business phone numbers (including all cell phones), email addresses, Twitter accounts, Slack accounts, or accounts on other electronic messaging services (including, but not limited to, Signal, Telegram, WeChat, iMessage, and Duo) for You.

REQUEST NO. 50:

All electronic messages (including MMS, SMS, and messages sent over the internet using applications such as WhatsApp, Signal, Telegram, WeChat, iMessage, Facebook Messenger, Duo, Twitter (via direct message), Slack, and Google Chat) concerning Cassava sent from, or received by and among the following individuals, during the Relevant Period:

> (a)    Defendant Barbier;
>
> (b)    Defendant Burns;
>
> (c)    Defendant Schoen;
>
> (d)    Nadav Friedmann; and
>
> (e)    Dr. Wang.

REQUEST NO. 51:

All Documents regarding any Internet postings by or on behalf of You concerning Cassava or Simufilam or SavaDx, including Documents sufficient to identify any aliases or screen names used by or on behalf of You.

REQUEST NO. 52:

All Documents concerning the Bonus Plan and including, but is not limited to, Documents regarding actual or potential compensation under the plan.

REQUEST NO. 53:

All Documents concerning the results of Cassava's March 2019 Phase 2a trial for Simufilam.

REQUEST NO. 54:

All Documents concerning the results of Cassava's September 2019 Phase 2b trial for Simufilam, including any reanalysis of those results.

REQUEST NO. 55:

All Documents concerning the use of software or any other means to Modify any image, figure, x-ray, Western blot analysis, data, research, study, poster, article, or publication concerning Cassava, Simufilam, SavaDx, or filamin A.

REQUEST NO. 56:

All Documents concerning Your actual or contemplated Class Period transactions in Cassava Securities, including, but not limited to, trades, purchases, sales, and/or charitable gifts.

REQUEST NO. 57:

All Documents concerning the Citizen Petition.

- 23 -

**TABLE 1: METADATA FIELDS[1]**

| Field Name | Example / Format | Description |
| --- | --- | --- |
| BEGNO | ABC0000001  (Unique ID) | The Document ID number associated with the first page of a document. |
| ENDNO | ABC0000003  (Unique ID) | The Document ID number associated with the last page of a document. |
| BEGATTACH | ABC0000001  (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document. |
| ENDATTACH | ABC0000008  (Unique ID Parent-Child Relationships) | The Document ID number associated with the last page of the last attachment. |
| VOLUME | VOL001 | The name of CD, DVD, or Hard Drive. |
| RECORDTYPE | Options: eMail, Attachment, Scanned Doc, eFile | The record type of a document. |
| SENTDATE | MM/DD/YYYY | The date the email or calendar entry was sent. |
| SENTTIME | HH:MM | The time the email or calendar entry was sent. |
| RECEIVEDDATE | MM/DD/YYYY | The date the document was received. |
| RECEIVEDTIME | HH:MM | The time the document was received. |
| CREATEDATE | MM/DD/YYYY | The date the document was created. |
| CREATETIME | HH:MM | The time the document was created. |
| LASTMODDATE | MM/DD/YYYY | The date the document was last modified. |
| LASTMODTIME | HH:MM | The time the document was last modified. |
| MEETING START DATE | MM/DD/YYYY | Start date of calendar entry. |
| MEETING START TIME | HH:MM | Start time of calendar entry. |
| MEETING END DATE | MM/DD/YYYY | End date of calendar entry. |
| MEETING END TIME | HH:MM | End time of calendar entry. |
| FILEPATH | i.e. /Jsmith/PC/Users/Jsmith/Desktop | The file path from the location in which the document was stored in the usual course of business.  This field should be populated for both email and e-files. |
| FILEPATH-DUP | i.e.  //JSmith.pst/Inbox<br>/Network Share/Accounting/...<br>/TJohnsonPC/Users/TJohnson/My Documents/... | The file paths from the locations in which the duplicate documents were stored in the usual course of business.  This field should be populated for both email and e-files and separated by semicolons. |
| AUTHOR | jsmith | The author of a document from extracted metadata. |
| LASTEDITEDBY | jsmith | The name of the last person to edit the document from extracted metadata. |
| FROM | Joe Smith <jsmith@email.com> | The display name and email address of the author of an email/calendar item.  An email address should always be provided. |
| TO | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and email address of the recipient(s) of an email/calendar item.  An email address should always be provided for every email if a recipient existed. |
| CC | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and email address of the copyee(s) of an email/calendar item.  An email address should always be provided for every email if a copyee existed. |
| BCC | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and email address of the blind copyee(s) of an email or calendar item. An email address should always be provided for every email if a blind copyee existed. |
| SUBJECT | | The subject line of the email/calendar item. |
| MESSAGE TYPE | Appointment, Contact, Task, Distribution List, Message, etc. | An indication of the email system message type. |
| IMPORTANCE | Normal, Low, High | Email Importance Flag |
| TITLE | | The extracted document title of a document. |
| CUSTODIAN-ALL | Smith, Joe: Doe, Jane | All of the custodians of a document from which the document originated, separated by semicolons. |
| SOURCE | Computer, Mobile Phone, Email, Network Share, Database Name, etc. | The source from which the document was collected. |
| ATTACH COUNT | Numeric | The number of attachments to a document. |
| FILEEXT | XLS | The file extension of a document. |
| FILENAME | Document Name.xls | The file name of a document. |
| FILESIZE | Numeric | The file size of a document (including embedded attachments). |
| IS EMBEDDED | Yes or No | The yes/no indicator of whether a file is embedded in another document. |
| HASH | | The MD5 or SHA-1 Hash value or "de-duplication key" assigned to a document.  The same hash method (MD5 or SHA-1) should be used throughout production. |
| CONVERSATION INDEX | | ID used to tie together email threads. |
| REDACTED | Yes or Blank | If a document contains a redaction, this field will display 'Yes'. |
| TIMEZONE PROCESSED | PST, CST, EST, etc | The time zone the document was processed in.  **NOTE**: This should be the time zone where the documents were located at time of collection. |
| NATIVELINK | D:\NATIVES\ABC0000001.xls | The full path to a native copy of a document. |
| FULLTEXT | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document.  There should be a folder on the deliverable, containing a separate text file per document.  These text files should be named with their corresponding Bates numbers. **Note**: Emails should include header information: author, recipient, cc, bcc, date, subject, etc.  If the attachment or e-file does not extract any text, then OCR for the document should be provided. |

[1]For ESI other than email and e-docs that do not conform to the metadata listed here, such as text messages, Instant Bloomberg, iMessage, Google Chat, Yammer, Slack, etc., the parties will meet and confer as to the appropriate metadata fields to be produced.

# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re CASSAVA SCIENCES, INC. SECURITIES LITIGATION | Civil No. 1:21-cv-00751-DAE |

## NON-PARTY HOAU-YAN WANG'S OBJECTIONS AND RESPONSES TO SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Non-Party Dr. Hoau-Yan Wang ("Dr. Wang") submits the following Responses and Objections ("Responses") to Plaintiffs Mohamman Bozorgi and Ken Calderon's ("Plaintiffs") Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action ("Subpoena"), dated June 13, 2023. Upon request, Dr. Wang is available to meet and confer with Plaintiffs to discuss his Responses.

## GENERAL OBJECTIONS

Dr. Wang asserts the following general objections ("General Objections"), which are incorporated by reference into each of the Responses below. These General Objections govern the scope of any Response made by Dr. Wang to the Requests herein and are neither waived nor limited by the Responses.

1. Dr. Wang objects to the Requests on the grounds that they are overly broad, unduly burdensome, seek irrelevant information and are not proportional to the needs of the underlying case considering the parties' relative access to relevant information, and because the burden or expense of the proposed discovery on a non-party outweighs its likely benefit.

-1-

2.      Dr. Wang objects to the Requests to the extent they seek responsive materials in the possession, custody or control of a party and to the extent they seek information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party.

3.      Dr. Wang objects to the Requests, under Fed. R. Civ. P. 45(d)(3)(A)(iii), to the extent they call for information protected from discovery by the attorney-client privilege, work product doctrine, or any other exemption from discovery.

4.      Dr. Wang objects to the Requests, under Fed. R. Civ. P. 45(d)(3)(b)(i), to the extent they seek confidential or proprietary business or financial information, analysis, or documents, protected commercial, financial, competitively sensitive or trade secret information, analysis, or documents, or other materials that Dr. Wang is prohibited by law or contract from providing, including but not limited to restrictions imposed on Dr. Wang by his employer, the City University of New York ("CUNY").

## **OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION**

**REQUEST NO. 1.** All Documents produced to or received by You from the SEC concerning the SEC Investigation, including, without limitation, any document or discovery requests, whether formal or informal.

**RESPONSE**: Dr. Wang objects to this Request to the extent it is overly broad, unduly burdensome, or seeks irrelevant information. After a reasonable and diligent search, however, Dr. Wang will produce all discoverable Documents or discovery requests produced to or received by Dr. Wang from the SEC concerning the SEC Investigation.

**REQUEST NO. 2.**  All transcripts of testimony, exhibits thereto or documents given by You to the SEC concerning the SEC Investigation.

**RESPONSE:** None.

-2-

**REQUEST NO. 3.**  All presentations given or produced to the SEC by You concerning the SEC Investigation.

**RESPONSE:**  None.

**REQUEST NO. 4.**  All Documents cited to or referenced in any presentation given or produced to the SEC by You concerning the SEC Investigation.

**RESPONSE:**  None.

**REQUEST NO. 5.**   All Communications between You and the SEC concerning the SEC Investigation, including, but not limited to, any correspondence, memoranda, discovery requests, or discovery responses.

**RESPONSE:**  Dr. Wang objects to this Request to the extent it is overly broad, unduly burdensome, or calls for irrelevant information and to the extent that it is duplicative of Request 1. After a reasonable and diligent search, however, Dr. Wang will produce all discoverable Communications between Dr. Wang and the SEC concerning the SEC Investigation. Moreover, no responsive "memoranda" exist, and the request for "discovery requests or discovery responses" is duplicative of Request 1.

**REQUEST NO. 6.**  All Documents produced or received by You from the DOJ concerning the DOJ Investigation, including, without limitation, any document or discovery requests, whether formal or informal.

**RESPONSE:**  Dr. Wang objects to this Request to the extent it is overly broad, unduly burdensome, or seeks irrelevant information. After a reasonable and diligent search, however, Dr.

Wang will produce all discoverable Documents and discovery requests produced or received by Dr. Wang from the DOJ concerning the DOJ Investigation.

**REQUEST NO. 7.**  All transcripts of testimony and exhibits thereto given by You to the DOJ concerning the DOJ Investigation.

**RESPONSE:** None.

**REQUEST NO. 8.**  All presentations given or produced to the DOJ by You concerning the DOJ Investigation.

**RESPONSE:** None.

**REQUEST NO. 9.**  All Documents cited to or referenced in any presentation given or produced to the DOJ by You concerning the DOJ Investigation.

**RESPONSE:** None.

**REQUEST NO. 10.**  All Communications between You and the DOJ concerning the DOJ Investigation, including, but not limited to, any correspondence, memoranda, discovery requests, or discovery responses.

**RESPONSE:** Dr. Wang objects to this Request to the extent it is overly broad, unduly burdensome, or calls for irrelevant information and to the extent it is duplicative of Request 6. After a reasonable and diligent search, however, Dr. Wang will produce all discoverable Communications between Dr. Wang and the DOJ concerning the DOJ Investigation. Moreover, no responsive "memoranda" exist, and the request for "discovery requests or discovery responses" is duplicative of Request 6.

**REQUEST NO. 11.**  All Documents produced to or received by You from the NIH concerning the NIH Investigation, including, without limitation, any document or discovery requests, whether formal or informal.

**RESPONSE:**  None.

**REQUEST NO. 12.**  All transcripts of testimony and exhibits thereto given by You to the NIH concerning the NIH Investigation.

**RESPONSE:**  None.

**REQUEST NO. 13.**  All presentations given or produced to the NIH by You concerning the NIH Investigation.

**RESPONSE:**  None.

**REQUEST NO. 14.**  All Documents cited to or referenced in any presentation given or produced to the NIH by You concerning the NIH Investigation.

**RESPONSE:**  None.

**REQUEST NO. 15.**  All Communications between You and the NIH concerning the NIH Investigation, including, but not limited to, any correspondence, memoranda, discovery requests, or discovery responses.

**RESPONSE:**  None.

**REQUEST NO. 16.**  All Documents concerning CUNY's Inquiry Report as identified in ¶368 of the Complaint regarding your misconduct including, but not limited to, correspondence regarding such inquiry.

**RESPONSE:** Dr. Wang objects to this Request, under Fed. R. Civ. P. 45(d)(3)(B)(i), to the extent it seeks confidential or proprietary business or financial information, analysis, or documents, protected commercial, financial, competitively sensitive, or trade secret information, analysis or research, or other documents that Dr. Wang is prohibited by law or contract from providing, including but not limited to restrictions imposed on Dr. Wang by his employer, CUNY. Dr. Wang further objects to this Request, under Fed. R. Civ. P. 45(d)(3)(A)(iii), to the extent it calls for information outside the scope of discovery due to the attorney-client privilege, work product doctrine, or any other exemption from discovery.

**REQUEST NO. 17.** All Documents produced to or received by You from CUNY concerning to the CUNY Investigation, including, without limitation, any document or discovery requests, whether formal or informal.

**RESPONSE:** Dr. Wang objects to this Request, under Fed. R. Civ. P. 45(d)(3)(B)(i), to the extent it seeks confidential or proprietary business or financial information, analysis, or documents, protected commercial, financial, competitively sensitive, or trade secret information, analysis or research, or other documents Dr. Wang is prohibited by law or contract from providing, including but not limited to restrictions imposed on Dr. Wang by his employer, CUNY. Dr. Wang further objects to this Request, under Fed. R. Civ. P. 45(d)(3)(A)(iii), to the extent it calls for information outside the scope of discovery due to the attorney-client privilege, work product doctrine, or any other exemption from discovery.

**REQUEST NO. 18.** All transcripts of testimony and exhibits thereto given by You to CUNY concerning the CUNY Investigation.

**RESPONSE:** None.

-6-

**REQUEST NO. 19.**  All transcripts of testimony, exhibits thereto or documents given by You to CUNY concerning the CUNY Investigation.

**RESPONSE:**  Dr. Wang objects to this Request, under Fed. R. Civ. P. 45(d)(3)(B)(i), to the extent it seeks confidential or proprietary business or financial information, analysis, or documents, protected commercial, financial, competitively sensitive, or trade secret information, analysis or research, or other documents Dr. Wang is prohibited by law or contract from providing, including but not limited to restrictions imposed on Dr. Wang by his employer, CUNY. Dr. Wang further objects to this Request, under Fed. R. Civ. P. 45(d)(3)(A)(iii), to the extent it calls for information outside the scope of discovery due to the attorney-client privilege, work product doctrine, or any other exemption from discovery. Dr. Wang further objects to this Request on the basis that it is duplicative of Request 18 to the extent it calls for "transcripts of testimony or exhibits thereto" and of Request 17 to the extent it calls for "documents," and further responds that no "transcripts of testimony or exhibits thereto" exist.

**REQUEST NO. 20.**  All presentations given or produced to CUNY by You concerning the CUNY Investigation.

**RESPONSE:**  None.

**REQUEST NO. 21.**  All Documents cited to or referenced in any presentation given or produced to CUNY by You concerning the CUNY Investigation.

**RESPONSE:**  None.

**REQUEST NO. 22.**  All Communications concerning the CUNY Investigation, including, but not limited to, any correspondence, memoranda, discovery requests, or discovery responses.

**RESPONSE:** Dr. Wang objects to this Request, under Fed. R. Civ. P. 45(d)(3)(B)(i), to the extent it seeks confidential or proprietary business or financial information, analysis, or documents, protected commercial, financial, competitively sensitive, or trade secret information, analysis or research, or other documents Dr. Wang is prohibited by law or contract from providing, including but not limited to restrictions imposed on Dr. Wang by his employer, CUNY. Dr. Wang further objects to this Request, under Fed. R. Civ. P. 45(d)(3)(A)(iii), to the extent it calls for information outside the scope of discovery due to the attorney-client privilege, work product doctrine, or any other exemption from discovery. Dr. Wang further objects to this Request on the basis that it is duplicative of Request 17 to the extent it calls for "discovery requests or discovery responses" and of Request 16 to the extent it calls for "correspondence."

**REQUEST NO. 23.**  All Documents concerning any actual or potential Compensation from Cassava to You. The scope of this Request is not limited by the Relevant Period.

**RESPONSE:** Dr. Wang objects to this Request to the it seeks Documents that are duplicative or cumulative of Requests directed to Defendant Cassava Sciences, Inc. ("Cassava") and to the extent it seeks documents and information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period."

**REQUEST NO. 24.**  All Documents concerning Cassava's funding of Your lab, including, all Documents related to donations, grants, direct payments, reimbursements, and supplies.

**RESPONSE:** Dr. Wang objects to this Request to the it seeks Documents that are duplicative or cumulative of Requests directed to Defendant Cassava and to the extent it seeks documents and

information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request as duplicative of Request 23.

**REQUEST NO. 25.**  All Source Data for the images in Your and Dr. Burns' 2008 paper "High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor-Gs Coupling Underlying Opioid Tolerance and Dependence," published in *PLOS ONE,* including, but not limited to, Figure 7A. The scope of this Request is not limited by the Relevant Period.

**RESPONSE:**  Dr. Wang objects to the Request to the extent it seeks Source Data in the possession, custody or control of Defendants Lyndsay Burns ("Dr. Burns") or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period." To the extent such Source Data is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all Source Data for the images in Dr. Wang and Dr. Burns' 2008 paper "High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor-Gs Coupling Underlying Opioid Tolerance and Dependence," published in *PLOS ONE.*

**REQUEST NO. 26.**  All Documents concerning Your and Dr. Burns' 2008 paper "High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor-Gs Coupling Underlying Opioid Tolerance and Dependence," published in *PLOS ONE,* including, but not limited to, Communications with *PLOS ONE.* The scope of this Request is not limited by the Relevant Period.

**RESPONSE:**  Dr. Wang objects to the Request to the extent it seeks Documents and Communications in the possession, custody or control of Dr. Burns or Cassava on the grounds that

it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period" and as duplicative of Request 25. To the extent such responsive Documents or Communications are not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Documents concerning Dr. Wang and Dr. Burns' 2008 paper "High-Affinity Naloxone Binding to Filamin A Prevents Mu Opioid Receptor-Gs Coupling Underlying Opioid Tolerance and Dependence," published in *PLOS ONE*.

**REQUEST NO. 27.**   All Source Data for the images in Your and Dr. Burns' 2012 *Journal of Neuroscience* paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A," including, but not limited to, Figure 1A, Figure 6B, Figure 9A, Figure 11A, Figure 12A, and Figure 8. The scope of this Request is not limited by the Relevant Period.

**RESPONSE:**  Dr. Wang objects to the Request to the extent it seeks Source Data in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period." To the extent such Source Data is not in the possession, custody or control of Dr. Burns or Cassava, and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all Source Data for the images in Dr. Wang and Dr. Burns' 2012 *Journal of Neuroscience* paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A".

**REQUEST NO. 28.**  All Documents concerning Your and Dr. Burns' 2012 paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A," published in *Journal of Neuroscience,* including, but not limited to, Communications with *Journal of Neuroscience.* The scope of this Request is not limited by the Relevant Period.

**RESPONSE:** Dr. Wang objects to the Request to the extent it seeks Documents and Communications in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period" and as duplicative of Request 27. To the extent such information is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Documents and Communications concerning Dr. Wang and Dr. Burns' 2012 paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A," published in *Journal of Neuroscience*.

**REQUEST NO. 29.**  All Documents concerning the *Journal of Neuroscience's* November 10, 2021 Erratum regarding the paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A," including, but not limited to, all data You provided to the *Journal of Neuroscience* pertaining to the Erratum.

**RESPONSE:** Dr. Wang objects to the Request to the extent it seeks Documents and data in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request, under Fed. R. Civ. P. 45(d)(3)(A)(iii), to the

extent it calls for information outside the scope of discovery due to the attorney-client privilege, work product doctrine, or any other exemption from discovery. To the extent such information is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Documents and data concerning the *Journal of Neuroscience's* November 10, 2021 Erratum regarding the paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A".

**REQUEST NO. 30.** All Source Data for the images, and data underlying the charts, in Your and Dr. Burns' 2017 paper in *Neurobiology of Aging* "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis," including, but not limited to, Figure 12, Figure 8B, Figure 3B, Figure 6, Figure 7, Figure 1B, Figure 2A, and Figure 9. The scope of this Request is not limited by the Relevant Period.

**RESPONSE:** Dr. Wang objects to this Request to the extent it seeks Source Data in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period." To the extent such Source Data is not in the possession, custody or control of Dr. Burns or Cassava, and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all Source Data for the images, and data underlying the charts, in Wang's and Dr. Burns' 2017 paper in *Neurobiology of Aging* "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis".

**REQUEST NO. 31.**  All Documents concerning Your and Dr. Burns' 2017 paper "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis," published in *Neurobiology of Aging,* including, but not limited to, Communications with *Neurobiology of Aging.* The scope of this Request is not limited by the Relevant Period.

**RESPONSE:**  Dr. Wang objects to the Request to the extent it seeks Documents and Communications in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period" and as duplicative of Request 30. To the extent such information is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Documents concerning Dr. Wang and Dr. Burns' 2017 paper "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis," published in *Neurobiology of Aging.*

**REQUEST NO. 32.**  All Documents reflecting use of Santa Cruz Biotechnology catalog # SC-5544 to detect alpha7 nAChR in the 2017 *Neurobiology of Aging* paper "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis" and the 2012 *Journal of Neuroscience* paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A." The scope of this Request is not limited by the Relevant Period.

**RESPONSE:**  Dr. Wang objects to the Request to the extent it seeks Documents in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr.

Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period" and as duplicative of Request 28. To the extent such information is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Documents reflecting use of Santa Cruz Biotechnology catalog # SC-5544 to detect alpha7 nAChR in the 2017 *Neurobiology of Aging* paper "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis" and the 2012 *Journal of Neuroscience* paper "Reducing amyloid-related Alzheimer's disease pathogenesis by a small molecule targeting filamin A".

**REQUEST NO. 33.**   All Documents concerning *Neurobiology of Aging's* March 22, 2022 Expression of Concern regarding the paper "PTI-125 binds and reverses an altered conformation of filamin A to reduce Alzheimer's disease pathogenesis," including, but not limited to, all data provided to the journal.

**RESPONSE:** Dr. Wang objects to the Request to the extent it seeks Documents and data in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request, under Fed. R. Civ. P. 45(d)(3)(A)(iii), to the extent it calls for information outside the scope of discovery due to the attorney-client privilege, work product doctrine, or any other exemption from discovery. To the extent such information is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all Documents and data concerning *Neurobiology of Aging's* March 22, 2022 Expression of Concern regarding the paper

-14-

"PTI-125 binds and reverses an altered conformation of filamin A to reduce Alzheimer's disease pathogenesis".

**REQUEST NO. 34.**  All Documents concerning use of carbon-14 for detecting high affinity binding for Simufilam and filamin A in the 2017 *Neurobiology of Aging* paper "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis." The scope of this Request is not limited by the Relevant Period.

**RESPONSE:**  Dr. Wang objects to the Request to the extent it seeks Documents in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period" and as duplicative of Request 31. To the extent such information is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Documentsconcerning use of carbon-14 for detecting high affinity binding for Simufilam and filamin A in the 2017 *Neurobiology of Aging* paper "PTI-125 Binds and Reverses an Altered Conformation of Filamin A to Reduce Alzheimer's Disease Pathogenesis".

**REQUEST NO. 35.**  All Source Data for the images in Your and Dr. Burns' 2005 *Neuroscience* paper "Ultra-low-dose naloxone suppresses opioid tolerance, dependence and associated changes in mu opioid receptor-G protein coupling and Gbetagamma signaling," including, but limited to, Figure 5A, Figure 5B, Figure 12A, Figure 2, and Figure 3. The scope of this Request is not limited by the Relevant Period.

-15-

**RESPONSE:**  Dr. Wang objects to the Request to the extent it seeks Source Data in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period." To the extent such Source Data is not in the possession, custody or control of Dr. Burns or Cassava, and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Source Data for the images in Dr. Wang and Dr. Burns' 2005 *Neuroscience* paper "Ultra-low-dose naloxone suppresses opioid tolerance, dependence and associated changes in mu opioid receptor-G protein coupling and Gbetagamma signaling".

**REQUEST NO. 36.**  All Documents concerning Your and Dr. Burns' 2005 paper "Ultra-low-dose naloxone suppresses opioid tolerance, dependence and associated changes in mu opioid receptor-G coupling and Gbetagamma signaling," published in *Neuroscience,* including, but not limited to, Communications with *Neuroscience* and an Expression of Concern contemplated by the journal. The scope of this Request is not limited by the Relevant Period.

**RESPONSE:** Dr. Wang objects to the Request to the extent it seeks Documents and Communications in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period" and as duplicative of Request 30. To the extent such information is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Documents concerning Dr. Wang and Dr. Burns' 2005 paper "Ultra-

-16-

low-dose naloxone suppresses opioid tolerance, dependence and associated changes in mu opioid receptor-G coupling and Gbetagamma signaling," published in *Neuroscience*.

**REQUEST NO. 37.** All Documents concerning *Neuroscience's* December 21, 2021 Editorial Note regarding the paper "Ultra-low-dose naloxone suppresses opioid tolerance, dependence and associated changes in mu opioid receptor-G protein coupling and Gbetagamma signaling," including, but not limited to, all data You provided to the journal.

**RESPONSE:** Dr. Wang objects to the Request to the extent it seeks Documents and data in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request, under Fed. R. Civ. P. 45(d)(3)(A)(iii), to the extent it calls for information outside the scope of discovery due to the attorney-client privilege, work product doctrine, or any other exemption from discovery. To the extent such information is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all non-privileged, discoverable Documents and data concerning *Neuroscience's* December 21, 2021 Editorial Note regarding the paper "Ultra-low-dose naloxone suppresses opioid tolerance, dependence and associated changes in mu opioid receptor-G protein coupling and Gbetagamma signaling".

**REQUEST NO. 38.** All Source Data for the images, and data underlying the charts, in Your poster entitled "SavaDx, a Novel Plasma Biomarker to Detect Alzheimer's Disease, Confirms Mechanism of Action of Simufilam," presented at the 2021 Alzheimer's Association International Conference, including, but not limited to, Figure 4, Figure 5, Figure 2, and Figure 1.

**RESPONSE:**  Dr. Wang objects to the Request to the extent it seeks Source Data in the possession, custody or control of Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. To the extent such Source Data is not in the possession, custody or control of Cassava, and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all Source Data for the images and data underlying the charts in Dr. Wang's poster entitled "SavaDx, a Novel Plasma Biomarker to Detect Alzheimer's Disease, Confirms Mechanism of Action of Simufilam".

**REQUEST NO. 39.**  All Source Data for the images in Your and Drs. Burns, Barbier and Friedmann's 2020 *Journal of Prevention of Alzheimer's Disease* article entitled, "PTI-125 Reduces Biomarkers of Alzheimer's Disease in Patients," including, but not limited to, Figure 3A, Figure 4C, and Figure 5A. The scope of this Request is not limited by the Relevant Period.

**RESPONSE:**  Dr. Wang objects to the Request to the extent it seeks Source Data in the possession, custody or control of Dr. Burns, Defendant Remi Barbier ("Barbier"), Dr. Navad Friedmann, PhD, MD ("Dr. Friedmann"), or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overly broad as to time period because it goes beyond the "Relevant Period." To the extent such Source Data is not in the possession, custody or control of Dr. Burns, Barbier, Dr. Friedmann or Cassava, and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all Source Data for the images in Dr. Wang's and Dr. Burns, Barbier, and Dr. Friedmann's 2020 *Journal of Prevention of Alzheimer's Disease* article entitled, "PTI-125 Reduces Biomarkers of Alzheimer's Disease in Patients".

-18-

**REQUEST NO. 40.** All Documents concerning Your and Drs. Burns, Barbier and Friedmann's 2020 paper "PTI-125 Reduces Biomakers of Alzheimer's Disease in Patients," published in *The Journal of Prevention of Alzheimer's Disease,* including, but not limited to, Communications with *The Journal of Prevention of Alzheimer's Disease.*

**RESPONSE:** Dr. Wang objects to the Request to the extent it seeks Documents and Communications in the possession, custody or control of Dr. Burns, Barbier, Dr. Friedmann or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request as duplicative of Request 39. To the extent such information is not in the possession, custody or control of Dr. Burns, Barbier, Dr. Friedmann or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Documents and Communications concerning Dr. Wang's and Dr. Burns, Barbier, and Dr. Friedmann's 2020 paper "PTI-125 Reduces Biomakers of Alzheimer's Disease in Patients," published in *The Journal of Prevention of Alzheimer's Disease*.

**REQUEST NO. 41.** All Source Data for the images, and data underlying the charts, in Cassava's 12th International Conference on Clinical Trials on Alzheimer's Disease presentation in 2020, entitled "Sumifilam [sic] Significantly Improves Eleven CSF Biomarkers in a Randomized, Placebo-controlled, One-month Clinical Trial in Alzheimer's Disease Patients," including, but not limited to, Figure 3A.

**RESPONSE:** Dr. Wang objects to the Request to the extent it seeks Source Data in the possession, custody or control of Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request to the extent it is duplicative of Request 39. To the extent such Source Data

is not in the possession, custody or control of Cassava, and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Source Data for the images, and data underlying the charts, in Cassava's 12th International Conference on Clinical Trials on Alzheimer's Disease presentation in 2020, entitled "Sumifilam [sic] Significantly Improves Eleven CSF Biomarkers in a Randomized, Placebo-controlled, One-month Clinical Trial in Alzheimer's Disease Patients".

**REQUEST NO. 42.**  All Source Data for the images in Your and Dr. Burns' 2006 *Journal of Neurobiology* paper, "Gbetagamma that interacts with adenylyl cyclase in opioid tolerance originates from a Gs protein," including, but not limited to, Figure 3. The scope of this Request is not limited by the Relevant Period.

**RESPONSE:**  Dr. Wang objects to the Request to the extent it seeks Source Data in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. To the extent such Source Data is not in the possession, custody or control of Dr. Burns or Cassava, and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Source Data for the images in Dr. Wang and Dr. Burns' 2006 *Journal of Neurobiology* paper, "Gbetagamma that interacts with adenylyl cyclase in opioid tolerance originates from a Gs protein".

**REQUEST NO. 43.**  All Documents concerning Your and Dr. Burns' 2006 paper "Gbetagamma that interacts with adenylyl cyclase in opioid tolerance originates from a Gs protein," published in *Journal of Neurobiology,* including, but not limited to, Communications with *Journal of Neurobiology.* The scope of this Request is not limited by the Relevant Period.

-20-

**RESPONSE:** Dr. Wang objects to the Request to the extent it seeks Documents and Communications in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request as duplicative of Request 42. To the extent such information is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Documents concerning Dr. Wang and Dr. Burns' 2006 paper "Gbetagamma that interacts with adenylyl cyclase in opioid tolerance originates from a Gs protein," published in *Journal of Neurobiology*.

**REQUEST NO. 44.** All Source Data for the images in Your and Dr. Burns' 2008 *The Journal of Pain* paper, "Oxycodone Plus Ultra-Low-Dose Naltrexone Attenuates Neuropathic Pain and Associated µ-Opioid Receptor-Gs Coupling," including, but not limited to, Figure 1. The scope of this Request is not limited by the Relevant Period.

**RESPONSE:** Dr. Wang objects to the Request to the extent it seeks Source Data in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. To the extent such Source Data is not in the possession, custody or control of Dr. Burns or Cassava, and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Source Data for the images in Dr. Wang and Dr. Burns' 2008 *The Journal of Pain* paper, "Oxycodone Plus Ultra-Low-Dose Naltrexone Attenuates Neuropathic Pain and Associated µ-Opioid Receptor-Gs Coupling".

**REQUEST NO. 45.** All Documents concerning Drs. Burns and Wang's 2008 paper "Oxycodone Plus Ultra-Low-Dose Naltrexone Attenuates Neuropathic Pain and Associated μ-Opioid Receptor-Gs Coupling," published in *The Journal of Pain,* including, but not limited to, Communications with *The Journal of Pain.* The scope of this Request is not limited by the Relevant Period.

**RESPONSE:** Dr. Wang objects to the Request to the extent it seeks Documents and Communications in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request as duplicative of Request 44. To the extent such information is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all discoverable Documents and Communications concerning Drs. Burns and Dr. Wang's 2008 paper "Oxycodone Plus Ultra-Low-Dose Naltrexone Attenuates Neuropathic Pain and Associated μ-Opioid Receptor-Gs Coupling," published in *The Journal of Pain.*

**REQUEST NO. 46.** All Documents received from, produced to and Communications with any academic journal inquiring about or referencing data manipulation, falsification, fabrication or duplication concerning Cassava, Simufilam, SavaDx, or filamin A. The scope of this Request is not limited by the Relevant Period.

**RESPONSE:** Dr. Wang objects to the Request to the extent it seeks Documents and Communications in the possession, custody or control of Dr. Burns or Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. To the extent such information is not in the possession, custody or control of Dr. Burns or Cassava and therefore not equally obtainable, after a reasonable and diligent search, Dr. Wang will produce all Documents received from, produced to and

Communications with any academic journal inquiring about or referencing data manipulation, falsification, fabrication or duplication concerning Cassava, Simufilam, SavaDx, or filamin A.

**REQUEST NO. 47.**  All Documents concerning actual, potential, or alleged data manipulation, falsification, fabrication, or duplication concerning Cassava, Simufilam, SavaDx, or filamin A.

**RESPONSE:** Dr. Wang objects to this Request as duplicative and cumulative of Requests 16, 17, and 46. After a reasonable and diligent search, Dr. Wang was unable locate any responsive Documents beyond what will be produced in response to Requests 16, 17 and 46.

**REQUEST NO. 48.**  Calendars, date books, telephone logs, telephone bills (local, long distance, and cellular), time sheets, expense reports, visitor logs, and/or appointment books reflecting Cassava-related activities, maintained by you.

**RESPONSE:** Dr. Wang objects to this Request because it is overly broad, unduly burdensome, seeks irrelevant information and is not proportional to the needs of the underlying case considering the parties' relative access to relevant information and because the burden or expense of the proposed discovery on a non-party outweighs its likely benefit. Dr. Wang further objects to this Request to the extent it seeks calendar, telephone bills, expense reports or visitor logs in the possession, custody or control of Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. By way of further response, Dr. Wang has not and does not maintain date books, telephone logs, telephone bills, time sheets, expense reports, visitor logs, or appointment books reflecting Cassava-related activities. Nevertheless, after a reasonable and diligent search, Dr. Wang will produce discoverable calendar entries reflecting Cassava-related activities.

**REQUEST NO. 49.**  Documents sufficient to identify all personal and business phone numbers (including all cell phones), email addresses, Twitter accounts, Slack accounts, or accounts on other electronic messaging services (including, but not limited to, Signal, Telegram, WeChat, iMessage, and Duo) for You.

**RESPONSE:**  Dr. Wang does not use Twitter, Slack, Signal, Telegram, or Duo. Dr. Wang objects to the request for his electronic messaging services accounts because he does not use those accounts for Cassava-related purposes.  Dr. Wang will produce Documents sufficient to identify all personal and business phone numbers (including all cell phones) and email addresses, for Dr. Wang.

**REQUEST NO. 50.**  All electronic messages (including MMS, SMS, and messages sent over the internet using applications such as WhatsApp, Signal, Telegram, WeChat, iMessage, Facebook Messenger, Duo, Twitter (via direct message), Slack, and Google Chat) concerning Cassava sent from, or received by and among the following individuals, during the Relevant Period:

      (a) Defendant Barbier;

      (b) Defendant Burns;

      (c) Defendant Schoen;

      (d) Nadav Friedmann; and

      (e) Dr. Wang.

**RESPONSE:**  Dr. Wang objects to the Request under Fed. R. Civ. P. 45(d)(3)(A)(iii) to the extent it calls for information outside the scope of discovery due to the attorney-client privilege, work product doctrine, or any other exemption from discovery. Dr. Wang further objects to this Request because it seeks electronic messages concerning Cassava that are in the possession, custody or control of Cassava on the grounds that it seeks information that is equally obtainable from a more

convenient and less burdensome source than Dr. Wang, a non-party. Dr. Wang further objects to this Request on the grounds that it is overbroad, not reasonably tailored in scope, time, or subject matter, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 51.**  All Documents regarding any Internet postings by or on behalf of You concerning Cassava or Simufilam or SavaDx, including Documents sufficient to identify any aliases or screen names used by or on behalf of You.

**RESPONSE:**  None.

**REQUEST NO. 52.**  All Documents concerning the Bonus Plan and including, but is not limited to, Documents regarding actual or potential compensation under the plan.

**RESPONSE:**  Dr. Wang objects to this Request to the extent it seeks Documents in the possession, custody or control of Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party. In any event, after a reasonable and diligent search, Dr. Wang was unable to locate any responsive Documents concerning the Bonus Plan.

**REQUEST NO. 53.**  All Documents concerning the results of Cassava's March 2019 Phase 2a trial for Simufilam.

**RESPONSE:**  Dr. Wang objects to this Request because it seeks Documents in the possession, custody or control of Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party.

**REQUEST NO. 54.**  All Documents concerning the results of Cassava's September 2019 Phase 2b trial for Simufilam, including any reanalysis of those results.

**RESPONSE:**  Dr. Wang objects to this Request because it seeks Documents in the possession, custody or control of Cassava on the grounds that it seeks information that is equally obtainable from a more convenient and less burdensome source than Dr. Wang, a non-party.

**REQUEST NO. 55.**  All Documents concerning the use of software or any other means to Modify any image, figure, x-ray, Western blot analysis, data, research, study, poster, article, or publication concerning Cassava, Simufilam, SavaDx, or filamin A.

**RESPONSE:**  None.

**REQUEST NO. 56.**  All Documents concerning Your actual or contemplated Class Period transactions in Cassava Securities, including, but not limited to, trades, purchases, sales, and/or charitable gifts.

**RESPONSE:**  None.

**REQUEST NO. 57.**  All Documents concerning the Citizen Petition.

**RESPONSE:**  Dr. Wang objects to this Request under Fed. R. Civ. P. 45(d)(3)(A)(iii), to the extent it calls for information outside the scope of discovery due to the attorney-client privilege, work product doctrine, or any other exemption from discovery. In any event, after a reasonable and diligent search, Dr. Wang was unable locate any non-privileged Documents concerning the Citizen Petition, other than the Citizen Petition itself.

Dated: August 11, 2023                             Respectfully submitted,

-26-

**DYKEMA GOSSETT PLLC**

 */s/ Jennifer L. Beidel*
**JENNIFER L. BEIDEL, ESQ.**
39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304
248-203-0506
Attorney for Third-Party
Subpoena Recipient
Hoau-Yan Wang

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 11, 2023, the foregoing document was served via email on

counsel for Plaintiffs, Megan A. Rossi, at mrossi@rgrdlaw.com.


   /s/ Jennifer L. Beidel           
Jennifer L. Beidel

# EXHIBIT 10



**U.S. Department of Justice**

Criminal Division

*1400 New York Avenue, NW*
*Washington, DC 20009*

August 23, 2021

**Via Personal Service**
Hoau-Yan Wang
149 Kalos Street
Philadelphia, PA 19128

   Re: Grand Jury Subpoena for Records

Dear Mr. Wang:

   Attached please find a Grand Jury Subpoena for records in your custody. The attached Grand Jury Subpoena requires you to produce the requested documents to the Grand Jury.

   In lieu of personally appearing before the Grand Jury, you may choose to deliver the subpoenaed documents to the agent listed on the subpoena attachment. If you choose to do so, please also: (i) provide us with an inventory of all materials you are producing; and (ii) read and sign the attached "Certification of Records of Regularly Conducted Activity," provided that the information in the certification is true and accurate. This Certification will excuse you from appearing before the Grand Jury, and will allow the materials to be admitted into evidence at trial without the need for testimony of a business records custodian.

   The Government prefers that you not disclose the existence of, or the fact of your compliance with, this subpoena, although there is no legal prohibition from doing so. Any such disclosure could impede the Grand Jury's investigation in this matter and thereby interfere with the enforcement of the law. In the event you do elect to disclose this subpoena, or the fact of your compliance with this subpoena, to any person or entity, we request that you notify me at 202-616-2634 or Andrew.Tyler@usdoj.gov prior to making any such disclosure.

             Sincerely,

             */s/ Andrew R. Tyler*
             Andrew R. Tyler
             Trial Attorney, Market Integrity &
             Major Frauds Unit
             Fraud Section, Criminal Division
             U.S. Department of Justice

AO 110 (Rev. 06/09) Subpoena to Testify Before a Grand Jury

# UNITED STATES DISTRICT COURT
for the

District of Columbia

## SUBPOENA TO TESTIFY BEFORE A GRAND JURY

To:   Hoau-Yan Wang
149 Kalos Street
Philadelphia, PA 19128

**YOU ARE COMMANDED** to appear in this United States district court at the time, date, and place shown below to testify before the court's grand jury. When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place: U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA<br>U.S. Courthouse, 3rd Floor    Grand Jury # 21-5-51<br>333 Constitution Avenue, N.W.<br>Washington, D.C. 20001 | Date and Time:<br>**September 3, 2021 at 9:00 AM** |
|---|---|

You must also bring with you the following documents, electronically stored information, or objects: *Any and all documents described in the Attachment to the Grand Jury Subpoena.*

Although you are not required to do so, if it is more convenient for you, you may send the requested records, preferably in non-proprietary electronic format via FedEx, UPS or DHL in lieu of personally appearing before the Grand Jury on the date indicated.

Date: August 23, 2021

CLERK OF COURT

Signature of Clerk or Deputy Clerk

The name, address, telephone number and email of the federal prosecutor requesting this subpoena:

Andrew Tyler
Trial Attorney, Fraud Section
U.S. Department of Justice, Criminal Division
1400 New York Avenue, NW
Washington, DC 20530
202-616-2634
Andrew.Tyler@usdoj.gov

Hoau-Yan Wang
149 Kalos Street
Philadelphia, PA 19128

## **ATTACHMENT**
(Grand Jury Subpoena Dated August 23, 2021)

### I.   INSTRUCTIONS

A. In complying with this subpoena, you are required to produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agent, employee or representative acting on your behalf. You are also required to produce documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody or control of any third party.

B. No documents called for by this request shall be destroyed, modified, removed, transferred, or otherwise made inaccessible to the grand jury. If you have knowledge that any subpoenaed document has been destroyed, discarded or lost, identify the subpoenaed document and provide an explanation of the destruction, discarding, loss, or disposal, and the date at which the document was destroyed, discarded, or lost.

C. This subpoena is continuing in nature. Any document not produced because it has not been located or discovered by the return date shall be provided immediately upon location or discovery subsequent thereto with an explanation of why it was not located or discovered until the return date.

D. If you believe any responsive documents are protected by a privilege, please provide a privilege log which (1) identifies any and all responsive documents to which the privilege is asserted, (2) sets forth the date, type, addressee(s), author(s), general subject matter, and indicated or known circulation of the document, and (3) states the privilege asserted in sufficient detail to ascertain the validity of the claim of privilege.

E. Production with respect to each document shall include all electronic versions and data files from email applications, as well as from word processing, spreadsheet, database, or other electronic data repositories applicable to any attachments, and shall be provided to the grand jury where possible in its native file format and shall include all original metadata for each electronic documents or data file.

### II.   DEFINITIONS

A. "**Document**" means any written, recorded or graphic material of any kind that is in your possession, custody or control.  The term includes, but is not limited to: contracts; agreements; letters; telegrams; interoffice communications; memoranda; notes; reports; analyses;

WANG_CIV_0000003

worksheets; spreadsheets; notebooks; surveys; lists; outlines; schedules; pamphlets; newsletters; flyers; charts; logbooks; tabulations; compilations; studies; books; records; telephone books or messages; visitor books; calendar or diary entries; desk or appointment calendars; drafts; business cards; minutes or meetings or conferences; notes or memos or other records of telephone or other conversations or communications; electronic transmissions (including emails, text messages, instant messaging, chat rooms, electronic bulletin boards); ledgers; financial statements; bank statements; bills or invoices; purchase orders; receipts; photographs; microfilm; microfiche; audio and video tape or disc recordings; and computer printouts.  It also includes electronically stored data and electronic files, stored on file servers, e-mail servers, hard drives, or other electronic storage media within your control from which information can be obtained either directly or by translation through detection devices or readers.  Any such document is to be produced in reasonably usable form, electronic and searchable, along with instructions for reading the data.  Any such electronically stored information must be preserved in its native format. The term "document" includes the original (or a copy thereof if the original is not available) and all copies that differ in any respect from the original or that bear any notation, marking or information not on the original. "Document" shall also include all documents, materials, transmissions and information, including Electronically Stored Information within the meaning of the Federal Rules of Civil Procedure.

B. **"Electronically Stored Information"** or **"ESI"** shall mean the complete original and any non-identical copy (whether different from the original because of notations, different metadata, or otherwise), regardless of origin or location, of any writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any electronic medium from which information can be obtained either directly or, if necessary, after translation by you into a reasonably usable form. This includes, but is not limited to, electronic mail, instant messaging, videoconferencing, and other electronic correspondence (whether active, archived, or in a deleted items folder), word processing files, spreadsheets, databases, and video and sound recordings, whether stored on: cards; magnetic or electronic tapes; disks; computer hard drives, network shares or servers, or other drives; cloud-based platforms; cell phones, personal digital assistants ("PDAs"), computer tablets, or other mobile devices; or other storage media.

C. **"Referring to"** or **"relating to"** shall mean discussing, describing, reflecting, regarding, containing, analyzing, studying, reporting, commenting on, evidencing, constituting, setting forth, considering, recommending, concerning, or pertaining to, in whole or in part.

D. The terms **"including"** and **"includes"** shall be construed broadly so that specification of any particular type of document shall not be construed to exclude other types of documents that are nevertheless responsive but not specifically identified.

E. **"Communications"** refers to exchanges kept in any form, whether written, electronic, e-mail, text, telephone, or other, and is meant to be interpreted broadly in accordance with Federal Law.

WANG_CIV_0000004

F.  Entities identified by name, including Cassava Sciences, Inc., shall be construed broadly to include any subsidiary, affiliate, successor-in-interest, or related corporate entity, as well as any employee, representative, contractor, affiliate, or vendor.

## III.  REQUEST FOR DOCUMENTS

A.  For the period from January 1, 2018 to the present, all documents and communications – including, but not limited to, memoranda; spreadsheets; test results; test reports; letters; email communications; records and content of calls, text messages, voicemails, and other telephone or cellular phone correspondence; and attachments – related to:

1.  Cassava Sciences, Inc. ("Cassava") and the development and/or use of PT-125, PT-125DX, SavaDx, or Simufilam, including records regarding development, effectiveness, safety, or likelihood of being approved by the Food and Drug Administration ("FDA"), or its effect on the value of Cassava Sciences, Inc. securities.

2.  New drug applications and draft new drug applications for PT-125, PT-125DX, or Simufilam.

3.  Data supporting applications for, and obtained through, studies or clinical trials of PT-125, PT-125DX, SavaDx, and/or Simufilam.

4.  Communications with the FDA regarding PT-125, PT-125DX, SavaDx, or Simufilam.

5.  Funding by and correspondence with the National Institutes of Health for studies of PT-125, PT-125DX, SavaDx, or Simufilam.

6.  Presentations made by or on behalf of Cassava relating to PT-125, PT-125DX, SavaDx, or Simufilam, including but not limited to slide decks or posters shown to investors and the medical community and drafts thereof.

7.  Speeches, presentations, and data, including drafts of same, presented at the 2021 Alzheimer's Association International Conference ("AAIC"), and communications regarding planning for, and reaction to, Cassava's presentation at the 2021 AAIC.

8.  Personnel files and resumes for all individuals who worked on the testing or development of PT-125, PT-125DX, SavaDx, or Simufilam.

9.  Documents sufficient to identify each relationship between Cassava and any medical professional who made presentations on its behalf relating to PT-125, PT-125DX, SavaDx, or Simufilam, including any payments made to such individual.

WANG_CIV_0000005

10. Contracts with outside consultants or professionals regarding development or efficacy of PT-125, PT-125DX, SavaDx, or Simufilam; and any findings, reports, or correspondence from such groups regarding PT-125, PT-125DX, SavaDx, or Simufilam.

11. Trading in securities of Cassava Sciences, Inc.

12. Statements to investors, analysts, and members of the general public regarding the securities of Cassava Sciences, Inc.

\*\*\*

**IN LIEU OF YOUR PERSONAL APPEARANCE BEFORE THE GRAND JURY,** *subpoenaed materials may be turned over to* **Andrew Tyler, U.S. Department of Justice, 1400 New York Avenue NW, Third Floor, Washington, DC 20530, telephone number 202-616-2634, email address Andrew.Tyler@usdoj.gov or FBI Special Agent Jeffrey Weeks, 601 4th St NW, Washington, DC 20535, telephone number 703-686-6143, email address jweeks@fbi.gov.**